IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KROY IP HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1405-MN-SRF |
| | ) | |
| GROUPON, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.      INTRODUCTION

Presently before the court in this patent infringement action are the following motions:
(1) a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to
Federal Rule of Civil Procedure 12(b)(6), filed by defendant Groupon, Inc. ("Groupon") (D.I.
10); (2) Groupon's motion to transfer venue to the Northern District of California pursuant to 28
U.S.C. § 1404 (D.I. 17); and (3) plaintiff Kroy IP Holdings, LLC's ("Kroy") alternative motion
for stay of a decision pending jurisdictional and venue-related discovery (D.I. 26). For the
following reasons, I recommend that the court deny each of the pending motions.

### II.     BACKGROUND

Kroy is a limited liability company organized and existing under the laws of Delaware
with its principal place of business in Baltimore, Maryland. (D.I. 1 at ¶ 2) Kroy is the owner by
assignment of all right, title, and interest in and to U.S. Patent No. 6,061,660 ("the '660 patent").
(*Id.* at ¶ 8) The '660 patent, which was filed on March 18, 1998 and issued on May 9, 2000, is
entitled "System and Method for Incentive Programs And Award Fulfillment," and lists York
Eggleston and Andrey Ukhov as inventors. (*Id.*) The '660 patent claims an incentive program

builder with an award fulfillment system that permits multiple sponsors to customize and market incentive programs through a central market place using an interface. (*Id.* at ¶ 9)

Groupon is incorporated in Delaware and maintains its headquarters in Chicago, Illinois. (*Id.* at ¶ 3) Groupon operates online local commerce marketplaces to connect merchants to customers by offering goods and services at a discount through its website and mobile applications. (*Id.* at ¶ 4)

Kroy filed this lawsuit on October 6, 2017, accusing Groupon of infringing the '660 patent by making, using, offering to sell, selling, providing, maintaining, and/or supporting its website portals and applications. (*Id.* at ¶ 43) Specifically, Kroy identifies the following allegedly infringing platforms and applications launched by Groupon: Merchant Center for Groupon Stores, Merchant Center for Now! Deals, Deal Builder, and the rebranding of Groupon Merchant. (*Id.* at ¶¶ 31-40) Kroy asserts that Groupon infringes claims 1, 10, 16-21, 25, and 27-30 of the '660 patent. (*Id.* at ¶ 43) In the complaint, Kroy identifies independent claim 1 of the '660 patent as exemplary:

> A system for incentive program generation, comprising:
>
> a network;
>
> a sponsor computer connected to the network;
>
> a host computer connected to the network, the host computer having a server;
>
> an incentive program builder application, running on the server;
>
> a database of objects associated with parameters of the incentive program builder application; and
>
> an interface of the incentive program builder application for sponsor entry of parameters for an incentive program,

2

wherein the sponsor builds an incentive program by interacting with the incentive program builder application,

wherein the host computer is configured to receive input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors, receive second input from a consumer selecting an incentive program from among the plurality of incentive programs, issue an award to the consumer corresponding to the selected incentive program, receive a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program, and validate the award,

wherein the host, the sponsor, and the consumer are different entities, and

wherein the host and sponsor are different individuals or corporate entities.

(D.I. 1 at ¶ 45 (quoting '660 patent, claim 1)) Independent claim 10 adds that the award is delivered via "electronic card," and recites the generation of "code," claiming that the selectable code components for the incentive programs purchased by sponsors are catalogued and a list of those selected by the sponsor is recorded in a "table." ('660 patent, col. 48:22-26, 48:41-48)

The '660 specification acknowledges that "[i]ncentive award programs, in which companies contract with sponsoring companies for programs to promote sales of the sponsoring companies' products or services, are well-known." ('660 patent, col. 1:27–30) These programs "offer awards and incentives to modify behavior of individual customers and to direct the consumers to some pre-determined action, such as purchase of products or services upon visiting a retail site, viewing advertising, testing a product, or the like." (*Id.*, col. 1:36-40) However, the specification describes numerous advantages offered by the invention over traditional incentive programs, including the reduced costs of generating and administering the programs, the ease of tracking consumer participation in the programs, and improvements in fulfilling the awards or prizes won in the programs. ('660 patent, col. 1:47-2:55)

3

The specification also describes prior art incentive programs implemented on digital computers on the Internet, but stresses that "none of the existing systems address all of the problems inherent in known incentive programs, particularly the problem of the need for an incentive program system that conveniently tracks participation while offering automated generation of incentive programs and automated fulfillment of awards won in incentive programs." (*Id.*, col. 4:11–16) Specifically, computerized incentive programs offered on the Internet "are generally offered by a single sponsor and are generally limited to offering consumers the ability to participate in incentive programs," but "do not offer sponsors the ability to conveniently generate incentive programs, to track participation of consumers in multiple incentive programs, or to provide for automated fulfillment of awards." (*Id.*, col. 4:17-24) These prior art systems also lack efficient means for fulfilling awards promised in promotional campaigns. (*Id.*, col. 4:25-32) The '660 patent specification identifies the advantages of the patented invention as "provid[ing] consumer access to expanded incentive programs, using a conventional computer," "permit[ting] sponsors to build, buy, store, modify, offer, track and administer incentive programs," and permit[ting] sponsors and retailers to offer improved award fulfillment for participants in incentive programs." ('660 patent, col. 5:47–54)

## III. DISCUSSION

### A. Venue

#### 1. Legal standard

Section 1404(a) of Title 28 of the United States Code grants district courts the authority to transfer venue "[f]or the convenience of parties and witnesses, in the interests of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In accordance with the analytical framework described in *Helicos Biosciences Corp. v. Illumina,*

4

*Inc.*, 858 F. Supp. 2d 367 (D. Del. 2012), the court starts with the premise that a defendant's state of incorporation has always been "a predictable, legitimate venue for bringing suit" and that "a plaintiff, as the injured party, generally ha[s] been 'accorded [the] privilege of bringing an action where he chooses.'" 858 F. Supp. 2d at 371 (quoting *Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955)). The Third Circuit in *Jumara v. State Farm Insurance Co.* reminds the reader that "[t]he burden of establishing the need for transfer . . . rests with the movant" and that, "in ruling on defendants' motion, the plaintiff's choice of venue should not be lightly disturbed." 55 F.3d 873, 879 (3d Cir. 1995) (citation omitted).

