# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

M2M SOLUTIONS LLC and BLACKBIRD
TECH LLC d/b/a BLACKBIRD
TECHNOLOGIES,

        Plaintiffs,

   v.

SIERRA WIRELESS AMERICA, INC. and
SIERRA WIRELESS INC.,

        Defendants.

Civil Action No. 14-cv-01102-RGA

MEMORANDUM

The Magistrate Judge filed a Report and Recommendation ("the Report") (D.I. 203) on

Defendants' Motion for Summary Judgment. (D.I. 165). The Report recommends granting

summary judgment of noninfringement under the doctrine of equivalents, granting the motion

with regard to the "exclusive set of numbers" limitation, and denying summary judgment on all

remaining issues. (*Id.* at 1). The Report further recommends denying Defendants' *Daubert*

motion to exclude Mr. Wacek's expert testimony and granting Defendants' *Daubert* motion to

exclude Mr. Geier's expert testimony. (*Id.*).

Both parties have filed Objections and Responses to various aspects of the Report. (D.I.

208, 209, 211, 212). I will ADOPT its recommendations to which there is no objection.

I will review each objection in turn.

## I.    BACKGROUND

The instant case concerns claims 25-27 of U.S. Patent No. 8,648,717 (the '717 Patent).

The '717 Patent discloses a programmable communication device which can establish a

communication link with a monitored technical device and authenticate transmissions. '717

1

Patent 14:54-67, 15:1-18. After several IPRs and the Court's claim construction, which are detailed in the Report, only claims 25-27 survive. (*See* D.I. 203 at 2-4).

Defendants (collectively "Sierra") moved for summary judgment on the grounds of collateral estoppel, law of the case,[1] unpatentable subject matter under § 101, noninfringement under the doctrine of equivalents, noninfringement of the "exclusive set of numbers" limitation, noninfringement by the accused non-SIM embedded module products of the "processing module" or "configured to use a memory" limitations, noninfringement by the AR7552 of the "processing module" or "configured to use a memory" limitations, and noninfringement of "programmable communication" limitation. (D.I. 166). Sierra also moved to exclude the testimony of Mr. Wacek and Mr. Geier under *Daubert*. (*Id*. at 36-40).

The Report set forth the relevant facts and law and I will not repeat them here. I review all objections to the summary judgment rulings *de novo*. 28 U.S.C. § 636(b)(1). I review the *Daubert* rulings under the more deferential "clearly erroneous and contrary to law" standard. *See Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc*., 61 F. Supp. 3d 437, 441 (D. Del. 2014).

## II.    DISCUSSION

### A. Plaintiffs' Objections

M2M objects to the Report's conclusions on noninfringement and the exclusion of the expert opinion of Mr. Geier. (D.I. 208 at 1). The Report recommended granting summary judgment of noninfringement as to the "exclusive set of numbers" limitation after finding that

---

[1] Sierra dropped its motion for summary judgment based on the law of the case doctrine. (D.I. 203 at 14).

2

M2M did not identify a disputed issue of fact sufficient to indicate that the Accused Products satisfied this limitation. (D.I. 203 at 24).

In the Claim Construction Order, I explained that the "exclusive set of numbers" limitation is not restricted to a "particular type" of transmission. (D.I. 140 at 13). Sierra's expert, Dr. Negus, performed testing on the accused products which indicated that they were capable of sending transmissions to numbers outside of those on the "exclusive list." (D.I. 203 at 24 (citing D.I. 167, Ex. O at ¶¶ 60-99)). As described in the Report, M2M's expert, Mr. Geier, objected that Dr. Negus' testing was seriously flawed. (*See id.*). However, M2M did not move to exclude or challenge Dr. Negus' report under *Daubert*. (*Id*. at 24 n.9).

The Report found summary judgment appropriate because Mr. Geier had "confirmed" Dr. Negus' conclusions when he stated that the Accused Products "may allow outgoing data transmissions to addresses that have not been stored in the secure phonebook." (*Id*. at 24 (citing D.I. 178, Ex. 3 at ¶¶ 22-41, 44, 137)).

M2M argues that its expert's objections to the methodology of Dr. Negus' report and its expert's statement, "I disagree that Dr. Negus's testing shows that my infringement conclusions were incorrect, or that the Accused products do not infringe the asserted claims," creates a dispute of material fact. (D.I. 208 at 3). Additionally, M2M asserts that the Report misinterpreted Mr. Geier's statement (quoted above) and that the term "may" should not be read as confirmation of Dr. Negus' test results. (D.I. 208 at 4-5).

While I agree that Mr. Geier may not have intended to confirm the results, I concur with the Report's findings that M2M has not pointed to a disputed issue of fact sufficient to survive summary judgment. M2M does not cite to any evidence in the record that suggests that the Accused Products can only make outgoing transmissions to an exclusive set of numbers

consistent with the claim limitation; instead, M2M's briefing criticizes the methodology

employed by Dr. Negus. (*Id.* at 3). M2M's objections may be the appropriate subject of a

*Daubert* motion, but M2M does not cite any authority for the proposition that critiquing an

expert's methodology in the absence of a motion to exclude the testimony is sufficient to create a

material dispute of fact.

I also agree with the Report's finding that Mr. Geier's opinions regarding the "exclusive

set of numbers" are inconsistent with the Court's claim construction. (D.I. 203 at 41).[2] As such,

I ADOPT the conclusions of the Report and Recommendation as to the "exclusive set of

numbers" limitation and Mr. Geier's testimony.

## B. Defendants' Objections

Sierra objects to the Report's findings as to collateral estoppel. (D.I. 209 at 1). The

Report concluded that the PTAB's invalidity determinations as to claims 1, 12, 24, and 29 made

during the IPR proceedings should not be extended to claims 25-27. (D.I. 203 at 9). Sierra

argues that the Report's conclusion is inconsistent with Federal Circuit precedent, citing *XY v.*

*Trans Ova*, 890 F.3d 1282 (Fed. Cir. 2018). (D.I. 209 at 3).

In the underlying briefing, Sierra argued that all four prongs of the Third Circuit's test for

issue preclusion are satisfied. (D.I. 166 at 8). First, based on similarities of claim language, there

is an "identity of issues" between claims 25-27 and those litigated and invalidated before the

---

[2] M2M states that they are not objecting to the Report's findings on claim construction but that Mr. Geier's statements on the "exclusive set of numbers" limitations were made in response to Dr. Negus' interpretation of the term. (D.I. 208 at 4 n.3). Regardless, as M2M does not object to the Report's findings on claim construction, I find no clear error in the Report's conclusion that the cited statements from Mr. Geier are inconsistent with the Court's claim construction order. If M2M wished to challenge what Dr. Negus says about the claim term, M2M could have challenged the cited expert report under *Daubert*. Further, M2M does not provide any disputed statements from Dr. Negus for the Court's review, only a single paragraph from Mr. Geier's expert report. (*See id.* (citing D.I. 178, Ex. 3 at ¶ 136)).

PTAB. (*Id* at 7-11).  Second, the relevant issues were actually litigated before the PTAB. (*Id*. at 15).  Third, the PTAB's findings, including its ultimate obviousness finding, were "essential" to its final decision. (*Id*.).  Lastly, M2M actually participated in the IPR proceedings while Blackbird acquired rights to the '717 Patent later and elected not to appeal the decisions. (*Id*.).

In its response, M2M argued that collateral estoppel cannot apply because the PTAB and this Court apply different evidentiary standards. (D.I. 177 at 4).[3]  M2M also argues that collateral estoppel is improper because a material factual dispute exists between the parties' experts as to the plain and ordinary meaning of the term "to process data." (*Id*. at 7).[4]  The PTAB construed "process data" under a BRI ('broadest reasonable interpretation') standard during the Sierra IPR but the parties did not seek claim construction of "process data" during the instant case. (*See* D.I. 140).

The Report agreed with M2M, focusing on the parties' dispute concerning the term "process data." (D.I. 203 at 13).  Sierra objected, arguing that the combination of Federal Circuit cases *XY v. Trans Ova* and *Ohio Willow Wood Co. v. Alps S. LLC* point to a different result. (D.I. 209 at 4).

The Court in *XY v. Trans Ova* held that a final judgment from the PTAB "has an immediate issue-preclusive effect on any pending or co-pending actions involving the patent." 890 F.3d at 1294.  The Court held as such over a dissent arguing that different burdens of proof

---

[3] M2M did not appear to meaningfully challenge Sierra's assertions that the asserted claims are not materially different from the invalidated claims, or any other prong of the test for collateral estoppel beyond what is discussed above.

[4] The parties, as did the PTAB, refer to the term as "process data" even though I would refer to it as "to process data," since "process" is a verb rather than a noun or an adjective in the claim. The term appears in independent claim 24, which was invalidated by the PTAB, and also in dependent claim 25. '717 Patent 15:16, 21.

between the PTAB and the district court urged a different result. *Id*. at 1300-01 (Newman, J.,
concurring-in-part, dissenting-in-part). Subsequently, district courts have interpreted *XY v. Trans
Ova* to stand for the position that differing burdens of proof will not prevent the application of
collateral estoppel to PTAB decisions that meet all other requirements. *See Cisco Sys., Inc v.
Capella Photonics, Inc*., 2020 WL 4923697, at *5 (N.D. Cal. Aug. 21, 2020) (discussing *XY v.
Trans Ova*); *Intell. Ventures I, LLC v. Lenovo Grp. Ltd*., 370 F. Supp. 3d 251, 256 (D. Mass.
2019) (same); *Fellowes, Inc. v. Acco Brands Corp*., 2019 WL 1762910, at *6 (N.D. Ill. Apr. 22,
2019) (same); *but see Papst Licensing GmbH v. Samsung Elecs. Co*., 403 F. Supp. 3d 571, 602
(E.D. Tex. 2019) (reaching the opposite conclusion concerning *XY v. Trans Ova*).

     Sierra also cites to several Federal Circuit cases, including *Ohio Willow Wood*, which
held that unadjudicated claims may still be subject to collateral estoppel so long as "the
differences between the unadjudicated patent claims and adjudicated patent claims do not
materially alter the question of invalidity." 735 F.3d 1333, 1342 (Fed. Cir. 2013); *cf. Soverain
Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1319 (Fed. Cir.
2015) ("Complete identity of claims is not required to satisfy the identity-of-issues requirement
for claim preclusion").

     I agree that the combination of these lines of cases suggests that collateral estoppel
applies here. M2M has not disputed Sierra's assertion that the claims at issue are not materially
different from invalidated claims 1, 12, and 29 (D.I. 209 at 2; D.I. 165 at 10-11), nor has M2M
challenged any remaining prong of the issue preclusion analysis beyond raising the "process
data" dispute. In its response briefing, M2M argues, as the Report found (D.I. 203 at 10), that
*SkyHawke Techs.* v. *Deca Int'l Grp.* should govern the result in this case. (D.I. 211 at 4). There,
the Federal Circuit held that claim constructions by the PTAB do not have issue preclusive

effect. 828 F.3d 1373, 1376 (Fed. Cir. 2016). However, I do not believe that the result here is inconsistent with the Court's holding in *SkyHawke*. Per the Court's decision in *XY v. Trans Ova*, I must grant issue preclusive effect to PTAB's invalidity decision despite differences in the claim construction standards that would naturally arise upon review by the district court. *Cisco Sys.*, 2020 WL 4923697, at *5 (stating that "*Sky Hawke* did not diminish *XY's* holding that preclusive effect must be given to the PTAB's decision on invalidity despite differences in the standard of claim construction or validity").