The Third Circuit goes on to recognize that,

[i]n ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."

*Id.* (citation omitted). The Court then describes some of the "many variants of the private and public interests protected by the language of § 1404(a)." *Id.*

The private interests have included: plaintiff's forum of preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses – but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* (citations omitted).

5

## 2. Whether the case could have been brought in the Northern District of California

Considering these "jurisdictional guideposts," the court turns to the "difficult issue of federal comity" presented by transfer motions. *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 976 (3d Cir. 1988). The parties disagree as to whether the action could have been brought in the proposed transferee venue. Specifically, Kroy IP alleges that Groupon failed to meet its burden under § 1400(b) to establish that the Northern District of California would have personal jurisdiction over Groupon. (D.I. 27 at 6-7)

Venue in patent infringement suits is governed by 28 U.S.C. § 1400(b). *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1519 (2017). Section 1400(b) provides that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). A domestic corporation "resides" only in its state of incorporation. *TC Heartland*, 137 S. Ct. at 1521. Pursuant to this authority, venue in the Northern District of California would not be proper under the first prong of § 1400(b) because both Kroy and Groupon are incorporated in Delaware.

Under the second prong of § 1400(b), Groupon must show that it committed alleged acts of infringement in the proposed transferee district,[1] and Groupon must have a regular and established place of business in the proposed district. Patent infringement occurs whenever one "without authority makes, uses or sells any patented invention within the United States during

---

[1] Although the Federal Circuit recently determined that the plaintiff bears the burden of establishing proper venue under § 1400(b) upon a motion by the defendant challenging venue in a patent case, Kroy satisfied its burden under the first prong of the § 1400(b) inquiry by demonstrating that both parties reside in Delaware. *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018). The determination of whether the Northern District of California is an appropriate alternative venue under § 1400(b) is a separate inquiry.

6

the term of the patent therefor." 35 U.S.C. § 271(a). Groupon's development team for the accused website portals and applications works in Groupon's San Francisco and Palo Alto offices. (D.I. 20 at ¶¶ 8-9, 13) In addition, the accused website portals and applications are hosted on servers located in Groupon's data centers, including in San Jose, California. (*Id.* at ¶ 6) By making and using the accused website portals in the Northern District of California, Groupon has committed purported acts of infringement in the proposed transferee district.

Although Groupon is not headquartered in the proposed transferee district, the record shows that Groupon maintains regular and established places of business in its San Francisco and Palo Alto offices, where "a significant portion of Groupon's development team, including developers with knowledge of the accused 'website portals and applications,'" work. (*Id.* at ¶ 13) Where, as here, infringement is alleged to have occurred in the proposed transferee district and the defendant has a regular and established place of business there, transfer to the proposed venue is appropriate. *See Blackbird Tech LLC v. Cloudflare, Inc.*, C.A. No. 17-283-MSG, 17-284-MSG, 2017 WL 4543783, at \*3-4 (D. Del. Oct. 11, 2017). Accordingly, this action could have properly been brought in the Northern District of California.

## 3. Private Interests

### (a) Plaintiff's forum preference

Plaintiffs have historically been accorded the privilege of choosing their preferred venue for pursuing their claims. *See C. R. Bard, Inc. v. AngioDynamics, Inc.*, 156 F. Supp. 3d 540, 545 (D. Del. 2016). "It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice should not be lightly disturbed." *Shuttle v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (internal citation and quotation marks omitted). However, the Federal Circuit has accorded less deference to a

7

plaintiff's choice of forum when the plaintiff is not physically located in the chosen forum and the forum is therefore not inherently more convenient for the plaintiff. *In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1223 (Fed. Cir. 2011), *see Mitel Networks Corp. v. Facebook, Inc.*, 943 F. Supp. 2d 463, 469-70 (D. Del. 2013).

In the present action, Kroy does not allege that it has facilities, employees, or operations in Delaware. Kroy's choice of Delaware as a forum weighs in Kroy's favor, but not as strongly as it would if Kroy had a place of business in Delaware. *See IpVenture, Inc. v. Acer, Inc.*, 879 F. Supp. 2d 426, 431 (D. Del. 2012); *see also Symantec Corp. v. Zscaler, Inc.*, C.A. No. 17-806-MAK, D.I. 25 at 3-4 (D. Del. July 31, 2017) (citing *Memory Integrity, LLC v. Intel Corp.*, C.A. No. 13-1804-GMS, 2015 WL 632026, at *3 (D. Del. Feb. 13, 2015) (concluding that a non-practicing entity's choice of forum should receive limited deference because it had no physical presence in Delaware)). Consequently, Kroy's forum preference weighs slightly against transfer.

### (b) Defendant's forum preference

Groupon's preference to litigate in the Northern District of California, where Groupon maintains offices, employees, and a data center connected to the accused technology, weighs in favor of transfer. However, Groupon's preference is accorded less weight than Kroy's preference. *See Stephenson v. Game Show Network, LLC*, 933 F. Supp. 2d 674, 678 (D. Del. 2013) (citing *Cradle IP, LLC v. Texas Instruments, Inc.*, 923 F. Supp. 2d 696, 699-700 (D. Del. 2013)). This factor weighs slightly in favor of transfer.