Additionally, I note that I do not believe that M2M has raised a dispute of material fact as to the plain and ordinary meaning of the term "process data." The briefing cites three paragraphs of Mr. Geier's expert report wherein he offers an opinion as to how a POSITA would understand the term "processing data." (D.I. 178-1, Ex. 1 ¶¶ 16-18). The only non-*ipse dixit* support cited in Mr. Geier's report for his opinion is the '717 specification. (*Id*. at ¶ 17). Analyzing the patent specification is not determining the plain and ordinary meaning; it is claim construction, pure and simple, and, as the Federal Circuit has said many times, is the judge's job, not an expert's. *See EMC Corp. v. Pure Storage, Inc*., 2016 WL 77542, at *3 (D. Del. Feb. 25, 2016). As such, Mr. Geier's improper and otherwise cursory "plain meaning" opinion does not suffice to create a dispute of material fact.

For the reasons stated above, I decline to adopt the findings of the Report and Recommendation and instead find that collateral estoppel applies to claims 25-27. There is no remaining dispute between the parties that would materially alter the question of invalidity that was adjudicated before the PTAB. *See Ohio Willow Wood*, 735 F.3d at 1342.

Lastly, Sierra challenges the Report's conclusion that the '717 Patent is not directed to an abstract concept. While I agree that the content of the '717 Patent is similar to the technology

7

held unpatentable in *Chamberlain Group*, I agree with the Report's finding that Sierra's arguments "would oversimplify the claims and ignore the express recitation of concrete elements in those claims." (D.I. 203 at 19). Thus, I ADOPT the Report and Recommendations findings as to *Alice* Step One.

III.     **CONCLUSION**

An appropriate order will issue.

/s/ Richard G. Andrews
United States District Judge

# EXHIBIT B

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

————————

GROUPON, INC.,
Petitioner

v.

KROY IP HOLDINGS, LLC,
Patent Owner

————————

Case IPR: 2019-00044
Patent No. 6,061,660 C1

————————

**CORRECTED PETITION FOR INTER PARTES REVIEW**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .........................................................................................1

II.    IDENTIFICATION OF THE CHALLENGE .........................................2

    A.     Filing Date of U.S. Patent No. 6,061,660 C1......................................2

    B.     Prior Art and Statutory Grounds of Challenge.....................................3

III.   SUMMARY OF '660 PATENT.................................................................5

    A.     Summary of Patent and Prosecution .....................................................5

    B.     Level of Ordinary Skill in the Art ........................................................7

    C.     State of the Art .......................................................................................8

    D.     Challenged Claims and Claim Construction .........................................9

IV.    DETAILED EXPLANATION ..................................................................16

    A.     GROUND 1: Kelly and Stanek Render Obvious Claims 1, 7,
          14, 16-21, 25, 27-30, 67-69, 87, and 101 .............................................16

         1.     Kelly (Ex. 1006)........................................................................16

         2.     Stanek (Ex. 1007)......................................................................17

         3.     Claim 1 ......................................................................................19

         4.     Dependent Claims 16-21, 25, and 27-30 ..................................34

         5.     Independent Claim 7 ..................................................................36

         6.     Independent Claim 87 ................................................................38

         7.     Independent Claim 101 ..............................................................41

         8.     Independent Claims 14 and Dependent Claims 67-69 ............44

    B.     GROUND 2: Kelly, Stanek, and Halter Render Obvious Claims
          10 and 12 ...............................................................................................46

# TABLE OF CONTENTS
(*Continued*)

Page

       1.    Halter, U.S. Patent No. 5,905,895 (Ex. 1008) ........................47

       2.    Independent Claims 10 and 12................................................49

C.    GROUND 3: Kelly and Wong Render Obvious Independent Claims 1, 7, 14, 87, and 101 ...................................................59

       1.    Wong, U.S. Patent No. 5,890,175 (Ex. 1010)..........................59

       2.    Independent Claims 1, 7, 14, 87, and 101................................60

           (a)   *Wong discloses (alpha) a builder application running on a host, and (beta) an interface to that builder application.* ........................................63

           (b)   *Wong discloses (gamma) a database of objects, and (delta) associating an object with a parameter.* .......65

           (c)   *Wong discloses (epsilon) generating a promotional web pages.* ........................................................67

           (d)   *Wong also discloses searching for promotional programs, as called by Independent Claim 87.* .............68

D.    GROUND 4 Kelly, Wong, and Halter Render Obvious Claims 10 and 12 ...............................................................................69

E.    There Is No Objective Indicia of Non-Obviousness ..........................74

V.    MANDATORY NOTICES AND PAYMENT OF FEES............................74

VI.    GROUNDS FOR STANDING.....................................................75

VII.    CONCLUSION................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
    107 F. Supp.3d 656 (E.D. Tex. 2015) .............................................................7

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
    639 F. App'x 637 (Fed. Cir. 2016) .................................................................8

*Natural Alternatives Int'l Inc. v. Iancu*,
    2018 WL 4686716 (Fed. Cir. Oct. 1, 2018) ..................................................2

## EXHIBIT LIST

| Exhibit (Ex.) | Description |
| --- | --- |
| 1001 | U.S. Patent No. 6,061,660 (including its Reexamination Certificate 10496[th]) |
| 1002 | Declaration of Dan Harkey |
| 1003 | File history, U.S. Patent No. 6,061,660 |
| 1004 | File history, Ex Parte Reexamination Certificate for U.S. Patent No. 6,061,660 |
| 1005 | Unused |
| 1006 | Kelly, U.S. Patent No. 5,816,918 |
| 1007 | Stanek, "Microsoft® FrontPage Unleashed" (excerpts) |
| 1008 | Halter, U.S. Patent No. 5,905,895 |
| 1009 | Unused |
| 1010 | Wong, U.S. Patent No. 5,890,175 |
| 1011 | Complaint, "Kroy IP Holdings LLC v. Groupon, Inc., Case No. 1:17-cv-01405, filed in the U.S. District Court of Delaware |
| 1012 | Executed Summons Served on Groupon Dated 10/10/2017 |

## I.    INTRODUCTION

Pursuant to 35 U.S.C. §§ 311-319 and 37 C.F.R. §§ 42.100 et seq., the undersigned submits this petition for inter partes review of claims 1, 7, 10, 12, 14, 16-21, 25, 27-30, 67-69, 87, and 101 in the reexamination certificate of U.S. Patent No. 6,061,660, owned by Kroy IP Holdings LLC ("Kroy"). The patent and appended certificate are attached hereto as Exhibit 1001. This petition demonstrates that there is a reasonable likelihood that at least one (if not all) of the challenged claims is unpatentable.

In plain English, these claims recite networked systems and methods for generating incentive programs and fulfilling awards. All of the claimed features were present in the prior art described in this petition—prior art that the Patent Office (the "Office") never considered before issuing the patent or the reexamination certificate. This petition demonstrates the skilled person would have found the claimed subject matter obvious over this prior art.

During reexamination, all elements of the independent claims reexamined were found in the prior art. A reexamination certificate issued only after the claims were amended to specify the host server hosted incentive programs for more than one (i.e. a *plurality*) of sponsors. Ex. 1004 at 329-378, 561-599; Ex. 1002, ¶¶ 30-36. Each of the challenged claims has been construed to include the requirement that the host provide incentive programs from a *plurality* of sponsors.

The hosting of incentive programs on behalf of a plurality of sponsors, as well as all or nearly all of the other elements of the challenged claims, are found in a single primary prior art patent, with any remaining features present in either of two secondary prior art patents or a prior art non-patent publication. The skilled person would have had ample reason to combine the teachings in these publications and further expect success in offering a system or method for generating an incentive program as claimed. No secondary considerations of unobviousness exist. The PTAB should cancel the challenged claims.

## II.     IDENTIFICATION OF THE CHALLENGE

### A.     Filing Date of U.S. Patent No. 6,061,660 C1

The '660 patent issued May 9, 2000, from U.S. patent application No. 09/040,490 filed March 18, 1998. The certificate issued February 6, 2015, from reexamination request Serial No. 90/013,245, filed May 19, 2014. The patent claims priority to two provisional applications, the earliest of which has an October 20, 1997, filing date. Nothing in the file history demonstrates the Office accorded any claims a filing date earlier than March 18, 1998. The challenged claims are not entitled to priority until Kroy proves entitlement to the Board. *See Natural Alternatives Int'l Inc. v. Iancu*, 2018 WL 4686716, at *3 (Fed. Cir. Oct. 1, 2018).

**B.     Prior Art and Statutory Grounds of Challenge**

This is one of two concurrently filed petitions that requests the Board to institute inter partes review of claims 1, 7, 10, 12, 14, 16-21, 25, 27-30, 67-69, 87, and 101 (the "challenged claims") of the '660 patent. The challenged claims concern systems for incentive program generation and methods therefore and award fulfillment programs. These systems and methods are performed over computer networks, such as the internet. In this petition the challenged claims are unpatentable over combinations of two or three of Stanek, "Microsoft® FrontPage Unleashed" (Sams.net Publ. 1996) (hereafter "Stanek" or "FrontPage," Ex. 1007), and these patents:

| Exhibit | Patent No. | To | Filed | Issued |
|---------|-----------|-------|----------------|---------------|
| 1006 | 5,816,918 | Kelly | Nov. 14, 1996 | Oct. 6, 1998 |
| 1008 | 5,905,895 | Halter | Mar. 7, 1997 | May 18, 1999 |
| 1010 | 5,890,175 | Wong | Sept. 25, 1996 | Mar. 30, 1999 |

Each patent qualifies as prior art under 35 U.S.C. § 102(e) (*see* Section II.A, above). Stanek qualifies as prior art under 35 U.S.C. § 102(b) because it published in 1996, more than one year before the March 18, 1998 filing.

The challenged claims are unpatentable based upon the following grounds:

| Ground | Claims | Basis |
|--------|--------|-------|

| Ground | Claims | Basis |
|--------|--------|-------|
| **1** | 1, 7, 14, 16-21, 25, 27-30, 67-69, 87, and 101 | Obvious over Kelly and Stanek |
| **2** | 10 and 12 | Obvious over Kelly, Stanek, and Halter |
| **3** | 1, 7, 14, 16-21, 25, 27-30, 67-69, 87, and 101 | Obvious over Kelly and Wong |
| **4** | 10 and 12 | Obvious over Kelly, Wong, and Halter |

Section IV, below, further describes these grounds, citing the declaration of Dan Harkey (Ex. 1002). This declaration supports both petitions.

Mr. Harkey has a formal education in electrical engineering and computer science. Since 1996, he has been teaching at San Jose State University. He currently serves as a director in the Department of Computer Engineering, and an advisor for over 600 students, many of which are professionals from Silicon Valley companies. His teaching and research specialty is software platforms for large-scale distributed systems using cloud, virtualization, SOA, component, and distributed system technologies. These and other experiences as a consultant and engineer for IBM qualify him to provide an opinion as to what a person having ordinary skill in this art (POSA) would have understood, known, or concluded as of the '660 patent's filing date. Ex. 1002, ¶¶ 5-12. Accordingly, he is competent to testify in this proceeding.

## III.    SUMMARY OF '660 PATENT

### A.    Summary of Patent and Prosecution

The application for the '660 patent was filed March 18, 1998. The patent
issued with five independent claims: claims 1, 7, 10, 12, and 14. Of these, claims 1,
7, and 14 were the subject of reexamination.  Each was amended. This petition
challenges patentability of these five independent claims and claims 87 and 101,
newly presented during reexamination. The challenged claims are directed to an
incentive program builder application with an award fulfillment system. Through a
computer network (e.g., Internet), the program builder permits sponsors to offer
incentive programs to customers. The system, through the same computer network,
provides consumers access to incentive programs.

The challenged claims recite a "builder application," running on the server
of the host computer. A sponsor interfaces with the application to input parameters
for an incentive program. These parameters may include duration, start date and
other criteria. A database houses objects associated with the incentive program and
the sponsor-entered parameters. These objects may be further associated with
actions of the incentive program. The challenged claims also recite a database of
awards associated with the incentive programs. Awards are issued to consumers,
and may be validated.