### (c) Where the claim arose

A claim for patent infringement arises wherever someone has committed acts of infringement. *See generally* 35 U.S.C. § 271(a); *Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998) (an infringement claim "arises out of

8

instances of making, using, or selling the patented invention"). Groupon alleges that infringement claims have "deeper roots" in the forum where the accused products are developed, designed, and manufactured, but acknowledges that its own development team "is spread out in different parts of the country and the world." (D.I. 18 at 8) Because Groupon's allegedly infringing products are made, sold, and used nationwide, the asserted patent claims may be said to arise in Delaware. *See C. R. Bard, Inc. v. AngioDynamics, Inc.*, 156 F. Supp. 3d 540, 547 (D. Del. 2016) (finding that a patent claim arose in Delaware when the defendant sold products there); *Scientific Telecomm., LLC v. Adtran, Inc.*, C.A. No. 15-647-SLR, 2016 WL 1650760, at *1 (D. Del. Apr. 25, 2016) (holding that, despite ties to Alabama, the defendant operated on a global basis, and its incorporation in Delaware precluded arguments that the forum was inconvenient absent a showing of a unique or unexpected burden). This factor is neutral.

### (d) Convenience of the parties

In evaluating the convenience of the parties, a district court should focus on the parties' relative physical and financial condition. *See C. R. Bard*, 2016 WL 153033, at *3 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). When a party "accept[s] the benefits of incorporation under the laws of the State of Delaware, 'a company should not be successful in arguing that litigation' in Delaware is 'inconvenient,' 'absent some showing of a unique or unexpected burden.'" *Scientific Telecomm., LLC v. Adtran, Inc.*, C.A. No. 15-647-SLR, 2016 WL 1650760, at *1 (D. Del. Apr. 25, 2016) (quoting *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 573 (D. Del. 2001)). "Unless the defendant 'is truly regional in character' – that is, it operates essentially exclusively in a region that does not include Delaware – transfer is

9

almost always inappropriate." *Checkpoint*, 797 F. Supp. 2d at 477 (quoting *Praxair, Inc. v. ATMI, Inc.*, 2004 WL 883395, at \*1 (D. Del. Apr. 20, 2004)).

The record before the court reveals that Groupon is a multinational, well-funded corporation engaging in business throughout the United States. (D.I. 38 at 6) Defendants have not shown a unique or unexpected burden as required to support transfer under the relevant standard. *See Bristol-Myers Squibb Co. v. Merck & Co.*, C.A. No. 14-1131-GMS, 2015 WL 13683600, at \*1 n.1 (D. Del. Apr. 29, 2015) (finding no undue financial burden on a defendant corporation "with global reach and annual revenues in the billions."). Moreover, Groupon's allegations of inconvenience are contradicted by its choice to incorporate in Delaware. *See Genentech, Inc. v. Amgen Inc.*, C.A. No. 17-1407-GMS, 17-1471-GMS, 2018 WL 503253, at \*4 (D. Del. Jan. 22, 2018). This factor is neutral.

### (e) Location of books and records

The Third Circuit in *Jumara* advised that the location of books and records is only determinative if "the files c[an] not be produced in the alternative forum." 55 F.3d at 879. However, the Federal Circuit has explained that "[i]n patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). Nevertheless, courts within the District of Delaware have repeatedly recognized that technological advances have reduced the weight of this factor. *See, e.g., Intellectual Ventures I LLC, v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 485 (D. Del. 2011); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 208 (D. Del. 1998); *Nihon Tsushin Kabushiki Kaisha v. Davidson*, 595 F. Supp. 2d 363, 372 (D. Del. 2009). Today, "virtually all businesses maintain their books and records in electronic format readily available

for review and use at any location." *C.R. Bard*, 2016 WL 153033, at \*3; *see also Quest Integrity USA, LLC v. Clean Harbors Indus. Servs., Inc.*, 114 F. Supp. 3d 187, 191 (D. Del. 2015).

Groupon designed and developed the allegedly infringing technology in multiple locations, including the Northern District of California. (D.I. 20 at ¶ 7) None of the relevant evidence from any party or third party is likely to be physically located in Delaware. However, Groupon has not shown that relevant documents cannot be transported to Delaware. *See Cruise Control Techs. LLC v. Chrysler Group LLC*, C.A. No. 12-1755-GMS, 2014 WL 1304820, at \*4 (D. Del. Mar. 31, 2014) (concluding that location of books and records is only relevant "where the Defendants show that there are books and records that cannot be transported or transmitted to Delaware."). This factor weighs slightly in favor of transfer.

### (f) Convenience of the witnesses

The relevant inquiry with respect to convenience of the witnesses is not whether witnesses are inconvenienced by litigation, but rather, whether witnesses "actually may be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879. The inconvenience of travel does not demonstrate that witnesses would "actually be unavailable for trial," as required by *Jumara*. 55 F.3d 873, 879 (3d Cir. 1995). The court has previously found that

> travel expenses and inconveniences incurred for that purpose, by a Delaware defendant, [are] not overly burdensome. From a practical standpoint, much of the testimony presented at trial these days is presented via recorded depositions, as opposed to witnesses traveling and appearing live. There certainly is no obstacle to [a party] embracing this routine trial practice.

*Oracle Corp. v. epicRealm Licensing, LP*, No. Civ. 06-414-SLR, 2007 WL 901543, at \*4 (D. Del. Mar. 26, 2007).

Groupon identifies potential employee witnesses who reside in or near the Northern District of California, as well as Chicago, Illinois and Seattle, Washington. (D.I. 20 at ¶¶ 8-9,

11

13-14) Groupon also identifies three former employees and third party witnesses, including four prior artists, who reside in or near the Northern District of California, and three prior defendants who may be called as witnesses to agreements entered into with Kroy, who reside in or near California. (D.I. 20 at ¶¶ 10-12; D.I. 19 at ¶¶ 2-8) However, Groupon does not indicate that any of these potential witnesses would be unavailable for trial in Delaware, and provides minimal, if any, explanation as to why their testimony is necessary for trial. Because defendants have not identified any specific witnesses who cannot appear in Delaware for trial, this factor is neutral.