- 5 -

Certain challenged claims recite "association applications" that associate awards with various incentive programs and with particular fulfillment methods. Other claims recite generating code for the incentive program. In certain claims, this generation is accomplished by classifying code by number, storing such numbers in a table, and then employing an "executor application" that interprets that table to execute the appropriate code. Certain claims also specify that the consumer interact via a web page and that an electronic card, storing information associated with the consumer, is used in fulfilling an award.

All of the challenged claims except independent claims 10 and 12 were the subject of patentee requested reexamination. The Office concluded these claims were unpatentable over prior art not of record in the original prosecution. The Office issued a reexamination certificate only after the patentee amended these claims to require the system receive input from a *plurality* of sponsors for a plurality of incentive programs, and that it receive input from a consumer selecting an incentive program. The Office concluded prior art disclosed all features of the claims, except receiving incentive program parameters from a *plurality* of sponsors. This petition demonstrates that prior art never considered discloses systems encompassing a plurality of sponsors and renders the challenged claims unpatentable.

The patentee did not request reexamination of claims 10 and 12. The same reasons the Office concluded original patent claims 1, 7 and 14 were not patentable during reexamination would have applied to the subject matter recited in claims 10 and 12. This petition demonstrates that prior art never considered similarly renders unpatentable claims 10 and 12.

### B.    Level of Ordinary Skill in the Art

A continuation of the '660 patent was filed and issued as U.S. Patent No. 7,054,830. A district court judgment held all claims of that continuation invalid over prior art. *See Kroy IP Holdings, LLC v. Safeway, Inc.*, 107 F. Supp.3d 656 (E.D. Tex. 2015). The continuation and '660 patent share a common specification. In *Safeway*, U.S. Circuit Judge Bryson explained that the patent involves no technology of any significant complexity and could be understood by an educated lay reader:

> Once past the abstractions and the prolixity, the claims require no technical background to understand, and even the lengthy specification requires no more than an educated layperson's knowledge of computers to comprehend.

*Id*. at 659. Kroy offered Judge Bryson no reason to believe that a POSA would understand the specification text any differently than would a lay reader. *Ibid*. The Federal Circuit affirmed the district court's judgment, without opinion. *See Kroy*

*IP Holdings, LLC v. Safeway, Inc.*, 639 F. App'x 637 (Fed. Cir. 2016). Because the specifications are the same, Judge Bryson's conclusions apply to this petition.

For purposes of this petition, the petitioner submits that a person having ordinary skill in the field of designing systems and methods—performed over computer networks, such as the internet—to generate incentive and/or award fulfillment programs would have at least an undergraduate degree or equivalent experience in computer science or computer engineering, about 4-5 years of practical experience of developing network-based consumer or business software applications, and a familiarity with the World-Wide-Web. Ex. 1002, ¶ 14.

## C.    State of the Art

By 1997, it was known how to conduct electronic commerce involving incentives over a computer network. It was also known how to centralize information creation and distribution using a host computer or server. Further, it was known how to build an application, based on user parameters input via an interface (such as a fill-in form or graphical user interface), using pre-built components, templates or server side scripts, and to use lookup tables of numbers representing computer code that could then be used to execute the application. This knowledge is further discussed in Section IV, below. Ex. 1002, ¶72.

### D.     Challenged Claims and Claim Construction

The text of challenged independent claims is reproduced below with

bracketed letters for ease of reference

Claims 1 and 87 recite systems for incentive program generation; claim 10

recites a system for incentive program generation and award fulfillment; claim 12

recites a method for providing incentive program generation and award fulfillment,

and is a near verbatim recitation of the limitations in claim 10 but in method form;

claims 7, 14 and 101 recite methods for generating an incentives program. These

independent claims read as follows:

> 1.     A system for incentive program generation, comprising:
>
> [a] a network;
>
> [b] a sponsor computer connected to the network;
>
> [c] a host computer connected to the network, the host computer having a server;
>
> [d] an incentive program builder application, running on the server;
>
> [e] a database of objects associated with parameters of the incentive program builder application; and
>
> [f] an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application,

[g] wherein the host computer is configured to receive first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors,

[h] receive second input from a consumer selecting an incentive program from among the plurality of incentive programs,

[i] issue an award to the consumer corresponding to the selected incentive program,

[j] receive a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program, and validate the award,

[k] wherein the host, the sponsor, and the consumer are different entities, and wherein the host and the sponsor are different individuals or corporate entities.

7.    A method for generating an incentive program, comprising:

[a] providing a computer;

[b] providing an incentive program builder application of such computer;

[c] providing a database of objects associated with parameters of an incentive program;

[d] providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program;

[e] receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors;

[f] associating an object in the database with each parameter entered by the plurality of sponsors; and

[g] generating the plurality of incentive programs comprising the objects associated with all of the parameters entered by the plurality of sponsors;

[h] receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs;

[i] issuing an award to the consumer corresponding to the selected incentive program;

[j] receiving a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program; and validating the award.

10.[1]   A system for incentive program generation and award fulfillment, comprising:

[a] a host computer connected to a network;

[b] a client computer of a consumer connected to the network;

[c] a sponsor computer of a sponsor connected to the network;

[d] an incentive participation application program for participation by the consumer in an incentive program, wherein the participation may be in incentive programs of a plurality of sponsors;

[e] a server of the host computer;

[f] a web site, located on the server of the host computer, wherein the consumer may participate in an incentive program via the web site;

---

[1]   Claim 12 is a method claim having equivalent elements and is not repeated here.

[g] a database of the host computer of awards associated with the incentive participation application programs;

[h] an award association application program for associating an award with an incentive program;

[i] a fulfillment automation application program for associating a fulfillment method with an award;

[j] an electronic card for fulfillment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program; and

[k] an incentive builder application program, running on the server of the host computer, wherein the sponsor may build an incentive program by interacting with the incentive builder application program,

[l] wherein the incentive builder application program comprises a database of objects associated with incentive programs, wherein each object is associated with an action that is associated with the incentive program,

[m] an interface for permitting a sponsor to enter parameters associated with an incentive program,

[n] an object association application for associating objects with the parameters entered by a sponsor and building a file comprising the objects associated with all of the parameters entered by a sponsor,

[o] an editor for generating an electronic file containing code for the incentive program,

[p] a classifying application program for classifying the code in numbers that represent the elements of the code,

[q] a generator application program for generating tables of the numbers that represent the code for the incentive program,

[r] and an executor application that is capable of interpreting the tables and executing the code.

14.     A method of incentive program generation, comprising:

[a] providing a host computer connected to a network for

[b] hosting a sponsor having a sponsor computer connected to the network;

[c] providing an incentive builder application program, running on the host computer;

[d] providing a database of objects associated with parameters of said incentive builder application program; and

[e] providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application;

[f] receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors;

[g] receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs;

[h] issuing an award to the consumer corresponding to the selected incentive program;

[i] receiving a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program; and validating the award.

87. A system for incentive program generation, comprising:

[a] a network;

[b] a sponsor computer connected to the network;

[c] a host computer connected to the network, the host computer having a server;

[d] an incentive program builder application, running on the server;

[e] a database of objects associated with parameters for the incentive program builder application; and

[f] an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application,

[g] wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer,

[h] wherein the host, the sponsor, and the consumer are different entities,

[i] wherein the host and the sponsor are different individuals or corporate entities,

[j] wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host,

[k] wherein an interface of a website of the host receives consumer interaction to participate in the incentive program,

[l] wherein the consumer interaction comprises a consumer request to search for promotions from among a

plurality of promotions offered to the consumer by a plurality of sponsors.

101.   A method of incentive program generation and redemption, comprising:

[a] providing a host computer, said host computer connected to a network for

[b] hosting a sponsor having a sponsor computer connected to the network;

[c] providing an incentive program builder application, running on the host computer;

[d] providing a database of objects associated with parameters of said incentive program builder application;

[e] providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer, wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application;

[f] issuing an award to the consumer in accordance with the incentive program, wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host;

[g] receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer; validating the award using the database,

[h] wherein the host, the sponsor, and the consumer are different individuals or corporate entities,

[i] wherein the host computer is provided by a host through which the sponsor offers the incentive program to a consumer; and

[j] providing the number of awards that remain to be
issued before issuing the award to the consumer.

The text of claims 10 and 12 is at columns 47–49 of the patent, claims 1, 7, and 14

at columns 1–2 of the certificate, and claims 87 and 101 at columns 5-6, 8 of the

certificate. *See* Ex. 1001.

All of the challenged dependent claims depend from either claim 1 or claim

14.

Columns 7 and 8 of the '660 patent expressly define many but not all of the

claim terms. Kroy has asserted that the challenged patent claims encompass

systems and methods Groupon's "Merchant Center" uses. For the purposes of this

petition and with respect to the prior art, this petition applies Kroy's apparent

construction of the claims, as well as the ordinary and customary meaning as

understood by a POSA as of October 20, 1997, where Kroy' s construction is not

apparent. This use of Kroy's apparent constructions is made without prejudice.

## IV.   DETAILED EXPLANATION

### A.   GROUND 1: Kelly and Stanek Render Obvious Claims 1, 7, 14, 16-21, 25, 27-30, 67-69, 87, and 101

#### 1.   Kelly (Ex. 1006)

Kelly discloses a system deploying promotional games over a wide area

network, like the Internet. Kelly discloses, among other things, players using game

units to interact with a "host" server that provides promotional games, including

games that may be supplied by a plurality of sponsors. Ex. 1006 at 23:39-45. Kelly

explains:

> A player can connect a home computer . . . or other
>
> device to the Internet . . .. The player can thus play games
>
> offered to the player from a remote server or other
>
> source.

*Id*., 2:37-49; Ex. 1002, ¶ 193. Prizes are issued to the players based on the outcome

of the game. Ex. 1006, 3:10-43; Ex. 1002, ¶ 87 Tickets and vouchers are employed

to redeem prizes. Ex. 1006, 8:31-37; Ex. 1002, ¶¶ 87, 229.  Sponsors may include

advertising within the game promoting their products or services.  Ex. 1006, 23:14-

16; Ex. 1002, ¶ 194.

## 2.     Stanek (Ex. 1007)

Stanek discloses using Microsoft FrontPage to build web sites using the

WYSIWYG FrontPage editor, an example of which show in Figure 1.2 below:



Stanek, Ex. 1007, Fig. 1.2; Ex. 1002, ¶ 88.

Stanek discloses that using inputs into the WYSIWYG interface, the

FrontPage generates the necessary HTML code:

> You can use the FrontPage Editor to create and edit
> pages. Pages are HTML documents that can contain
> references to images, sound, and even video files.
>
>        *           *           *
>
> Because the editor is a WYSIWYG tool for creating
> HTML documents, behind the scenes it is generating
> HTML markup for your document as you enter text,
> formatting, and images.

Ex. 1007, 108, 120; Ex. 1002, ¶ 91. *See also* Ex. 1007, 117, Fig. 5.36; Ex. 1002,

¶ 90 (discussing image tool bar webpages).

Stanek further explains that FrontPage offers WebBots, a form of pre-written code script, that can be inserted by the author into webpages without complex programming:

> WebBots offer drop-in interactive functionality, which greatly streamlines the development process and eliminates the need to write your own scripts or add complicated HTML commands. No programming is involved at all.

Ex. 1007, 7; Ex. 1002, ¶ 90.

Stanek discloses an easy to use interface that automatically generates the necessary code to create webpages.  It would have been obvious to one of skill in the art to employ FrontPage to permit sponsors to design incentive programs involving internet games to be hosted using the Kelly system. Ex. 1002, ¶¶ 189-190.