## 3. Public interests[2]

### (a) Practical considerations

Groupon contends that this factor is neutral because there are no related lawsuits in one of the forums. (D.I. 18 at 11-12) Kroy reiterates its arguments regarding private interest factors such as the convenience of the parties and witnesses in support of their position on practical considerations. (D.I. 27 at 16) Courts in this district have declined to "double-count" a party's arguments in such cases. *Contour IP Holding, LLC v. GoPro, Inc.*, C.A. No. 15-1108-LPS-CJB, 2017 WL 3189005, at *13 (D. Del. July 6, 2017). This factor is neutral.

### (b) Court congestion

Groupon alleges that this factor weighs in favor of transfer due to the judicial vacancies[3] on this court, citing statistics[4] regarding the current caseload in this district. (D.I. 18 at 12)

---

[2] The court notes that the parties do not dispute two of the public interest factors: (1) the enforceability of the judgment; and (2) the familiarity of the trial judge with the applicable state law in diversity cases. (D.I. 18 at 11, 13; D.I. 27 at 16-19) These factors are therefore neutral.
[3] Since the completion of briefing on the motion to transfer, the judicial vacancies have been filled.
[4] Kroy counters with statistics of its own, stating that the Northern District of California has 622 pending actions per judge to 515 per judge in this district, and noting that the average time to

However, "the case management orders [in this district] always start with the schedules proposed by the litigants . . . . [I]f there is a need to expedite proceedings, that need is generally accommodated by the court." *Godo Kaisha IP Bridge 1 v. OmniVision Techs., Inc.*, 246 F. Supp. 3d 1001, 1003-04 (D. Del. 2017). This factor is neutral.

### (c) Local interest

The local interest factor is generally neutral in patent litigation because patent cases "implicate[] constitutionally protected property rights, [are] governed by federal law reviewed by a court of appeals of national (as opposed to regional) stature, and affect[] national (if not global) markets." *C.R. Bard, Inc. v. Angiodynamics, Inc.*, 156 F. Supp. 3d 540, 547 (D. Del. 2016) (citing *Cradle IP v. Texas Instruments, Inc.*, 923 F. Supp. 2d 696, 700-01 (D. Del. 2013)); *see also Tessera*, 2017 WL 1065865, at *11. However, Groupon contends that the Northern District of California has a local interest in this litigation because Groupon maintains one of its main technical development hub and data centers in the district. (D.I. 18 at 12-13) Groupon has admitted that its development team and offices are spread across the country. (D.I. 20 at ¶ 7) Because Kroy brings only a federal patent law claim, the local interest factor is neutral.

### (d) Public policy

Kroy contends that the public policy factor weighs against transfer because both Groupon and Kroy are incorporated in Delaware. (D.I. 27 at 19) "The public policy of Delaware encourages the use by Delaware corporations of Delaware as a forum resolution of business disputes." *Graphics Props. Holdings Inc. v. Asus Computer Int'l, Inc.*, 964 F. Supp. 2d 320, 331 (D. Del. 2013) (quoting *Wacoh Co. v. Kionix Inc.*, 845 F. Supp. 2d 597, 609 n.9 (D. Del. 2012)).

trial in civil cases is faster in Delaware than it is in the Northern District of California. (D.I. 27 at 17)

13

"Delaware promotes itself as a place that entities should choose as their corporate home, and in doing so, touts itself as a forum well-positioned to help resolve business disputes." *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, C.A. No. , 2015 WL 4778828, at \*15 (D. Del. Aug. 13, 2015) (citing *Wacoh Co. v. Kionix Inc.*, 845 F. Supp. 2d 597, 609 n.9 (D. Del. 2012)). Because Kroy and Groupon are Delaware corporations, this factor weighs against transfer.

### 4. Transfer analysis summary

As a whole, the *Jumara* factors weigh against transfer. Although Kroy's forum preference is given slightly less deference because Kroy does not maintain a place of business in Delaware, it is accorded more weight than Groupon's choice of forum. Groupon has shown that, while some of the relevant evidence and witnesses are located in the Northern District of California, Groupon's operations are spread across the United States. Moreover, Groupon has not shown that the evidence and witnesses would be unavailable if the case is not transferred. Public policy considerations weigh against transfer because both Kroy and Groupon are Delaware corporations. The remaining factors are neutral. For these reasons, I recommend that the court deny Groupon's motion to transfer venue.

## B. Motion to Stay Pending Jurisdictional / Venue-Related Discovery

Kroy alternatively moves to stay a decision on Groupon's motion to transfer pending jurisdictional and venue-related discovery, and supplemental briefing on the resultant discovery. (D.I. 27 at 19-20) Kroy indicates that it seeks a stay and discovery only in the event that the court is inclined to grant Groupon's motion to transfer on the present record. (5/22/18 Tr. at 97:3-8) Groupon opposes the motion to stay, alleging that there is "[n]o justifiable reason . . . to delay resolution" of the motion to transfer. (D.I. 31 at 9) Having recommended denial of

14

Groupon's motion to transfer based on the evidence of record, Kroy's motion to stay is moot. Consequently, I recommend that the court deny Kroy's alternative motion to stay.

## C. Patentability Under § 101

### 1. Legal standard

Groupon moves to dismiss the pending action pursuant to Rule 12(b)(6), which permits a party to seek dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). According to Groupon, Kroy's complaint fails to state a claim because the patents-in-suit are ineligible for patent protection under 35 U.S.C. § 101.

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). However, "a court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (quoting *Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 931 (Fed. Cir. 2014)).