### 3.    Claim 1

Kelly discloses almost all of the limitations that claim 1 recites. Stanek discloses those limitations that Kelly does not. Kelly discloses, among other things, a system involving players using game units, which may consist of personal computers having internet browsers, to interact with a host server that provides the games via the Internet. Players can receive and redeem prizes for participating. A plurality of sponsors may provide promotional games to be hosted on the host

server. It would have been obvious to provide an interface for sponsors to input parameters for games they wished to offer, and it would have been obvious to use well known technologies, such as Microsoft FrontPage (as Stanek describes), to receive such input. It would have been further obvious to employ the capabilities of FrontPage to dynamically generate web pages reflecting the parameters input by the sponsors for presentation to the players. Ex. 1002, ¶¶ 188-189.

Claim 1's preamble recites "incentive program generation." According to the '660 patent, an "incentive programs" may include "any type of program that results in 'winning' activity." Ex. 1001, 30:13-14; Ex. 1002, ¶ 46. "Any computer program that results in a successful outcome can serve as an incentive program, as long as the program is capable of generating a 'win' statement after successful completion of a predefined activity." Ex. 1001, 30:20-24; Ex. 1002, ¶ 46. Such programs can include "promotional games, such as sweepstakes prizes, scratch-and-win-games, and the like." Ex. 1001, 1:31-35; Ex. 1002, ¶ 45. S*ee also* Ex. 1001, 19:7-9 (identifying other games surveys and questionnaires as "conventional incentive program games"); Ex. 1002, ¶ 46. To the extent deemed a limitation, Kelly discloses this feature because Kelly discloses a gaming system deployed over a wide area network, like the Internet, in which prizes are issued to the players based on the outcome of the game. Ex. 1006, 3:30-43; Ex. 1002, ¶ 87.

- 20 -

Kelly discloses the first three recited features of claim 1, annotated as [a] through [c] in Section III.D, above, and correspondingly summarized as follows:

[a] network

[b] sponsor computer connected to the network

[c] host computer/server connected to the network.

Kelly also discloses the final feature of the claim 1 (**[k]**) wherein the consumer, the host, and the sponsor are different entities and the latter two are different individuals or corporate entities.

Kelly discloses "game units" on which players can play games, and explains that these can include personal computers. Ex. 1006, 5:57-63. Kelly discloses a system in which games are hosted on an Internet server and accessed by players using their personal computers. Ex. 1006, 2:37-49, 16:65-67. Kelly discloses that these game units may communicate with the server via communications protocols associated with the World Wide Web. Ex. 1006, 17:15-19; Ex. 1002, ¶¶ 190-192.

The games are employed as incentive programs promoting the goods and/or services of "sponsors," "prize providers," and other companies. Ex. 1006, 14-45. For example, during games, game units may display promotions or advertisements. *Id.*, 23:14-16. The promotions can include offers for free or reduce price merchandise. *Id.*, 23:19-21. For example, McDonald's may offer prizes (e.g. Big Mac) for successful game play. *Id.*, 27:58-67. Sponsors may also supply games for

hosting by the operator on the host server. *Id.*, 23:39-42; Ex. 1002, ¶ 195. Kelly discloses that sponsors, such as those distributing prizes, may interact with the centralized system over  the Internet using computers. Ex. 1006, 25:65-26:10 (routing information electronically over network to prize distributor), 40:66-41:18 (centrally stored prize table receiving input from prize distributors over the network); Ex. 1002, ¶¶ 195, 218.

It is clear to a POSA that Kelly discloses a three-computer setup where the three computers are controlled by three separate entities: host (e.g., internet servers), consumer (e.g., game players), and sponsor (e.g., prize distributors, like McDonald's). Thus, Kelly discloses claim 1 features [a] through [c] and [k]. *See* Ex. 1002, ¶ 235.

Collectively, Kelly and Stanek disclose the fourth and sixth recited features of claim 1, annotated as [d] and [f] in Section III.D, above, and correspondingly summarized as follows

[d] incentive program builder application running on host server

[f] interface of program builder application for sponsor entry of parameters.

Kelly discloses that the games in which the players participate may include promotions and advertisements. Kelly discloses the use of a "simple interface" to allow this input of such information for delivery to players. Ex. 1006, 23:22-24; Ex. 1002, ¶¶ 200.

As noted above, Kelly contemplates sponsors who may supply games to the host for delivery to players. Kelly further discloses that these sponsors may also provide advertising content, that can include "still shots", animations," and other content. Ex. 1006, 23:13-17. Kelly also contemplates sponsors interfacing with its system to electronically input information into Kelly's host system relating to the offered incentive programs. Ex. 1006, 40:66-41:18, 41:66-43:7 (describing tournament table for input of promotional game parameters by "prize distributor or other source" input "remotely . . . by a linked server or other source"); Ex. 1002, ¶ 202. Figure 9b of Kelly shows a setup screen for entry of parameters:

## TOURNAMENT SETUP SCREEN

490

| GAME | Tourna-ment On/Off | Games Required | Cost/ Game (coins) | % Applied to Tournament Prize | Seed Money | WINNING % FOR PLACES | | | | | Start Date | Start Time | End Date | End Time | Repeat Tourney |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | | | | | | 1st Place | 2nd Place | 3rd Place | 4th Place | 5th Place | | | | | |
| SCUD ATTACK | ON | 3 | 1 | 50% | $50 | 40% | 25% | 15% | 10% | 10% | 2/1/97 | 8:00 | 2/14/97 | 23:00 | NO |
| SOLITAIRE | OFF | | | | | | | | | | | | | | |
| QUIZ | ON | 1 | 1 | 30% | $30 | 60% | 30% | 10% | 0% | 0% | 2/20/97 | 14:00 | 3/20/97 | 12:00 | YES |
| FUN 21 | NOT AVAIL. | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

492   494   496   498   500   502   504   506   508   510   512   514

*Figure 9b*

Kelly also discloses games that take forms suitable for coding as web pages. Ex. 1006, 23:51-62, 14:48-54, 14:48-54; Ex. 1002, ¶ 196. Kelly depicts a screen

display shown a player that a POSA would recognize as the type of interface provided by a web page using HTML and other web page functionality:



*Figure 5a*

Ex. 1006, Fig. 5a; Ex. 1002, ¶ 197.

Kelly describes implementing its system using web technology. In particular, Kelly describes the host server responding to a player's URL request by transmitting HTML pages constituting the game. Ex. 1006, 19:9-20; Ex. 1002, ¶ 198. Kelly further describes game units capable of requesting and displaying HTML web pages. Ex. 1006, 19:21-28; Ex. 1002, ¶ 199.

Kelly notes it is desirable to reduce the burden on operators (i.e. host) of the redemption system. Ex. 1006, 10:58-60 ("These features reduce the operating and maintenance costs of implementing a redemption system."). Kelly seeks, using its

- 24 -

system, to "decrease operator involvement" in aspects of the redemption system and the "overhead" of maintaining the redemption system. Ex. 1006, 4:40-44; Ex. 1002, ¶ 201.

A POSA would appreciate that the suggested interface in Kelly could include, or an interface could be included that would have, capability through which a plurality of sponsors may provide games and other web content (i.e. advertising) to be delivered to players. Ex. 1002, ¶203. A POSA would appreciate that sponsor supplied content and games Kelly contemplates would need to be compatible with the hosts' operating environment. *Id*. One way to ensure such compatibility is to offer sponsors a self-service option to build incentives programs directly on the host's server using the host's tools. *Id.*.

Stanek describes such a widely available interface: Microsoft FrontPage. FrontPage would to permit sponsor entry of parameters for generating incentive programs. Ex. 1002, ¶ 204.

The '660 patent describes incentive programs that include "surveys or questionnaires" Ex. 1001, 19:8. Kelly discloses its system distributes similar  "quiz games" that provide questions to which a player responds. Ex. 1010, 1:29, 3:44-45, 14:49-54; Ex. 1002, ¶ 205.  In Fig. 11.10 below, Stanek discloses a web page questionnaire created using FrontPage that operates identically to Kelly's quiz-game.  A user can select specific buttons which correspond to displayed multiple

choice answers. Stanek demonstrates that a POSA can use FrontPage to implement the type of trivia or quiz games that Kelly contemplates.





Ex. 1007, Figs. 11.8, 11.10; Ex. 1002, ¶ 206.

FrontPage not only provides an interface for input of parameters, but as Stanek explains, FrontPage automatically generates the necessary HTML and other code from that input, permitting a person without programming experience to build web pages. Ex. 1006, 6-7; Ex. 1002, ¶ 207. Use of FrontPage in this fashion would reduce the burden on the operator (i.e. host). Ex. 1002, ¶ 209.

A POSA would anticipate that at least some of the sponsors seeking to offer incentive programs through Kelly's system would lack the necessary programming experience to program the web page code themselves. Ex. 1002, ¶209. Stanek discloses the use of FrontPage by unsophisticated parties to code web pages of the

type used to offer games in Kelly. A POSA would be motivated to combine the teaching from Stanek with that of Kelly to add an interface to the Kelly host system for sponsors to generate incentive programs at the host. Ex. 1002, ¶¶ 209, 249.  The '660 Patent simiarly describes one of its goals as extending programming capability to inexpereinced sponsors who may wish to avoid the need to hire sophisticated computer programmers.  Ex. 1001, 32:66-33:2; Ex. 1002, ¶ 207.

Thus, not only is it highly desirable to add a web interface for sponsors to generate Kelly-compatible games to ensure that they will be compatible with the host's systems and processes, but such a solution was both technologically feasible and widely known. Ex. 1002, ¶¶ 203-204.  A POSA would have reasonably expected success in combining FrontPage's interface and code generation with Kelly's promotional game system.  Ex. 1002, ¶203.

With continued reference to the claim 1 feature [d]— incentive program builder application running on host server—FrontPage permitted remote generation of webpages and the underlying HTML code from the input made across a network via its simple graphical user interface.  Such a facility could have been made available to sponsors to simplify administration of the gaming system. Ex. 1002, ¶ 210.

FrontPage includes a what-you-see-is-what-you-get (WYSIWYG) editor (i.e. FrontPage Editor. Ex. 1007, 120). FrontPage Editor permits one to open webpages for editing where those webpages reside on a remote server. *Id*., 122. Ex. 1002, ¶¶ 211-212.

Webpages residing on the host in the Kelly redemption system, such as generic templates for various types of games (i.e. quizzes, surveys, etc.), could be made available to and accessed by a sponsor via the World Wide Web. Parameters could be entered by the sponsor using FrontPage Editor, and the resulting page saved as part of a new incentive program offered by the sponsor. Ex. 1007, 123; Ex. 1002, ¶ 213.

Stanek offers an example of the use of FrontPage to generate webpages that solicit responses from a user in the manner of a questionnaire or quiz.  Ex. 1002, ¶¶ 213-214. Stanek also explains that FrontPage permits creation of simple animations on webpages, describing the process in terms nearly identical to descriptions found in the '660 Patent. Stanek offers an example of using FrontPage to create a webpage which includes an animated logo.  The animation is accomplished through a series of slightly altered images in a series of webpages that are looped to create the impression of movement. Ex. 1001 at 33:20-30; Ex. 1002, ¶¶ 215-216.

Kelly and Stanek, thus, collectively disclose the claim 1 features [d] and [f].

Kelly and Stanek collectively also disclose the fifth recited feature of claim 1, annotated as **[e]**—database of objects associated with incentive program—in Section III.D. The '660 patent gives a relational database (e.g., Oracle database) as an example of database storing parameters of an incentives program, such as the prizes associated with the program or parameters related to tournaments. Ex. 1001, 33:39-45, 45:51-52; Ex. 1002, ¶ 116, 217.

Kelly describes use of databases for storage of incentive program elements. Kelly discloses that prize information may be maintained in a central database. Ex. 1006, 41:31-39. Kelly also refers to the storage of prize information in prize tables distinct for each game. Ex. 1006, 41:40-43; Ex. 1002, ¶¶ 219. Parameters for tournaments are stored in a tournament setup table.  Ex. 1006, 41:66-43:7; Ex. 1002, ¶¶252, 260.