Section 101 provides that patentable subject matter extends to four broad categories, including "new and useful process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). The Supreme Court recognizes three exceptions to the statutory subject matter eligibility requirements: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Supreme Court has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men . . . free to all men and reserved exclusively to none.'" *Id.* at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). At issue in the present case is the third category pertaining to abstract ideas, which "embodies the longstanding rule that an idea of itself is not

16

patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (internal quotations omitted).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), the Supreme Court articulated a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. In accordance with the first step of the *Alice* test, the court must determine whether the claims at issue are directed to a patent-ineligible concept. *See id.* If so, the court must turn to the second step, under which the court must identify an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (certain quotation marks omitted). The two steps are "plainly related" and "involve overlapping scrutiny of the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

At step one, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."). However, "courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (internal quotation marks omitted). "Whether at step one or step two of the *Alice* test, in determining the patentability of a method, a court must look

17

to the claims as an ordered combination, without ignoring the requirements of the individual steps." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed. Cir. 2016).

At step two, the Federal Circuit instructs courts to "look to both the claim as a whole and the individual claim elements to determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *McRO*, 837 F.3d at 1312 (internal brackets and quotation marks omitted). Under the step two inquiry, the court must consider whether claim elements "simply recite 'well-understood, routine, conventional activit[ies].'" *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2359). "Simply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted).

The Federal Circuit looks to the claims as well as the specification in performing the "inventive concept" inquiry. *See Affinity Labs of Texas v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) ("[N]either the claim nor the specification reveals any concrete way of employing a customized user interface."). "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. In *Bascom*, the Federal Circuit held that "the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," but nonetheless determined that the patent adequately alleged an ordered combination of these limitations to be patent-eligible under step 2 at the pleading stage. *Id.* at 1349.

The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention" under step two. *Alice*, 134 S. Ct. at 2358. "Given the

18

ubiquity of computers . . . wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.* (internal citation and quotation marks omitted). For the second step of the *Alice* framework, the machine-or-transformation test may provide a "useful clue," although it is not determinative. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)). A claimed process can be patent-eligible under § 101 consistent with the machine-or-transformation test if it "uses a particular machine or apparatus" and does not "pre-empt[5] uses of the principle that do not also use the specified machine or apparatus in the manner claimed." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2010), *aff'd sub nom.*, *Bilski v. Kappos*, 561 U.S. 593 (2010).

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016) (applying regional circuit law to the *de novo* review of a district court's patent eligibility determination under § 101 on a Rule 12(b)(6) motion to dismiss). However, the Federal Circuit recently emphasized that, "like many legal questions,

---

[5] At both steps one and two of the *Alice* inquiry, the Federal Circuit considers the issue of preemption to determine whether a patent is not directed to a specific invention and instead would monopolize "the basic tools of scientific and technological work," thereby "imped[ing] innovation more than it would tend to promote it" and "thwarting the primary object of the patent laws." *Alice*, 134 S. Ct. at 2354; *see also McRO*, 837 F.3d at 1315 (applying the doctrine of preemption and concluding that a claim was patent-eligible at step one); *Bascom*, 827 F.3d at 1350 (applying the doctrine of preemption and concluding that a claim was patent-eligible at step 2). "[T]he focus of preemption goes hand-in-hand with the inventive concept requirement." *Jedi Techs., Inc. v. Spark Networks, Inc.*, C.A. No. 16-1055-GMS, 2017 WL 3315279, at *8 n.2 (D. Del. Aug. 3, 2017) (quoting *Tenon & Groove, LLC v. Plusgrade S.E.C.*, C.A. No. 12-1118-GMS, 2015 WL 1133213, at *4 (D. Del. Mar. 11, 2015)). However, "the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).

19

there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact[]" that goes beyond what was simply known in the prior art. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). On a motion to dismiss, this question of fact, like all questions of fact, must be resolved in the plaintiff's favor. *Aatrix Software, Inc.*, 882 F.3d at 1128.

## 2. Analysis

As a preliminary matter, the court addresses the parties' disagreement as to whether claim 1 of the '660 patent is adequately representative of the remaining asserted claims.[6] Kroy accuses Groupon of failing to meet its burden to establish how claim 1 of the '660 patent is representative of claim 10, which teaches a way of protecting the proprietary nature of the host's underlying source code through the combination of an interpreter program and an executor program. (D.I. 14 at 13-14) At oral argument on the pending motion, counsel for Groupon indicated that the court need not spend a substantial amount of time on the issue because Groupon's briefing separately addresses independent claim 10 and asserted claims depending from claim 1. (5/22/18 Tr. at 6:10-17) A review of the parties' briefing supports Groupon's assertion. (D.I. 11 at 15-19; D.I. 16 at 3-8; 5/22/18 Tr. at 6:10-17) Groupon's identification of claim 1 as "representative" does not substantively alter the court's analysis where, as here, Groupon separately addresses independent claim 10 and the asserted dependent claims.[7]

---

[6] The asserted claims of the '660 patent are independent claims 1 and 10, and dependent claims 16-21, 25, and 27-30. (D.I. 1 at ¶ 43)

[7] The court's conclusion on this point should not be construed as acceptance of Groupon's decision to label claim 1 a "representative" claim. In evaluating whether a representative claim

20

**(a)** *Alice* **Step 1**

At step one of the *Alice* inquiry, Groupon relies on a 2015 decision from the Eastern

District of Texas in *Kroy IP Holdings, LLC v. Safeway, Inc.* ("*Safeway*"), which rendered United

States Patent No. 7,054,830 ("the '830 patent") invalid under 35 U.S.C. § 101. The *Safeway*

court determined that the '830 patent, which has a specification identical to the '660 patent

specification, was directed to the abstract idea of "providing a computer-based incentive award

program." 107 F. Supp. 3d 677, 690 (E.D. Tex. 2015). After conducting a thorough analysis of