Stanek discloses input of parameters for generation of webpages, such as the submission of a name and a value for a radio button which will display on the webpage:



Ex. 1007, 265, Fig. 11.9.  A POSA would understand these selections are stored upon receipt in a database on the webserver where they are then used to generate the HTML code necessary to provide the webpage. Ex. 1002, ¶¶ 221-222.

Kelly discloses the seventh and eighth recited features of claim 1, annotated as [g] and [h] in Section III.D, above, and summarized as:

**[g]** plurality of sponsors (inputting parameters) to build incentive programs

**[h]** consumer selects from plurality of incentive programs.

As discussed above, Kelly discloses a system hosting promotional games of a plurality of sponsors, and a POSA would appreciate that an interface in Kelly could include, or an interface could be included that would have, capability through which a plurality of sponsors may provide games and other web content to be delivered to players. Ex. 1002, ¶¶ 202, 233. With respect to feature [h], Kelly discloses that the "host" offers a plurality of games that a user may select. Ex. 1006, 20:17-35; Ex. 1002, ¶ 222. Kelly thus discloses claim 1 feature [h].

- 31 -

Kelly discloses the ninth and tenth recited features of claim 1, annotated as [i] and [j] in Section III.D, above, and correspondingly summarized as follows

**[i]** issue award to customer

**[j]** request to validate award from sponsor and validate award.

According to the '660 patent, "awards" are synonymous with "prizes." Ex. 1001, 7:46-50;  Ex. 1002, ¶ 50. Kelly contains extensive disclosure of the issuance of prizes to participants that are then presented to sponsors and verified. For instance, Kelly describes

> In one described embodiment, the player receives a specific prize ticket or coupon from a dispenser, where the specific prize ticket is redeemable for the selected prize.

Ex. 1006, 3:26-39; Ex. 1002, ¶ 224, 232.

Kelly thus discloses claim 1 feature [i].

With respect to claim 1 feature [j], the '660 patent offers examples of validation occurring by phone, by querying the award database online, and by other means. *See* Ex. 1001, 22:9-32; Ex. 1002, ¶ 228. Kelly contemplates, among other things, the issuance of physical tickets or vouchers that may be redeemed for prizes. These may include promotional coupons to be presented to a merchant at a location at which the user has played the game. This merchant is different from the

host of the game. Ex. 1006, 8:31-37, 8:54-67; Ex. 1002, ¶ 229. According to Kelly, prizes need not only be paper coupons or voucher, but can also include smart cards or other electronic vouchers. Ex. 1006, 9:50-63, 10:12-15; Ex. 1002, ¶ 230.

Kelly also contemplates verification can occur via remote request to the central host computer. This same passage contemplates verification by the "prize supplier." It would have been an obvious and technologically straightforward design change to provide the capacity to the sponsor for the same electronic verification by the central host available to the operator so as to further ensure that an award coupon was not counterfeit. Ex. 1006, 11:3-17; Ex. 1002, ¶ 228. Kelly contemplates other means for a sponsor or "prize supplier" to validate the award, such as by means of the form of the award itself. Ex. 1006, 9:64-10:15. Kelly contemplates the issuance of an identification code that a sponsor or prize supplier can cross-reference against information available from the host. Ex. 1006, 30:7-20; Ex. 1002, ¶¶ 232-233. Kelly thus discloses claim 1 features [i] and [j].

Based on the foregoing, Kelly and Stanek discloses all features [a] through [k] recited in claim 1.  As discussed, Claim 1 would have been obvious to a POSA prior to as of October 20, 1997 based upon a combination of the disclosures in Kelly and Stanek, and a POSA would have been motivated and enabled to make such a combination, and would have had a reasonable expectation of success for the reasons set forth above.  Ex. 1002, ¶ 209.

### 4.    Dependent Claims 16-21, 25, and 27-30

Claim 16 depends from claim 1 and specifies the incentive program is a promotion of the sponsor to the consumer facilitated by the host. Kelly describes sponsors' promotions, such as a "happy hour" and free merchandise from McDonald's being offered through a host and displayed on a game unit. Ex. 1006, 23:18-24; Ex. 1002, ¶¶ 194, 247.

Claim 17 depends from claim 16 and specifies "the host computer is configured to host a website of the host through which the sponsor builds the incentive program." Stanek supplies such a configuration. Per Stanek, the host's web server can be configured to provide a sponsor with functionality necessary to build a promotional web game employing the FrontPage Editor. Ex. 1002, ¶ 257.

Dependent claims 18 and 19 respectively specify the "interface is configured to allow the sponsor to build the incentive program by interacting with the interface through the website of the host" and the "sponsor interacting with the interface to build the incentive program comprises the interface receiving the sponsor entry of the parameters." Stanek discloses the website interface running on the host computer for a merchant to enter parameters to build promotions. Ex. 1007, 6-7, 92, 626-627; Ex. 1002, ¶¶ 224, 208-209, 257-258. Kelly in combinations with Stanek thus renders claims 17–19 obvious.  Ex. 1002, ¶¶ 257-258.

Each of claims 20, 21, 25, 27, and 28 depends from claim 19. These claims recite various types of incentives program parameters: duration (claim 20), start date (claim 21), location (claim 25), discount (claim 27), and service (claim 28). These are all disclosed in Kelly. Ex. 1006, 41:66-42:5 (set up table for entering characteristics by "prize distributor"), 42:47-57 (fields for start and end date), 41:48-51 (prize table specifying fulfillment location), 23:33-36 (percentage discount), 8:54-58 (prizes include "services"); Ex. 1002, ¶ 259. The interface FrontPage interface would be suitable for inputting these parameters and it would be obvious to employ it for the reasons discussed. Ex. 1002, ¶ 253. The combination of Kelly and Stanek render these claims similarly obvious. Ex. 1002, ¶ 259.

Claim 29 depends from claim 16 and recites "an interface of a website of the host receives consumer interaction to participate in the incentive program." Claim 30 depends from claim 29 and recites "the consumer interaction comprises the consumer registering." A player in Kelly may interact via a website of the host to participate in the promotional game. ¶ 260. *See* pp. 20-22, *supra*. Kelly also indicates a player registers via his or her personal computer (i.e. game unit) by inputting a password or other identifying information in order to access features of the game, and/or to link the player's game session to the player's account. Ex. 1006, 6:52-56; 22:3-13; Ex. 1002, ¶¶ 250-254.

- 35 -

Each of the features recited in claims 16-21, 25, and 27-30 is disclosed either in Kelly or Stanek. A POSA would have concluded that these claims recite subject matter that is obvious for the same reasons the POSA would have concluded the subject matter of claim 1 is obvious.   Ex. 1002, ¶ 260.

### 5.     Independent Claim 7

Independent claim 7 recites nearly all of the same features claim 1 recites. Section III.D, above, includes the text of claim 7 and labels these corresponding steps in claim 7 as [a] through [f], and [h] through [j]. A POSA would have concluded these elements of claim 7 obvious for the same reasons similar elements of claim 1 would have been obvious.  Ex. 1002, ¶ 224. For purposes of an obviousness analysis, there is only one difference between the two claims.

*First*, claim 7 does not expressly recite the claim 1 features of a network, a networked sponsor computer, and the requirement that the host, sponsor, and consumer are different entities. In Section III.D, above, these were labeled for claim 1 as features [a], [b], and [k]. Kelly and Stanek need not therefore disclose these features—even though they do—to render the claim obvious. Claim 7 includes the transitional phrase "comprising," and therefore does not exclude these elements.

*Second,* claim 7 specifies the step of "generating the plurality of incentive programs comprising the objects associated with all of the parameters entered by

the plurality of sponsors," labeled in Section III.D as step "[g]." The '660 patent specification describes the sponsor's input of parameters using HTML forms (e.g. tables) and through the selection of graphics using a WYSIWYG interface.  Ex. 1001, 31:9-21, 32:49-52, 36:20-39, Fig. 19; Ex. 1002, ¶ 219.  According to the '660 Patent:

> [T]he incentive builder program can build the incentive program that satisfies all of the parameters, by combining preexisting code for each of the individual components into larger files that embody the entire incentive program.

Ex. 1001, 32:15-20.  A consumer's selection of a particular incentive program "causes the server to display a new HTML page for the relevant incentive program."  Ex. 1001, 26:30-40; Ex. 1002, ¶ 126.

Stanek discloses such a generation process. As discussed above, FrontPage includes a what-you-see-is-what-you-get (WYSIWYG) editor (i.e. FrontPage Editor) that includes drag and drop input.  The tool automatically generates the necessary HTML code needed to render the resulting webpage:

> To edit pages, you use the FrontPage Editor.  You enter text just as you would in any word processor. . . . [B]ehind the scenes it is generating HTML markup for your document as you enter text, formatting, and images. There are dozens of HTML elements you can add to your pages with the FrontPage Editor.

Ex. 1007, 120; Ex. 1002, ¶ 223. According to Stanek, a user may insert a table into a web page and FrontPage will automatically create HTML code for that page behind the scene. Ex. 1007, 114, 120; Ex. 1002, ¶ 223. Stanek further discloses using CGI script or Web bots to create HTML pages that can retrieved data from a SQL database for display. For example, in response to a request from a user, a CGI script can generate the HTML response based on data from a database, such as parameters input by the webpage author. Ex. 1007, 92, 626-27; Ex. 1002, ¶ 224. Stanek thus discloses step [g] recited in claim 7 in combination with all of the other limitations recited in claim 7.

A POSA would have concluded claim 7 recites subject matter that is obvious for the same reasons that the subject matter of claim 1 would have been deemed obvious. FrontPage permits non-programmers to easily create web pages through the automation of the code generation. Ex. 1002, ¶224.

### 6.     Independent Claim 87

Independent claim 87 recites nearly all of the same features claim 1 recites. Section III.D, above, includes the text of claim 87 and labels these common elements in claim 87 as [a] through [f], and [h] through [j]. A POSA would have concluded these elements of claim 87 obvious for the same reasons similar elements of claim 1 would have been obvious. Ex. 1002, ¶ 240. For purposes of an obviousness analysis, there are only a few differences between these claims.

*First*, claim 87 does not expressly recite the system limitations of issuing an award to customer, receiving a request to validate the award and then validating the award. In Section III.D, above, these were labeled as claim 1 features [i] and [j]. Kelly and Stanek need not therefore disclose these features—even though they do—to render the claim obvious.  Claim 87 includes the transitional phrase "comprising," and therefore does not exclude these elements.

*Second*, claim 87 specifies the following features concerning specific consumer interaction not recited in claim 1:

> [g] wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer,
>
> [j] wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host,
>
> [k] wherein an interface of a website of the host receives consumer interaction to participate in the incentive program,
>
> [l] wherein the consumer interaction comprises a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors.

Section III.D (reproducing text of claim 87). Kelly and Stanek disclose these features.

As discussed above, pp. 20-23, Kelly discloses an incentive program comprising a promotion of the sponsor offered to the consumer and facilitated by

- 39 -

the host, where the host is configured to allow the sponsor to offer the program to a consumer.  The consumer interacts with the host's website to participate in the promotional game. *Id*.

Kelly also discloses presenting a consumer with icons representing a variety of games, and the ability to cause the system to retrieve available games in order to make a selection.  Ex. 1006, 14:66-15:2, 16:60-63, Fig. 5a (e.g., arrows 273 and game selections 272); Ex. 1002, ¶234. Kelly reveals search functionality on the host available to game participants, such as for example, the ability to search among available prizes.  Ex. 1001 at 27:23-33 (providing search selections for "sporting goods" and further subcategory "baseball" to "narrow choices to baseball-related prizes."); Ex. 1002, ¶238.  It would have been obvious to employ this existing search functionality to also deliver game categories to the participants, given its usefulness in permitting selections where there are a large number of potential games available of differing types. Ex. 1002, ¶ 235-236.