Supreme Court and Federal Circuit precedent,[8] the *Safeway* court held that "[u]sing a computer

and a computer-based network to provide and operate such an incentive award program does not

is sufficiently representative of the remaining asserted claims, the court considers whether all
non-representative claims are "adequately represented by the representative claim (i.e., do *all* of
the challenged claims relate to the *same* abstract idea and do any of the non-representative
claims add one or more inventive concepts that would result in patent eligibility)." *Cronos
Techs., LLC v. Expedia, Inc.*, C.A. No. 13-1538-LPS, 2015 WL 5234040, at \*2 (D. Del. Sept. 8,
2015). Groupon bears the burden of proof to establish the exemplary nature of claim 1. *See
Diamond Grading Techs. Inc. v. Am. Gem Soc'y*, 2016 WL 5719700, at \*4 (E.D. Tex. Sept. 12,
2016) (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d
1343, 1348 (Fed. Cir. 2014)) ("When the movant relies on a representative claim in its § 101
analysis, it bears the burden of showing that the other asserted claims are 'substantially similar
and linked to the same abstract idea.'"). On the present record, Groupon has not met its burden
of showing that claim 1 is sufficiently representative of independent claim 10 in particular,
which contains unique limitations. Specifically, claim 10 expands upon the incentive program
builder application recited in claim 1 by adding an electronic card for award fulfillment, an editor
for generating an electronic file containing an incentive program code, a classification
application program, and a combination of a generator application program and an executor
application that assists in maintaining the proprietary nature of the host's source code. ('660
patent, col. 47:66-48:48)

[8]The *Safeway* court specifically analyzed the Supreme Court's decisions in *Bilski v. Kappos*, 561
U.S. 593 (2010), *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289
(2012), and *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), as well as the
Federal Circuit's decisions in *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014),
*Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343 (Fed. Cir. 2014),
*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014), *Accenture Global Services,
GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013), *Bancorp Services, L.L.C. v.
Sun Life Assurance Co.*, 687 F.3d 1266 (Fed. Cir. 2012), and *DDR Holdings, LLC v. Hotels.com,
L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

render the idea any less abstract or any more patentable." *Id.* at 691. Comparing the claimed incentive award program to the financial or business operations at issue in *Bilski* and *Alice*, the *Safeway* court emphasized that "the addition of novel or non-routine components to an abstract idea do not necessarily 'turn an abstraction into something concrete.'" *Id.* (quoting *Ultramercial*, 772 F.3d at 715).

However, the claims of the '830 patent differ substantively from the asserted claims of the '660 patent. The analysis based on the common specification is therefore of limited utility in the present analysis. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012) ("In considering patent eligibility under § 101, one must focus on the claims."). Moreover, since the court's 2015 decision in *Safeway*, the Federal Circuit has rendered several decisions offering further clarification of the § 101 inquiry. Consequently, the court proceeds to an analysis of the specific asserted claims of the '660 patent in the context of the most recent binding precedent from the Federal Circuit.

"[T]he first step in the *Alice* inquiry . . . asks whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335-36. Applying the first step of the *Alice* framework to the asserted claims, the court concludes that the claims of the '660 patent are not directed to an improvement in the functioning of a computer, but instead are directed to the abstract idea of using generic computer components to create and implement incentive award programs. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (concluding that claims were directed to an abstract idea because "the recited physical components merely provide a generic environment in which to carry out the abstract idea. . . ."). Claim 1 of the reexamined '660 patent begins by

22

generally reciting a system comprising a sponsor computer and a host computer connected to a

network, an incentive program builder application running on the server of the host computer, a

database, and an interface:

> A system for incentive program generation, comprising:
>
> a network;
>
> a sponsor computer connected to the network;
>
> a host computer connected to the network, the host computer having a server;
>
> an incentive program builder application, running on the server;
>
> a database of objects associated with parameters of the incentive program builder application; and
>
> an interface of the incentive program builder application for sponsor entry of parameters for an incentive program,
>
> wherein the sponsor builds an incentive program by interacting with the incentive program builder application,
>
> wherein the host computer is configured to receive input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors, receive second input from a consumer selecting an incentive program from among the plurality of incentive programs, issue an award to the consumer corresponding to the selected incentive program, receive a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program, and validate the award,
>
> wherein the host, the sponsor, and the consumer are different entities, and
>
> wherein the host and sponsor are different individuals or corporate entities.

('660 patent Reexam Cert., col. 1:23-54) The remainder of claim 1 describes the components of

the claimed system in functional terms. (*Id.*) In *In re TLI Communications LLC Patent*

*Litigation*, the Federal Circuit rejected the notion that such claims "directed to the use of

23

conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two," are not abstract. 823 F.3d 607, 612 (Fed. Cir. 2016). Automating the generation of incentive programs, absent an improvement to the functionality of the computer itself, is insufficient to render the '660 patent eligible under 35 U.S.C. § 101. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (concluding that the automation of the fundamental economic concept of offer-based price optimization through the use of generic-computer functions was abstract).