Additionally, Stanek describes the availability in FrontPage of options by which a sponsor could build an incentive program consisting of various webpages, wherein those web pages could also include search functionality permitting the identification of other web pages meeting certain search criteria. Ex. 1007, 254, Fig. 19.10; 451-53; Ex. 1002, ¶ 237.  Stanek discloses, for example, the FrontPage

includes standard functionality permitting authors to insert a "Search bot" into the design of his or her web page:

> The Search bot provides a full text-searching capability for you Web. . . .
>
> To insert the Search bot and its associated search form into a page, open the Insert menu and select Bot.  Next, select the Search bot in the Insert Bot dialog box.

Ex. 1006, 451-52; Ex. 1002, ¶ 241.

Kelly and Stanek thus disclose the claim 87 features [g] and [j] through [l] in combination with all of the other limitations recited in claim 87. A POSA would have concluded that the subject matter of claim 87 was obvious for the for the reasons set forth above in connection with this claim and claim 1.  Ex. 1002, ¶240.

### 7.    Independent Claim 101

Independent claim 101 recites nearly all of the same features as claims 1 and 87 recite. Section III.D, above, includes the text of claim 101 and labels these corresponding elements in claim 101 as [a] through [h], and [i] (but see discussion below regarding certain inconsequential differences). A POSA would have concluded these elements of claim 101 obvious for the same reasons similar elements of claims 1 and 87 would have been obvious.  Ex. 1002, ¶ 245. For

purposes of an obviousness analysis, there are only few differences between these claims.

*First*, claim 101 does not expressly recite the claim 1 limitations that the host computer have a server, that a *plurality* of sponsors input parameters for hosted incentive program, or that a consumer select from such a plurality.  In Section III.D, above, these were labeled as claim 1 features [c], [g], and [h].  Claim 101 also does not recite the claim 87 limitation of receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by the plurality of sponsors (claim 87, element [l]). Kelly and Stanek need not therefore disclose these features—even though they do—to render the claim obvious.  Claim 101 includes the transitional phrase "comprising," and therefore does not exclude these elements.

*Second*, claim 101 additionally requires that the incentive program is a promotion of the sponsor to consumer facilitated by the host, that the issued award be received by the sponsor from the consumer and that it be validated using the database. These steps are annotated [f] and [g] in Section III.D, above. But, as explained in Section IV.A.3, above, with respect to features [f] through [i] of claim 1, Kelly discloses these features.

Specifically, Kelly describes various promotions of sponsors to consumers that are facilitated by the host.  See, pp. 20-23, *supra*.  Kelly also contains

- 42 -

extensive disclosure of the issuance of awards that are presented to sponsors and verified. Ex. 1006, 3:26-39, 23:36-39; Ex. 1002, ¶ 227. Kelly thus discloses claim 101 feature [f].

With respect to claim 101 feature [g], Kelly contemplates, among other things, the issuance of physical tickets or vouchers that may be redeemed for prizes. These may include promotional coupons to be presented to a merchant at a location at which the user has played the game. This merchant is different from the host of the game. Ex. 1006, 8:31-37, 8:54-67; Ex. 1002, ¶ 229.

Kelly also contemplates a variety of means by which to validate the award and it would have been obvious to provide the capacity for the prize supplier to electronically verify the award with the database of the central host. The bar code information which Kelly contemplates printing on the voucher which would easily facilitate this. A POSA would be motivated to validate in this manner given Kelly's concerns with counterfeiting and maintaining timely and accurate information on the costs of the promotion. Ex. 1006, 11:3-17, 10:38-43, 25:24-30; Ex. 1002, ¶¶ 232-233. Kelly thus discloses claim 101 features [f] and [g].

*Third*, claim 101 requires the method step [j] of providing the number of awards that remain to be issued before issuing the award to the consumer. Kelly discloses steps intended to control the amount of prize payouts for various promotional games. For example, Kelly describes the entry of desired win ratios

by sponsors which take into account the number of awards issued in previous games in determining whether or not to issue a further award. Ex. 1006, 33:53-59; Ex. 1002, ¶ 243. In addition, the Kelly systems permits a sponsor to control the profitability of a particular promotional game by determining the total costs of issued awards by multiplying the number of previously issued awards times an actual cost per award. The system then adjusts the frequency with which it issues further awards to comply with a desired global payout amount or percentage of game revenue. Ex. 1006, 33:41-49; Ex. 1002, ¶ 244.

Kelly thus discloses the claim 101 features [f], [g], and [j] in combination with all of the other limitations claim 101 recites. A POSA would have concluded that the subject matter of claim 101 was obvious for the for the reasons set forth above in connection with this claim and claims 1 and 87. Ex. 1002, ¶245.

### 8.   Independent Claims 14 and Dependent Claims 67-69

Independent claim 14 recites the same subject matter as system claim 1, but does so in the format of a method claim. For example, instead of reciting a system that includes a network and a host computer connected to the network like claim 1, claim 14 recites providing a host computer connected to a network. Claim 14 similarly recites all of the other claim 1 system features. Section IV.A.3, above, offers a complete analysis of how Kelly and Stanek disclose all of these system features.

The only pertinent difference between method claim 14 and system claim 1 is that claim 14 does not require that the host, sponsor, and consumer be different entities.  Kelly and Stanek need not therefore disclose these features—even though they do—to render the claim obvious.

Kelly and Stanek thus disclose all of the limitations claim 14 recites.  A POSA would have concluded that the subject matter of claim 14 was obvious for the for the reasons set forth above in connection with claim 1.  Ex. 1002, ¶224.

Claims 67-69 depend from claim 14. Claim 67 specifies that the "host computer is provided by a host through which the sponsor offers the incentive program to a consumer." Kelly discloses a sponsor may supply free games for hosting by a host and the host distributes games associated with prizes to game units via a network. Ex. 1010, 23:39-45, 25:65-26:10; Ex. 1002, ¶ 248.

Claim 68 recites "the award is a coupon." Kelly discloses dispensing a promotional coupon as the award:

> A prize might also be a promotional coupon, which can encourage players to return to the current gaming environment or location more quickly in the future. . . . [A] promotional coupon can be dispensed . . . which offers a player a free pitcher of beer if the player returns and redeems the coupon within 1 week[.]

Ex. 1006, 8:61-67; Ex. 1002, ¶ 261.

Claim 69 recites an award consisting of a coupon to redeem sponsor merchandise or services. Kelly discloses a redemption system in which the award consists of a coupon to redeem sponsor merchandise or services.  Ex. 1006, 8:61-67; Ex. 1002, ¶ 261.

A POSA would have concluded that these claims 67-69 recite subject matter that is obvious for the same reasons the POSA would have concluded the subject matter of claim 14 is obvious.

## B.    GROUND 2: Kelly, Stanek, and Halter Render Obvious Claims 10 and 12

Independent claim 10 recites a system for incentive program generation and award fulfillment. Independent claim 12 is a near verbatim recitation of the limitations in claim 10 but in method form. Ex. 1002, ¶ 37. Independent claims 10 and 12 recite many of the same limitations that were addressed above in connection with claims 1, 7, 14, 87, and 101. Additional elements recited in independent claims 10 and 12 are addressed below. As explained below, the combination of Kelly, Stanek, and Halter render both claims obvious. Section IV.A.1 and IV.A.2 describes the pertinent disclosures in Kelly and Stanek, respectively.

### 1.      Halter, U.S. Patent No. 5,905,895  (Ex. 1008)

Halter, entitled "Method and system for optimizing non-native bytecodes before bytecode interpretation," was issued on May 18, 1999 from an application filed on March 7, 1997.  Halter discloses generating optimized Java bytecodes before bytecode interpretation, shown generally in Fig. 2:



*Fig. 2*

Halter explains that JAVA enables Web distribution of executable content. Ex. 1008, 1:34-40; Ex. 1002, ¶¶ 281-282.  According to Halter, "application software written in Java is first compiled into a set of JAVA bytecodes," which are then "subsequently distributed to a software user through the Web." Ex. 1008,

- 48 -

1:42-44; Ex. 1002, ¶ 182.  Halter discloses "a method and system for optimizing Java bytecode before the bytecode interpretation process occurs within a computer system."  Ex. 1008, 1:54-59; Ex. 1002, ¶¶ 181, 280-284.

### 2. Independent Claims 10 and 12

For purposes of this obviousness analysis, there are several categories of differences between what claims 10 and 12 recite and what claim 1 recites. But these are not meaningful differences and in no way affect a conclusion that independent claims 10 and 12 are unpatentable.

*First*, claims 10 and 12 do not recite the following claim 1 limitations:

**[g]** plurality of sponsors (inputting parameters) to build incentive programs

**[j]** request to validate award and validate award

**[k]** wherein the consumer, the host, and the sponsor are different entities.

(The bold-face bracketed letters match recitations in claim 1 as set out in Section III.D, above.) Kelly and Stanek need not therefore disclose these features—even though they do—to render the claim obvious.

*Second*, Claims 10 and 12 recite an additional feature that claim 1 does not recite: [2]

---

[2]  The recited limitations are drawn from claim 10.  Claim 12 recites a method in terms similar to the system in claim 10.

> **[j]** an electronic card for fulfillment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program.

*See* Section III.D, above. P. 9.

Kelly contains numerous disclosures regarding the use of a smart card to store player-specific prize information:

> [A] player can insert a card or other medium which stores electronic data into a suitable output device 18. The game unit 10 then can write electronic data on the medium indicating the specific prize that was won by the player, and/or indicating a number of tickets or prize credits which the player has won. The player can then take the card and insert the card into a suitable card reader connected to a prize selection apparatus[.]

Ex. 1006, 11:24-29, 9:59-63 ("smart cards, etc., can be used as 'specific prize tickets'"); Ex. 1002, ¶¶ 230, 277.

Kelly discloses that such smart cards may include a personal identification number or information associated with the consumer's participation in the incentive program.  Ex. 1006, 22:7-11 ("include[es] an electronic form of

identification."), 28:1-16 (card stores results of consumer's previous participation in promotional games); Ex. 1002, ¶¶ 233, 276.

*Third*, Claims 10 and 12 include additional references to associating "actions" with objects associated with the incentive builder application program and associating objects with parameters to build a "file" thereof:

> **[l]** wherein the incentive builder application program comprises a database of objects associated with incentive programs, wherein each object is associated with an action that is associated with the incentive program, and
>
> **[n]** an object association application for associating objects with the parameters entered by a sponsor and building a file comprising the objects associated with all of the parameters entered by a sponsor.

As discussed above at pp. 30-31, both Kelly and Stanek disclose use of a database to store input received from sponsors relating to the incentive program. It would be obvious to a POSA to use such a database in the combination of Kelly and Stanek to store the parameters entered by the sponsor for eventual generation of web pages corresponding to the promotional games. Ex. 1002, ¶ 221.

Kelly discloses the presentation of buttons, input fields, checkboxes, and other graphical icons through which a consumer participating in the promotional game may interact with the system and prompt actions by the system with respect to the promotional games. Ex. 1002, ¶265. Stanek similarly discloses the input of

parameters by a webpage author that are associated with objects having related

actions.  For example, in the figure below, a user enters the name and value for a

radio button:

> For each check box or radio button element, you must
> specify the default properties. . . . After you define the
> properties for this element and click the OK button, the
> element is inserted into your document

Ex. 1007, 265;



*Id*., Fig. 11.9; Ex. 1002, ¶¶ 220, 265.

Stanek discloses the storage of such objects in a database to ultimately

generate web pages displaying those interactive elements.  Ex. 1002, ¶ 265.  Stanek

describes the generation of web pages employing this database of objects to

produce one or more files (e.g. HTML) that comprise the objects associated with

the parameters entered by the web page author (i.e. sponsor).  Ex. 1002, ¶ 265.