The asserted claims depending from claim 1 add only descriptions of business models regarding the respective roles of the host and sponsor, as well as conventional computer components such as an interface and a website.[9] These claims do not disclose a specific improvement to computer functionality as required at step one. Independent claim 10 likewise fails to recite a specific improvement to computer functionality:

> A system for incentive program generation and award fulfillment, comprising:
>
> a host computer connected to a network;
>
> a client computer of a consumer connected to the network;
>
> a sponsor computer of a sponsor connected to the network;

---

[9] Specifically, claim 16 adds that the incentive program must be "a promotion of the sponsor offered to the consumer and facilitated by the host." ('660 patent Reexam Cert., col. 2:63-64) Claim 17 requires the host computer to be "configured to host a website of the host through which the sponsor builds the incentive program." (*Id.*, col. 2:65-67) Claim 18 recites an interface "configured to allow the sponsor to build the incentive program by interacting with the interface through the website of the host." (*Id.*, col. 3:1-3) Claim 19 provides that the interface "receiv[es] the sponsor entry of the parameters." (*Id.*, col. 3:4-6) Claims 20, 21, 25, 27, and 28 specify that the parameters entered by the sponsor comprise "a duration," "a start date," "a location for fulfillment," "a discount offered," and "a service offered." (*Id.*, col. 3:7-10; 3:19-20; 3:23-26)

24

an incentive participation application program for participation by the consumer in an incentive program, wherein the participation may be in incentive programs of a plurality of sponsors;

a server of the host computer;

a web site, located on the server of the host computer, wherein the consumer may participate in an incentive program via the web site;

a database of the host computer of awards associated with the incentive participation application programs;

an award association application program for associating an award with an incentive program;

a fulfillment automation application program for associating a fulfillment method with an award;

an electronic card for fulfillment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program; and

an incentive builder application program, running on the server of the host computer, wherein the sponsor may build an incentive program by interacting with the incentive builder application program, wherein the incentive builder application program comprises a database of objects associated with incentive programs, wherein each object is associated with an action that is associated with the incentive program, an interface for permitting a sponsor to enter parameters associated with an incentive program, an object association application for associating objects with the parameters entered by a sponsor and building a file comprising the objects associated with all of the parameters entered by a sponsor, an editor for generating an electronic file containing code for the incentive program, a classifying application program for classifying the code in numbers that represent the elements of the code, a generator application program for generating tables of the numbers that represent the code for the incentive program, and an executor application that is capable of interpreting the tables and executing the code.

('660 patent, col. 47:66-48:48) The addition of a claimed award association application

program, fulfillment automation application program, object association application, editor,

classifying application program, generator application program, and executor application in

25

claim 10 are functional recitations. (*Id.*, col. 48:17-48) These limitations describe steps to create an incentive program, using only standard computer functions to perform ordinary tasks. The '660 patent specification, which offers no further elaboration on how these claimed elements work, establishes that these steps and functions are conventional in the realm of computerized incentive program creation. The electronic card recited in claim 10 of the '660 patent is also conventional according to the specification: "The card may be any conventional electronic payment card." ('660 patent, col. 22:44-45)

Although the '660 patent specification provides additional context to the asserted claims, the Federal Circuit has cautioned that these details cannot transform the asserted claims into "a concrete implementation of the abstract idea" because the focus of the § 101 inquiry is on the language of the claims themselves. *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016). Nonetheless, the '660 patent specification does not adequately support Kroy's position that the claims are directed to an improvement in computer functionality. (D.I. 14 at 7-8; 5/22/18 Tr. at 43:20-24) The specification explains that "[c]omputers have been used in connection with incentive programs," "[c]omputer-based systems exist for tracking some aspects of consumer participation in incentive programs," and "[c]omputer incentive programs are offered on the Internet." ('660 patent, col. 2:63-64; 3:21-22; 4:17) Moreover, "[c]omputer systems and methods for generation of computer software programs based on underlying data are also known," ('660 patent, col. 5:29-31).

Kroy asserts that the incentive program builder application, in particular, "solves specific technical problems in the prior art and improves the efficiency and operation of those systems." (D.I. 14 at 8) However, the specification describes the claimed incentive program builder application as generically including "any computer file that contains data in a format for being

accessed and processed by the processing unit of a computer." (*Id.*, col. 7:27-30) The claimed

incentive programs "are prepackaged application programs, typically written in languages

suitable for conventional, graphics-based, on-line computer games, such as Java or C++.

Incentive programs may be any type of program that results in a 'winning' activity." (*Id.*, col.

30:10-14) In building the incentive program, the application combines "preexisting code for

each of the individual components into larger files that embody the entire incentive program."

(*Id.*, col. 32:15-20) The invention otherwise requires only conventional computer components,[10]

and is accessible "to consumers who have standard computer hardware and software." ('660

patent, col. 5:38-61; 10:38-12:11) Instead of reciting improvements to computer functionality,

the specification emphasizes the conventional nature of the claimed computer components.

Several recent cases from the Federal Circuit are factually analogous and support the

court's conclusion that the asserted claims of the '660 patent are directed to an abstract idea, with

no improvement to the functionality of a computer. In *In re TLI Communications LLC Patent

Litigation*, the claims recited a "method for recording and administering digital images,"

including "recording images using a digital pick up unit in a telephone unit," digitally storing

them, transmitting the images and classification information to a server, and storing the images

in the server based on the classification information. 823 F.3d 607, 610 (Fed. Cir. 2016). The

Federal Circuit concluded that the disputed claim used only conventional computer components

to implement the abstract idea of "classifying and storing digital images in an organized

---

[10] Conventional computer components recited in the specification include "any conventional
server, such as DEC server with a UNIX operating system, ('660 patent, col. 23:32-34), a
network such as the Internet, or one using "any other conventional or proprietary transfer
protocol," (*id.*, col. 7:24-26), an interface using "any conventional browser, such as Netscape
Navigator, Microsoft Explorer, or the like," (*id.*, col. 37:40-41), and a "conventional database,
such as an Oracle database," (*id.*, 45:28-30).

manner." *Id.* at 613. Similar to the circumstances before the Federal Circuit in *In re TLI*, the specification of the '660 patent describes the invention in functional terms, identifying "a standard personal computer and a commonplace web browser" that permit a consumer to "access dynamic applications and content that are stored on the web server." ('660 patent, col. 10:38-42)