As discussed above, Stanek discloses an editor (e.g. FrontPage editor) that

generates the necessary HTML code based on the input into the WYSIWYG

interface. According to Stanek, FrontPage generates web pages that includes objects such as text fields and buttons as shown in Figure 4 below.



Ex. 1007, Fig. 4.18; Ex. 1002, ¶ 266.

*Fourth*, Claims 10 and 12 recite certain limitations having to do with consumer participation that are similar to, but more detailed than, limitations found in claims 1.  Those limitations in claims 10 and 12 are:

> **[d]** an incentive participation application program for participation by the consumer in an incentive program, wherein the participation may be in incentive programs of a plurality of sponsors; and

> **[f]** a web site, located on the server of the host computer, wherein the consumer may participate in an incentive program via the web site.

(The bold-face bracketed letters match recitations in claim 10 as set out in Section III.D, above).

As discussed above at 20-23, Kelly discloses the presentation of web pages via a host's site to players for participation in promotional games of a plurality of sponsors.

*Fifth,* claims 10 and 12 include several additional limitations relating specifically to awards:

> **[g]** a database of the host computer of awards associated with the incentive participation application programs;
>
> **[h]** an award association application program for associating an award with an incentive program; and
>
> **[i]** a fulfillment automation application program for associating a fulfillment method with an award.

Kelly contemplates computer processes for associating certain prizes with particular promotional games. Specifically, Kelly contemplates a variety of possible prizes that may be paired to specific games and outcomes, and its applications provide the ability to specify what awards are associated with what incentive programs and the manner of that association using a computer interface:

> A prize table is displayed on a game apparatus or other computer system. Prize input is received from the operator or other source (e.g., remote server) and displayed in the prize table.

Ex. 1006, 3:55-4:4;

> The same prize list can be provided to all games in the redemption system from a central prize database[.]

> In alternate embodiments, each type of game offered on game unit 10 can be associated with its own distinct prize table 480, having its own desired level of payout and profitability, its own list of available prizes, etc.

*Id.*, 41:34-43, Fig. 9 and 9a; Ex. 1002, ¶ 273.

As recited above, Kelly discloses that these awards are recorded in a database table.  Ex. 1002, ¶¶ 273-274.

With respect to associating fulfillment methods with awards, the '660 patent gives, as an example of a fulfillment method, the manner in which an award is delivered to a consumer (e.g. mail)  Ex. 1001, 21:65-22:5.

Kelly also discloses a variety of methods for fulfilling awards, from selecting them directly from the game unit to presenting universal and/or specific award tickets in exchange for products and services.  Ex. 1006, 9:33-11:34; Ex. 1002, ¶273. Locations may be specified for award fulfillment.  Ex. 1006, 8:61-67; Ex. 1002, ¶273.   These methods for fulfillment are established in advance for the various awards by the applications that manage Kelly's redemption system, and may be determined by the nature of the award:

> The specific prize ticket may be redeemed at an appropriate exchange center for the actual prize. For example, a prize exchange booth can be provided at a gaming environment such as an arcade or bar . . .. In other embodiments, the player can insert a card having the specific prize ticket information into a vending machine. In still other embodiments, the player can mail the  specific prize ticket to a prize distributor.

Ex. 1006, 3:22-29;

> This may be more convenient . . . when large prizes such as bicycles are won by players. . . . Alternatively, the prize can be mailed to the gaming environment, where the player can pick up the prize[.]

Ex. 1006, 41:17-30; Ex. 1002, ¶ 275.

*Lastly*, claims 10 and 12 recite certain features not recited in claim 1, namely a particular generation of incentive programs:

**[o]** an editor for generating an electronic file containing code for the incentive program,

**[p]** a classifying application program for classifying the code in numbers that represent the elements of the code,

**[q]** a generator application program for generating tables of the numbers that represent the code for the incentive program,

- 56 -

**[r]** and an executor application that is capable of interpreting the tables and executing the code.

*See* Section III.D, above.

The '660 patent describes classifying larger logical code elements into numbers and employing that translation to execute the program.  Ex. 1001, 36:48-63.

As noted above, Kelly contemplates implementing its promotional programs in Java. Ex. 1006 at 19:35-39 ("information can be sent in Java from Sun Microsystems, . . . in addition to HTML.") ; Ex. 1002, ¶ 320.  Stanek similarly contemplates that FrontPage will permit incorporation of JAVA into webpages it generates.  Ex. 1007, 152; Ex. 1002, ¶ 279.

Halter notes that non-optimal Java bytecode can be quite slow, and identified a need "for optimizing Java bytecode before the bytecode interpretation process occurs within a computer system."  Ex. 1008, 1:54-59; Ex. 1002, ¶¶ 181, 280, 321.  Because there is an express advantage to Halter's bytecode optimization process, a POSA would deem it desirable to apply Halter's optimization process to the Java files generated for the Kelly game system using the interface and builder application of Wong.

With respect to element [o], Halter discloses a compiler (i.e. an "editor") which initially compiles software written in JAVA into a set of JAVA bytecodes

- 57 -

stored in an electronic file.  Ex. 1:42-43; Ex. 1002, ¶ 281.  A JAVA bytecode represents an instruction of the JAVA virtual machine.  Ex. 1:21-23; Ex. 1002, ¶ 281.

With respect to element [p], Halter discloses a program (i.e. a "classifying application program") that reads the contents to the JAVA bytecode file and replaces first and second bytecodes (i.e. byte-code pairs) from that file with an optimized bytecode:

> if the first bytecode and the second bytecode match with a bytecode-pair within the optimizable bytecode table, the first bytecode and the second bytecode are replaced with an optimized bytecode that corresponds to the matched bytecode-pair within the optimizable bytecode table[.]

Ex. 3:37-48; Ex. 1002, ¶ 282.

With respect to element [q], Halter discloses that the results of this classification are then stored (i.e. the "generator application") for subsequent interpretation as a stack (i.e. rows) of name-value pairs (i.e. columns) that denote the computer instructions to be executed and the associated value pertaining to that instruction.  Ex. 5:37-41("it is best to perform the optimization process first and then store the results for subsequent interpretation process."); Ex. 1002, ¶ 283.

The resulting stored optimized byte code (i.e. numbers) are interpreted by a built-in JAVA interpreter of a web browser and executed within the Web user's computer (i.e. "executor application").  Ex. 1008 at 1:48-50; Ex. 1002, ¶ 284.

For these reasons, the elements of claims 10 and 12 would have been obvious over Kelly in view of Stanek and Halter as of October 20, 1997. Ex. 1002, ¶ 285.

### C.  GROUND 3: Kelly and Wong Render Obvious Independent Claims 1, 7, 14, 87, and 101

Section IV.A.1 describes the pertinent disclosure in Kelly.

Like Stanek (Ex. 1007), Wong (Ex. 1010) discloses an interface and automated web page generation system which, in combination with Kelly, renders the challenged claims obvious.

### 1.  Wong, U.S. Patent No. 5,890,175 (Ex. 1010)

Wong discloses a system and method that dynamically generates a product catalog by permitting merchants to submit information via online forms, storing that input in a database, and dynamically generate HTML pages. An example of this arrangement is shown in Figures 1 from the patent:



FIG. 1

Ex. 1002, ¶ 92. Sub-sections below further explain Wong's disclosure as it pertains to the particular claims of the '660 patent.

### 2.   Independent Claims 1, 7, 14, 87, and 101

These independent claims recite certain common features:

|   | Feature | Indep. Claim | | | | |
|---|---------|:---:|:---:|:---:|:---:|:---:|
|   |         | 1 | 7 | 14 | 87 | 101 |
| **A** | Incentive program builder application running on host | [d] | [b] | [c] | [d] | [c] |
| **B** | Interface to incentive program builder application | [f] | [d] | [e] | [f] | [e] |
| **C** | Database of objects associated with incentive program | [e] | [c] | [d] | [e] | [d] |
| **D** | Associating object with parameter | [e] | [f] | [d] | [d] | [d] |
| **E** | Generating incentive program | - | [g] | - | [g] | [i] |

In the above table, the common features are annotated with claim specific bracketed letters corresponding to the recitation of these features in the claim as

reproduced in Section III.D, above. For ease of the following discussion, these features are referred to as alpha, beta, gamma, delta, and epsilon.

Ground 1 explains how Stanek (Ex. 1007) discloses these features, why one would have been motivated to combine FrontPage with Kelly, and how that combination would have rendered the claimed subject matter obvious. Wong (Ex. 1010) also discloses these features of the above independent claims, and could have been combined with Kelly in place of Stanek in a manner known to a POSA. A similar motivation exists to combine Wong with Kelly.  Ex. 1002, ¶¶ 291, 295. Each of these independent claims would therefore have been obvious over the combination of Kelly and Wong.  Ex. 1002, ¶¶ 316, 318.

Kelly describes implementing its system using web technology. In particular, Kelly describes the host server responding to a player's URL request via HTML pages. Ex. 1006, 19:7-19; Ex. 1002, ¶289.   Kelly further describes its game units as capable of  requesting and display HTML web pages. For example, a player can use its game unit to select prizes. Ex. 1006, 19:20-28; Ex. 1002, ¶¶ 289-290.

As discussed in, pp. 22-25, above, because Kelly describes distributing and running games (i.e. incentive programs) within its server and game units configuration and because Kelly contemplates having the sponsor supply free games for hosting, it would be important for games supplied by a sponsor to be

compatible with the operating environment of Kelly. One way to ensure such compatibility is to offer a self-service option to sponsors who build incentives programs directly on the host's server using the tools provided by the host.  Thus, not only is it technologically feasible but also highly desirable to add an interface for  sponsors to generate Kelly-compatible games. Ex. 1002, ¶ 291.

As noted above, Kelly describes delivering its incentive programs in the form of HTML over the World Wide Web to a player's personal computer operating a standard web browser.   Wong describes an interface meant to allow a plurality of merchants to create product web pages easily and without knowledge of complex web programming. Ex. 1010, 4:64-67; Ex. 1002, ¶¶ 293-294.  These web pages are hosted on a third parties web server. Ex. 1010 , 4:64-67; Ex. 1002, ¶ 297.  Wong further describes use of server-side scripts, running on the host's web server, to automatically generate web pages based upon parameters input by merchants via this interface. Ex. 1010, 7:7-13, 7:18-24, 7:28-33; Ex. 1002, ¶¶ 299-300.

Given the ease with which the Wong system lets a plurality of merchants build promotional web pages, and given that Kelly already contemplates implementing its hosting system using web technology, a POSA would be motivated to combine the teaching from Wong with that of Kelly to add an

interface to the Kelly host system for sponsors to generate incentive programs at the host. Ex. 1002, ¶ 295.

      **(a)**    ***Wong discloses (alpha) a builder application running on a host, and (beta) an interface to that builder application.***

Wong discloses using forms to receiving input from a merchant and generate responsive web pages based on that input. In particular, Wong discloses an Internet web server,  operating a "form server process," coupled to a database, where the process stores input received from merchants via HTML forms in the database. Ex. 1010, 3:57-61, 3:65-4:2, 6:52-54; Ex. 1002, ¶ 298. An example of a form through which a merchant may input parameters for generation of these web pages is shown in Figure 8 of Wong:

FIG. 8

Ex. 1010, Fig. 8; Ex. 1002, ¶¶ 292-293.

According to Wong, once a consumer requests a product page, the system dynamically generates that web page by first accessing the database to retrieve content (i.e. parameters) input by merchants via these forms. Ex. 1002, ¶ 296. The

retrieved content is supplied to a Page Generation Module, which generates a display page from a combination of that content and a display template. Ex. 1010, 7:7-33, Ex. 1002, ¶ 299.  The Page Generation Module can, for example, insert multimedia objects into the retrieved display template in predefined locations. Ex. 1010, 7:64-8:15, Ex. 1002, ¶ 301.  Kelly made use of multimedia objects in connection with its promotional game web pages. *See p. 51*, *supra*.