Beyond claiming that "the sponsor builds an incentive program by interacting with the incentive program builder application," the asserted claims of the '660 patent do not describe how a sponsor may implement the incentive builder application program to build an incentive program. ('660 patent Reexam Cert., col. 1:36-38) In *Affinity Labs of Texas, LLC v. DirecTV, LLC*, the Federal Circuit held that claiming the function of "wirelessly communicating regional broadcast content to an out-of-region recipient," without claiming a particular way of performing the function, rendered the patent ineligible. 838 F.3d 1253, 1258-59 (Fed. Cir. 2016). Similar to the asserted claims of the '660 patent, the patent at issue in *Affinity Labs* included a display that allowed the user to select particular content via a user interface. *Id.* at 1256, 1261. The Federal Circuit drew a comparison to the technology at issue in *In re TLI* and *Ultramercial*, both of which also broadly "involve[d] the conveyance and manipulation of information using . . . computer technology." *Id.* at 1261. The Federal Circuit ruled that "the claim is drawn to the idea itself," and held that limiting the idea to the particular technological environment "does not render the claims any less abstract." *Id.* Applying these authorities to the asserted claims of the '660 patent, I recommend that the court find the asserted claims of the '660 patent directed to an abstract idea.

Most recently, in *SAP America, Inc. v. InvestPic, LLC*, the Federal Circuit held that claims directed to systems and methods for performing certain statistical analyses of investment information were ineligible under § 101 "because their innovation is an innovation in ineligible

subject matter. . . . No matter how much of an advance in the . . . field the claims recite, the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm." 898 F.3d 1161, 1163 (Fed. Cir. 2018). Like the asserted claims of the '660 patent, the Federal Circuit observed that the claims did not identify an improved computer or network. "[I]ndeed, the specification makes clear that off-the-shelf computer technology is usable to carry out the analysis." *Id.* at 1168. The '660 patent's reliance on self-described conventional computer components implemented over the Internet is therefore insufficient to establish patent eligibility under § 101.

Kroy contends that the asserted claims of the '660 patent are comparable to the claims considered by the Federal Circuit in *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018). In *Core Wireless*, the asserted claims were directed to an improved user interface for computing devices. The Federal Circuit determined that the claims were not abstract because, "[a]lthough the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices." *Id.* at 1362. The claim language recited an application summary reached directly from a menu listing a limited set of data. *Id.* at 1362-63. The specification identified improved efficiencies on devices with small screens resulting from the reduced navigation required. *Id.*

In contrast, the '660 patent does not identify increased efficiencies in the function of the claimed computer components. Although sponsors relying on the disclosure of the '660 patent gain the benefit of designing their own incentive programs, this results from the automation of a task previously performed by software engineers hired to develop incentive programs for retailers. As previously discussed, the automation of an abstract concept is not sufficient to

29

render it patent-eligible under § 101. *See OIP Techs.*, 788 F.3d at 1363. Despite the alleged improvements identified by Kroy, the '660 patent does not claim a manner of decreasing the amount of memory, storage, or processing required by a computer to develop an incentive program, and instead shifts these requirements from the retailer computer to a centrally-located host computer. (5/22/18 Tr. at 20:3-25) The advances at the core of the '660 patent claims are derived from the Internet's provision of shared resources and communications used to access multiple applications, as opposed to an improved computer functionality. (*Id.*, col. 3:46-52) Unlike the claims at issue in *Core Wireless*, the alleged improvements in the asserted claims of the '660 patent do not change the functionality of the computer itself.

The facts before the Federal Circuit in other recent cases are also distinguishable. In *Enfish*, the claimed self-referential table was "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." 822 F.3d at 1338-39. In *Thales Visionix Inc. v. United States*, the use of conventional sensors and a mathematical equation did not render the claims ineligible because the claims identified a particular configuration of the sensors and a particular way of using the raw data that eliminated problems inherent in prior art methods. 850 F.3d 1343, 1348-49 (Fed. Cir. 2017). In *Visual Memory LLC v. NVIDIA Corp.*, the claims were directed to an improved computer memory system which eliminated the need to design a separate memory system for each type of processor. 867 F.3d 1253, 1259 (Fed. Cir. 2017). Finally, in *Finjan, Inc. v. Blue Coat Systems, Inc.*, the Federal Circuit upheld the patent eligibility of claims directed to a behavior-based virus scanning method that "employ[ed] a new kind of file that enables a computer security system to do things it could not do before," such as accumulating and utilizing behavior-based information about potential threats. 879 F.3d 1299, 1304-05 (Fed. Cir. 2018).

In contrast to each of these claimed advancements, the '660 patent claims and specification do not identify any improvements to the functionality of the computer itself. The '660 patent claims no improved data structure, new configuration of standard components, or novel computer file. Instead, the improvements described in the '660 patent identify the automation of the incentive program building process, and a variety of standard computer components, neither of which is sufficient to establish an improvement to computer functionality under recent Federal Circuit precedent.

### (b)  *Alice* **Step Two**

In determining whether a patent describes an inventive concept at step two of the *Alice* inquiry, the Federal Circuit recently indicated that "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact," and must be established by clear and convincing evidence. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)). "The mere fact that something is disclosed in a piece of prior art . . . does not mean it was well-understood, routine, and conventional." *Id.* at 1369.

In the case at bar, questions of fact remain as to whether the asserted claims of the '660 patent were conventional at the time of the patent, and unresolved issues of claim construction could potentially bear on the analysis. Consequently, I recommend that the court deny Groupon's motion to dismiss pending consideration of additional evidence outside the scope of the pleadings. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). This is consistent with the procedure followed in *Safeway*, in which the court considered expert testimony in evaluating the merits of the defendant's motion for summary

31

judgment pursuant to 35 U.S.C. § 101. *See Safeway*, 107 F. Supp. 3d 677, 701-02 (E.D. Tex. 2015).

## IV.    CONCLUSION

For the foregoing reasons, I recommend that the court deny defendants' motion to transfer (D.I. 21), and deny defendants' motion to dismiss pursuant to Rule 12(b)(6) (D.I. 16).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: October 9, 2018

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

32