It would have been obvious to a POSA to employ the input forms and dynamic web page generation technology of Wong in connection Kelly's system hosting promotional games from a plurality of sponsors. Ex. 1002, ¶ 301.

### (b)   *Wong discloses (gamma) a database of objects, and (delta) associating an object with a parameter.*

Wong discloses a system in which input received from the merchant via the form is stored as part of a "product page" in a database storage system.  Ex. 1007, 6:52-57; Ex. 1002, ¶¶ 296-297, 314-315.  Wong describes the use of this database in the generation of the web pages delivered to consumers.  Wong discloses that output modules query this database for all of the content fields associated with the specific page.  Ex. 1007, 7:21-24; Ex. 1002, ¶ 309.

The database includes objects associated with the generated web pages (i.e. incentive program) and the user's input (i.e. parameters).  Ex. 1002, ¶¶298-299. The database stores information organized in the form of objects, such as "aisles,"

"shelves," and other such "objects."  Ex. 1002, ¶299.  The stored objects may also include pictures and other multimedia objects (e.g. audio, video, program applets) associated with the merchant's inputs.  Ex. 1007, 4:29-35; Ex. 1002, ¶ 308. Figure 2 of Wong depicts the association of such objects with the input received from merchants:



FIG. 2

Ex. 1007, Fig. 2; Ex. 1002, ¶ 92.

**(c)** *Wong discloses (epsilon) generating a promotional web pages.*

The '660 patent describes one example of the generation process as generating HTML pages that reflect an incentive program. Ex. 1001, 31:9-21, 32:49-52; Ex. 1002, ¶ 313. As discussed above in pp. 62-65, Wong discloses the means to dynamically generate web pages reflecting input received from a plurality of merchants.  For example, Wong generates the promotional page shown in Figure 15 below from the information entered into a form show in Figure 8 above.



Ex. 1010, Fig. 15; Ex. 1002, ¶ 314.

### (d)  *Wong also discloses searching for promotional programs, as called by Independent Claim 87.*

As discussed in connection with Ground 1 (see p. 44, *supra*), to the extent that Kelly did not itself disclose searching for promotions from among a plurality of sponsors, a POSA would have viewed the inclusion of such functionality in Kelly, through the its combination with Wong, as obvious.  We have previously discussed the motivation that would have prompted a POSA to include functionality in Kelly to search for incentive programs.  Wong discloses such functionality for searching amongst the promotional programs input by merchants.  Ex. 1007, 7:14-16 ("the system may invoke a search subsystem that provides a search query form to the user or executes a "similarity" search, in known fashion");  Ex. 1002, ¶ 303.

It was earlier explained that the remaining elements of these independent claims were disclosed in, or otherwise obvious from, disclosures made in the primary reference, Kelly.  Based on the above further disclosures in Wong, in the same manner to that explained in Ground 1 with respect to Stanek's (Ex. 1007) disclosures of a web builder application and interface, the combination of Kelly and Wong renders obvious all of these independent claims, as well as the claims which depend therefrom. Ex. 1002, ¶ 302.

### D.    GROUND 4 Kelly, Wong, and Halter Render Obvious Claims 10 and 12

Independents claim 10 and 12 recite nearly all of the same features claim 1 recites. For purposes of this obviousness analysis, there are three categories of differences between what claims 10 and 12 recite and what claim 1 recites. But these are not meaningful differences and in no way affect a conclusion that independent claims 10 and 12 are unpatentable.

*First*, claims 10 and 12 do not recite the following claim 1 limitations:

**[g]** plurality of sponsors (inputting parameters) to build incentive programs

**[j]** request to validate award and validate award

**[k]** wherein the consumer, the host, and the sponsor are different entities.

(The bold-face bracketed letters match recitations in claim 1 as set out in Section III.D, above.) Kelly and Wong need not therefore disclose these features—even though they do—to render the claim obvious.

*Second*, Claims 10 and 12 recite **[j]** an electronic card for fulfillment of an award, an additional feature that claim 1 does not recite. *See* Section III.D, above. P. 9.  As discussed at pp. 32, 49-50, Kelly contains numerous disclosures regarding the use of a smart card to store player-specific prize information.

*Third*, Claims 10 and 12 include additional references to associating "actions" with objects associated with the incentive builder application program and associating objects with parameters to build a "file" thereof:

> **[l]** wherein the incentive builder application program comprises a database of objects associated with incentive programs, wherein each object is associated with an action that is associated with the incentive program, and
>
> **[n]** an object association application for associating objects with the parameters entered by a sponsor and building a file comprising the objects associated with all of the parameters entered by a sponsor.

As discussed above at pp. 29-31, Kelly discloses use of a database to store input received from sponsors relating to the incentive program, and would be obvious to a POSA to use such a database in the combination of Kelly and Wong to store the parameters entered by the sponsor.   Ex. 1002, ¶ 305.  As discussed above at pp. 51-53, Kelly discloses that these objects are associated with actions relating to the inventive program.

Wong similarly discloses the input of parameters by a webpage author that are associated with objects having related actions.  For example, as described below, a user enters the name and value for a radio button.

> For example, a user may input text or multimedia objects
> (such as graphics images, audio clips, Video clips,

> program applets, etc.) into a Merchant Store Information
> component 12.

Ex. 1007, 3:66-4:2.

According to Wong, once a consumer requests a product page, the system dynamically generates that web page by first accessing the database to retrieve content (i.e. parameters) input by merchants via these forms.  The Page Generation Module can, for example, insert multimedia objects into the retrieved display template in predefined locations. Ex. 1010, 7:64-8:15, Ex. 1002, ¶ 300.

As Wong discloses, these objects, such as multimedia objects, are associated with actions relating to participation in the incentive program

> For the frame, the icon dimensions are added, in known
> fashion, to a navigation map file so that an associated
> URL is created that is responsive to clicking or selection
> of an icon on the final display page (or "imagemap") to
> be displayed to the consumer (STEP135).

Ex. 1007, 8:16-20; Ex. 1002, ¶¶ 308-310.

As discussed at pp. 29-30, above, Wong discloses associating objects in the database with parameters entered by merchants and dynamically generating one or more HTML files comprising those objects that are transmitted to participants in the promotional program (i.e. consumers).  Ex. 1002, ¶ 311.

*Fourth*, Claims 10 and 12 recite certain limitations that are similar to, but more detailed than two limitations found in claims 1.  Those limitations in claims 10 and 12 are **[d]** an incentive participation application program for participation by the consumer, and **[f]** a web site on the server wherein the consumer may participate in an incentive program.  (The bold-face bracketed letters match recitations in claim 10 as set out in Section III.D, above).

As discussed above at p. 24, Kelly discloses the presentation of web pages via a host's site to players for participation in promotional games of a plurality of sponsors.

*Fifth,* claims 10 and 12 include several additional limitations relating specifically to awards**: [g]** a database of the host computer of awards, **[h]** an award association application program, and **[i]** a fulfillment automation application program for associating a fulfillment method with an award.

As discussed at pp. 29-30 above, Kelly contemplates computer processes for associating certain prizes with particular promotional games.  Ex. 1002, ¶ 270.

As recited above, Kelly discloses that these awards are recorded in a database table.  Ex. 1002, ¶ 271.

Also discussed above at pp. 54-55, Kelly discloses a variety of methods for fulfilling awards and associating those methods with awards using the computer application disclosed in its systems .  Ex. 1002, ¶ 273.

*Lastly*, claims 10 and 12 recite certain features not recited in claim 1, namely a particular generation of incentive programs:

**[o]** an editor for generating an electronic file containing code for the incentive program,

**[p]** a classifying application program for classifying the code in numbers that represent the elements of the code,

**[q]** a generator application program for generating tables of the numbers that represent the code for the incentive program,

**[r]** and an executor application that is capable of interpreting the tables and executing the code.

*See* Section III.D, above.

As noted above, Kelly contemplates implementing its promotional programs in Java. See p. 56 , supra.  Wong similarly discloses using JAVA to implement its promotional system.   Ex. 1007 at 4:62-64 ("The forms are preferably created with a macro language, such as the HyperText Markup Language-HTML or JAVA");  Ex. 1002, ¶ 320.

As discussed in connection with Ground 2, *supra*, Halter discloses elements [o], [p], and [q].  Because there is an express advantage to Halter's bytecode optimization process, a POSA would deem it desirable to apply Halter's

- 73 -

optimization process to the Java files generated for the Kelly game system using the interface and builder application of Wong.

For these reasons, the subject matter of claims 10 and 12 of the '660 patent would have been obvious over Kelly in view of Wong and Halter as of October 20, 1997.

### E.    There Is No Objective Indicia of Non-Obviousness

Petitioner is unaware of any evidence suggesting the existence of secondary factors of non-obviousness.

## V.    MANDATORY NOTICES AND PAYMENT OF FEES

Groupon Inc. is the real party-in-interest and the Petitioner.

The Petitioner was served on October 10, 2017, with a copy of the complaint in *Kroy IP Holdings LLC v. Groupon, Inc.*, Case No. 1 :17-cv-01405-VAC-CJB filed in the U.S. District Court for the District of Delaware on October 6, 2017. Ex. 1011. This petition is therefore timely and not subject to 35 U.S.C. § 315(b).

Lead and back-up counsel are identified in the signature block at the end of this petition. Service may be made upon such counsel by directing papers to the indicated addresses (including email).

Payment of the fees required under 37 C.F.R. §§ 42.103(a) and 42.15(a) is submitted herewith. The Office is authorized to charge payment of any additional

required fees (and credit any overpayment) to Deposit Account No. 13-2855 under Order No. 31964/10034.

## VI.   GROUNDS FOR STANDING

Petitioner hereby certifies that the '660 patent is eligible for inter partes review, and that the Petitioner is neither barred nor estopped from requesting such review. Petitioner further certifies that the prohibitions in 35 U.S.C. § 315(a) and (b) do not apply.

## VII.  CONCLUSION

Petitioner has demonstrated there is a reasonable likelihood that at least one of the challenged claims is unpatentable and, therefore, requests the petition be granted.

Respectfully submitted,

/   /Sandip H. Patel, Reg. #43,848

January 3, 2019

Sandip H. Patel (Reg. No. 43,848)
spatel@marshallip.com
Lead Counsel for Petitioner

Michael R. Weiner (Reg. No. 38,359)
mweiner@marshallip.com
Back-up Counsel for Petitioner

**Customer No. 04743**

MARSHALL, GERSTEIN & BORUN LLP
6300 Willis Tower
233 South Wacker Drive
Chicago, Illinois 60606-6357
Telephone: (312) 474-6300
Docket@marshallip.com

- 75 -

## **PTAB AUTHORIZATION TO FILE CORRECTED PETITION**

On January 2, 2019, the PTAB issued an Order (Paper 9) authorizing

Petitioner to file the foregoing corrected petition.

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that, pursuant to 37 C.F.R. § 42.24(d), the

foregoing petition complies with 37 C.F.R. § 42.24(a)(i) permitting up to 14,000

words because, excluding the exempted portions of the petition, the petition

contains 13,886 words as counted by the word-processing system used to prepare

the petition.

January 3, 2019                     /   /Sandip H. Patel, Reg #43,848
                                   _____
                                    Sandip H. Patel
                                    MARSHALL, GERSTEIN & BORUN LLP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, pursuant to 37 C.F.R. §§ 42.6(e), a copy the foregoing "CORRECTED PETITION FOR INTER PARTES REVIEW" is being served today, **January 3, 2019**, by electronic mail on counsel for the Patent Owner:

> jwaldrop@kasowitz.com
>
> rmiller@kasowitz.com

/  Sandip H. Patel, Reg #43,848 /

Sandip H. Patel (Reg. No. 43,848)
Lead Counsel for Petitioner