# EXHIBIT A

13:12:40          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


KROY IP HOLDINGS, LLC,       )
                             )
          Plaintiff,         )
                             ) C.A. No. 17-1405(MN)
v.                           )
                             )
GROUPON, INC.,               )
                             )
          Defendant.         )


                    Wednesday, March 2, 2022
                    2:00 p.m.
                    Teleconference


                    844 King Street
                    Wilmington, Delaware



BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge



APPEARANCES:


          POTTER ANDERSON & CORROON, LLP
          BY:  DAVID E. MOORE, ESQ.

          -and-

          HECHT PARTNERS, LLP
          BY:  CONOR B. McDONOUGH, ESQ.

                    Counsel for the Plaintiff

1   **APPEARANCES CONTINUED:**

2

3               **ASHBY & GEDDES**
                **BY:  ANDREW MAYO, ESQ.**
4
                **-and-**
5
                **MARSHALL GERSTEIN & BORUN**
6               **BY:  THOMAS DUSTON, ESQ.**
                **BY:  RAYMOND RICORDATI, ESQ.**
7
                        **Counsel for the Defendant**
8

9                       **— — — — — — — — —**

13:38:49 10

13:40:35 11          **THE COURT:  Good afternoon, counsel.  Who is**

14:01:37 12   **there, please?**

14:02:48 13          **MR. MOORE:  Good afternoon, Your Honor.  David**

14:02:50 14   **Moore from Potter Anderson on behalf of the plaintiff, Kroy.**

14:02:53 15   **I'm joined by my co-counsel from Hecht Partners, Conor**

14:02:58 16   **McDonough.**

14:02:58 17          **THE COURT:  Good afternoon.**

14:02:59 18          **MR. MAYO:  Good afternoon, Your Honor.  This is**

14:03:02 19   **Andrew Mayo from Ashby & Geddes on behalf of defendant,**

14:03:06 20   **Groupon.  And I'm joined this afternoon by my co-counsel**

14:03:06 21   **from Marshall, Gerstein & Borun, you have Thomas Duston and**

14:03:14 22   **Ray Ricordati on the line.  And we are also joined by the**

14:03:18 23   **assistant general counsel from Groupon, Kevin McCormick.**

14:03:21 24          **THE COURT:  Good afternoon to all of you.**

14:03:22 25          **So I have the letters here about seeking leave**

to amend.  And I guess my first question is, are they new claims that are being asserted here or is this really just removing claims and maybe bolstering some of the allegations of infringement?  Answer that question first, or those questions first and then we'll get to who I want to hear from.

MR. McDONOUGH:  This is Conor McDonough for plaintiff.

It is the latter, Your Honor.  There seems to have been maybe a typo in paragraph 18 that would suggest that claims were raised that were not in the original second amended -- First Amended Complaint as in the paragraph of proposed amended complaint the claims at issue are those -- it has removed claims that were originally asserted in the First Amended Complaint, and the allegations that have been asserted to the direct infringement claim are just there to bolster the pleadings.  The indirect infringement claims theory has been removed.

THE COURT:  All right.  So then let me hear from Groupon.  What is the big deal?  Assuming that I don't deal with utility now, you can still bring a motion to dismiss, what's the big deal with letting them amend so that your motion to dismiss is directed at the cleanness and most recent pleadings.

MR. DUSTON:  Your Honor, Tom Duston here for

Groupon.  Thank you.

I guess I have a first question.  I'm a little confused.  I have a letter from Mr. Moore to Your Honor dated February 24th in which he indicates that their amendment proposes to add claims 94, 98, 99, 105, 106, 112, 113, 14, and 15.  Now those claims were not asserted in the First Amended Complaint.

MR. DUSTON:  I can respond to that, Your Honor. That appears to have been an oversight.  To the extent that there is a discrepancy between the letter and the proposed amended pleading, the proposed amended pleading controls, so the operative set of claims that we would assert in the proposed amended pleading are those that are set forth in paragraph 50 of the proposed amended complaint.

THE COURT:  What is the oversight?  Is the oversight that the letter says you're adding those claims but you're not?

MR. McDONOUGH:  Yes, that is correct, Your Honor.

THE COURT:  All right.  Whoever just joined, you're six minutes late and you shouldn't be getting on if you're going to disrupt the call, but anyway.

So let's take what the Second Amended Complaint says and not the letter, now answer my question.

MR. DUSTON:  I still have one question then, on

14:06:45 1   paragraph 50, there is the addition of a claim 103 to the

14:06:51 2   list, if I'm looking at the red line correctly.

14:06:56 3          MR. McDONOUGH:  Well, I believe that reflects

14:06:58 4   the fact that claims 100 through 104 were originally

14:07:02 5   submitted for the First Amended Complaint and claims 101 and

14:07:05 6   102 are no longer asserted.  So that's why I wanted to --

14:07:11 7          MR. DUSTON:  I understand.  Thank you.

14:07:12 8          THE COURT:  So I find --  stop talking.  Okay.

14:07:18 9   I can't even understand how you guys are in front of me and

14:07:21 10  you don't even know what claims are being asserted.  That is

14:07:25 11  mind boggling to me.  But now assuming that we know what

14:07:29 12  claims there are, there are no new claims, what is the big

14:07:33 13  deal, Groupon, with just cleaning up the pleadings before

14:07:37 14  you make a motion to dismiss?

14:07:40 15         MR. DUSTON:  So, Your Honor, just with that in

14:07:42 16  mind, and that clarification that there are no new claims

14:07:45 17  being added, I apologize, I understood there were based on

14:07:49 18  the letter we received.

14:07:51 19         THE COURT:  But it was the pleading that they

14:07:54 20  should have sent you that you looked at and decided whether

14:07:57 21  you were going to oppose their motion.  Right?  And the

14:08:01 22  pleading didn't have all these new claims in them.  Right?

14:08:05 23         MR. DUSTON:  So the issue -- Your Honor, the

14:08:08 24  issue comes down then to the new joint infringement

14:08:12 25  allegations that are included in the complaint.  And

secondly, the question of whether or not the way to deal with the invalidated claims is simply to write them out of the complaint or whether it's appropriate given that there has been four years of litigation over them that a judgment be entered on those claims now that they have been found invalid.

THE COURT: All right. So let's assume that I'm not going to do that and enter judgment because you don't even say anything about that in the letters that are before me today. So assuming that there are no new claims being asserted, what is your opposition, if any, to the new complaint, again, not based on futility because I will allow you to renew your motion to dismiss.

MR. DUSTON: Groupon's objection, Your Honor, has to do with the fact that good cause has not been shown for the addition of a brand-new theory of infringement, the joint infringement theory that's included in the amended -- proposed amended complaint.

THE COURT: All right. So then let me hear from the plaintiff. This is well after the time for amendment, so you need to show good cause. Where is the good cause shown?

MR. McDONOUGH: Well, I think, Your Honor, it's twofold. For one thing, the single theory of infringement now is really consolidation of pleadings. The indirect

infringement theory includes certain of the allegations that
are now folded into and are part of the operative claim for
direct infringement under a joint infringement theory, so
there is not really a new set of allegations so much as
there is consolidation of allegations into a direct
infringement theory.

        And where good cause exist is the inquiry that
we set out under the letter is really about diligence and as
set forth in our letter, it wasn't really available to Kroy
that the knowledge that what claims would or wouldn't
survive IPR and whether the Federal Circuit wouldn't reject
or accept certain of the PTAB's findings, and so you know,
where the case has been stayed pending the outcome of that
IPR and appeal, and where the parties were ordered following
the Federal Circuit's ruling to meet and confer, we feel
that we have done so.  And we are just trying to make sure
that the Court has the benefit of streamlined pleadings that
set forth the operative theory of our case.

        THE COURT:  I guess what I'm not understanding
is why didn't you assert joint infringement originally, and
what is your good cause for doing so now?  You're just
saying I don't know what claims are going to be left, but
okay, that doesn't answer the question of why you're
changing your theory of infringement.

        MR. McDONOUGH:  Well, I guess I'm not sure I see

it as a change of the theory. The idea that there is joint

infringement has been there as far as I understand from the

beginning, even in the direct infringement claim, it's just

that pleadings have been added to that to bolster that

theory. I wouldn't say that this is an entirely new theory

at all. It mostly just has removed the indirect

infringement claims.

THE COURT: Could I ask another question. So

where are we in this case? Have there been infringement

contentions out there? The infringement contentions, did

they include a theory of joint infringement, plaintiff?

MR. McDONOUGH: As far as I understand the

status of the case, Your Honor, it is -- it has been in its

infancy to the extent that there has been some preliminary

contentions exchanged, but I am not aware that there have

been discovery exchanges of documents. I know that Groupon

has indicated that it has had at least at one point dated

source code available for inspection. I'm not aware of the

extent that that actually has gone forward where the stay

pending IPR has been in place. So I think at the moment

there hasn't been a lot -- there really hasn't been a lot of

formal discovery undertaken and I don't know that there has

been final infringement contentions submitted on the basis

of any discovery.

THE COURT: All right. Let me here from the

14:14:01 1    defendant.

14:14:01 2                MR. DUSTON:  Your Honor, Tom Duston for Groupon.

14:14:04 3                There were three days of source code inspection

14:14:07 4    prior to the amendments that was last made.  There were

14:14:12 5    infringement contentions to which we responded with

14:14:15 6    invalidity contentions that were exchanged.  The two

14:14:20 7    complaints previous made no mention of a joint infringement

14:14:24 8    theory.  The infringement contentions made no mention of a

14:14:28 9    joint infringement theory.  My understanding is the claims

14:14:31 10   that they're moving forward now on are the same as those

14:14:34 11   that were asserted in the last amended complaint.  It's

14:14:38 12   certainly clear that they could have asserted a joint

14:14:42 13   infringement theory at that time before the deadline to

14:14:45 14   amend.  I do not believe that they have shown that despite

14:14:49 15   their diligence that deadline could not have been met to

14:14:53 16   assert a joint infringement theory.  We have cited the case,

14:14:57 17   the *Sprint* case to Your Honor where just this situation

14:15:00 18   occurred and the court addressed it, the effort to include a

14:15:06 19   joint infringement theory and found that the addition of

14:15:11 20   that theory would require the showing of just cause or good

14:15:15 21   cause under Rule 16.  And I have looked through their

14:15:18 22   materials, Your Honor, I see no excuse offered for why this

14:15:23 23   joint infringement theory was not advanced previously.

14:15:26 24                I'll say one other thing.  I think it's

14:15:28 25   particularly -- the problem here is particularly acute given

the nature of these claims.  This patent underwent

reexamination.  The patent claims survived that

reexamination only after the patentee amended those claims

to specify that the claims required three different actors

operating three different systems in coordination with one

another.  And they expressed that that division of the

system among three players was what allowed the claims to

prevail over the prior art in that very early reexamination.

So to suggest that they were not sensitized to

the issue of divided infringement and joint infringement

before they filed their First Amended Complaint simply is

astounding.

THE COURT:  So plaintiff, are you new to this

case or something?  How is it that you didn't know that

there have been contentions?

MR. McDONOUGH:  Your Honor, I just wanted to

respond to that.  I understood that there had been

preliminary contentions exchanged, but discovery had not

taken place to the point where formal and final contentions

had been exchanged.

THE COURT:  So where is it if you're saying, oh,

we always had joint infringement in there.  It's not clear

in the original complaint.  In your preliminary contentions

you didn't include it.  So why am I supposed to believe that

there has been a disclosure of joint infringement and you're

14:17:08 1   just kind of bolstering it now?

14:17:12 2         MR. McDONOUGH:  Well, as I understood it, Your

14:17:14 3   Honor, the joint infringement theory really comes in to the

14:17:17 4   way consumers are interacting with these systems.  The other

14:17:22 5   -- the theory of a joint infringement to the extent it

14:17:26 6   involves a sponsor organization that would offer a deal

14:17:31 7   through Groupon services, that I believe has always been

14:17:36 8   part of the operative pleading.  So I think where we have

14:17:43 9   seen the clarification of the joint infringement, it really

14:17:46 10  is through the bolstering of allegations as to the consumers

14:17:52 11  themselves.  I'm not sure that that -- I'm not sure if that

14:17:57 12  was really -- it's not explicitly set forth in the original

14:18:03 13  amended complaint, it certainly is clearly there with

14:18:10 14  respect to the way the system operates or the accused system

14:18:13 15  is said to operate in the pleadings.

14:18:14 16         THE COURT:  All right.  So you have to tell me

14:18:16 17  now, assume that I don't see joint infringement alleged in

14:18:21 18  the Original Complaint or the First Amended Complaint and

14:18:24 19  you didn't raise it in your contentions when discovery was

14:18:30 20  ongoing, tell me what your good cause for me to allow you to

14:18:33 21  assert joint infringement is now.

14:18:38 22         MR. McDONOUGH:  Well, I think that it involves

14:18:40 23  in part the discovery that would seem to be -- yet to occur,

14:18:44 24  and that, you know, where amendment of the pleadings that

14:18:51 25  informs that the discovery should be allowed.

14:18:52 1          THE COURT: Wait a second. Wait a second. Wait

14:18:54 2  a second. That argument applies before this case was stayed

14:18:59 3  and before the amendment to the pleadings occurred the first

14:19:02 4  time. So you didn't do it then, so you need good cause.

14:19:08 5  And good cause is not well, maybe I could find something

14:19:13 6  else. Good cause is, I didn't do it then because I couldn't

14:19:17 7  have done it then, or you know, something has changed since

14:19:22 8  then. I'm not hearing any good cause.

14:19:25 9          MR. McDONOUGH: Well, maybe I wasn't clear in

14:19:29 10  the explaining, Your Honor, but what I was referring to as

14:19:32 11  far as what I understand there has been limited, very

14:19:36 12  limited discovery. And where discovery develops the record

14:19:39 13  and following a development of that record, contentions can

14:19:44 14  be supplemented and then even after that pleadings are

14:19:48 15  typically allowed to be conformed to the --

14:19:50 16          THE COURT: But stop, stop. What has changed

14:19:55 17  between the time that -- in terms of joint infringement,

14:20:01 18  between the time that you let the amended deadline go by and

14:20:07 19  now, what is different?

14:20:09 20          MR. McDONOUGH: I'm not sure there is much

14:20:11 21  difference, Your Honor, other than the fact that discovery

14:20:14 22  is really --

14:20:15 23          THE COURT: So why didn't you try to assert

14:20:20 24  joint infringement before the amendment deadline passed?

14:20:22 25          MR. McDONOUGH: I don't have a particularly good

14:20:31 1  answer for that, Your Honor, other than, you know, the

14:20:33 2  proposed amendments now are really just trying to make sure

14:20:37 3  that the streamline proceedings are there and that, you

14:20:41 4  know, that the nature of the claims is clarified.  Again,

14:20:45 5  I'm not sure that the joint infringement theory is not

14:20:49 6  totally absent from the original pleadings, so the

14:20:53 7  consolidation to a single claim here I think is not so much

14:20:58 8  an issue of notice to Groupon, it's more of a formulaic sort

14:21:05 9  of recitation issue that should not necessarily be limiting.

14:21:15 10  THE COURT:  Give me a minute.

14:21:17 11  (Pause.)  All right.  Thanks.  I just wanted to

14:26:12 12  look at the prior pleadings.

14:26:15 13  So plaintiff here seeks to amend its complaint

14:26:18 14  to delete some of the claims previously asserted and to add

14:26:22 15  allegations of joint infringement.  The deadline to amend

14:26:26 16  pleadings passed long ago and long before this case was

14:26:29 17  stayed pending IPR, thus plaintiff must satisfy

14:26:33 18  Rule 16(b)(4) of the Federal Rules of Civil Procedure which

14:26:38 19  provides that a schedule may be modified only for good cause

14:26:41 20  and with the judge's consent.

14:26:44 21  The primary measure of good cause is the

14:26:48 22  movant's diligence in attempting to meet the scheduling

14:26:52 23  ordinary requirements.  And consistent with that, this Court

14:26:55 24  has found this good cause is present when the schedule

14:26:57 25  cannot be met despite the moving party's diligence.  Here

1  the plaintiff suggest that its original pleading including

2  allegations of joint infringement.  I disagree about that.

3  That pleading asserted indirect infringement, not joint

4  infringement, and that joint infringement was not being

5  asserted is further seen from the lack of any such

6  allegations in the infringement contentions that were served

7  in this case.  So I agree with defendant that there was not

8  appropriate diligence here and good cause has not been

9  shown.  Indeed as plaintiff's counsel acknowledged today,

10  nothing has changed between the time of the scheduling order

11  for amendment of pleadings and now.  So while I will allow

12  the plaintiffs to clean up the claims in the complaint, I

13  will not allow new allegations of joint infringement at this

14  late stage.

15          So I guess I am granting the motion in part and

16  denying it in part.  And where does that leave us?

17          MR. McDONOUGH:  Well, Your Honor, plaintiff

18  would like to just confirm that the only change, then, is

19  the deletion of the claims that were invalidated in IPR,

20  that both direct and indirect infringement counts will

21  remain in the operative pleading.

22          THE COURT:  Whatever was there before, but not

23  joint infringement.  I don't see joint infringement in the

24  original pleadings.  You didn't raise it in your contentions

25  before the stay.  So that further confirms to me it is not

in the original pleadings so you cannot now amend to add
that.

MR. McDONOUGH:  Understood.  That's -- I think
that also answers my other question, so if it was in the
operative amended complaint at DI 76, other than the claims
that are being deleted, I think Your Honor expressed we
clean up the proceedings, that no other counts or
allegations, joint infringement under Count 1 are to be
added.

THE COURT:  Yes, that sounds right.  So where
does that leave us?  Defendant.

MR. DUSTON:  Your Honor, Tom Duston here for
Groupon.

I think where it leaves us is we need whatever
this is going to look like get filed and then we will move
to dismiss it on the basis that the claims asserted have
been resolved by the decisions of the Patent Office and the
Federal Circuit.

THE COURT:  All right.  And while that is going
on, I saw that the parties want to keep the stay in place.
So my procedures don't allow for that.  I don't typically
say you all can just sit there and stay the case until I do
something on your case.  So I was thinking that the case
should start moving forward.  If the parties who both seem
to agree that this case should be stayed pending a decision

on that motion, the only way I can allow that to occur is if
you will consent to the motions being heard by a magistrate
judge.  And I don't know which magistrate judge that would
be at the moment.  Any thoughts on that?

MR. McDONOUGH:  I was just saying we have to
confirm with our client before we are able to respond to
that officially, but we certainly would be able to take it
under advisement.

MR. DUSTON:  Your Honor, Tom Duston for Groupon.
I was going to suggest that we set Friday for an
announcement on that point to, Your Honor, give our clients
an opportunity to be heard.

THE COURT:  So we are in the process here of
trying to come up with procedures to these when Judge Stark
leaves.  And we are trying to come up with ways to encourage
magistrate judge consent, so what we are allowing is that
the parties need to -- in cases that are no longer assigned
to a judge, we allow the parties to confirm whether they
consent to a magistrate judge that the Court will assign,
whether they consent to a magistrate judge of the parties'
choosing, so if you all were to say hey, look, we both
consent to Judge Fallon, we would take that into
consideration.

So I will allow you in this limited instance to
consider those two options which is you can come back and

14:32:00 1   tell me we consent to a magistrate judge that the Court will

14:32:07 2   choose, we consent to a particular magistrate judge to deal

14:32:11 3   with this motion, or we don't consent at all.  And if you

14:32:15 4   don't consent at all, then what I will ask is that two weeks

14:32:20 5   after Friday, you submit to me a schedule for moving forward

14:32:25 6   in this case.

14:32:31 7           MR. DUSTON:  Your Honor, Tom Duston for Groupon.

14:32:33 8           If I can just clarify.  The consent we're

14:32:36 9   talking about is consent to decide this motion or is it

14:32:39 10   consent for all purposes?

14:32:40 11           THE COURT:  Well, you're certainly willing to

14:32:45 12   consider consent for all purposes, but it will be consent to

14:32:48 13   hear this motion.  Basically my position is if you want me

14:32:51 14   to decide this motion, I don't know when I'm going to be

14:32:56 15   able to decide it and I'm not holding the case up for that

14:33:00 16   time, so you're going to have to go forward.  If you both

14:33:05 17   agree that you want to stay the case pending the decision on

14:33:08 18   this motion, the only way you can get that done is by

14:33:12 19   consenting to a magistrate judge, either generally or both

14:33:16 20   agreeing to a particular magistrate judge to hear it.

14:33:20 21           MR. DUSTON:  Thank you, Your Honor.

14:33:27 22           THE COURT:  Any other questions on that?

14:33:31 23           MR. DUSTON:  Nothing for defendant.

14:33:32 24           MR. McDONOUGH:  Just confirming the timing on

14:33:34 25   that.  You were looking to receive from the parties our

14:33:39 1    position on the magistrate issue within two weeks from this

14:33:44 2    Friday?

14:33:44 3                 THE COURT:  No.  I want you to tell me whether

14:33:47 4    you consent or not this Friday.  That would be two days from

14:33:52 5    now.  And then if you do not consent, then you need to

14:33:59 6    submit to me a briefing schedule within two weeks from this

14:34:05 7    Friday.  Not a briefing schedule, I'm sorry, a schedule for

14:34:09 8    moving forward in this case.

14:34:11 9                 MR. McDONOUGH:  Understood.  My apologies.  I

14:34:14 10   hadn't heard the Friday, this Friday, March 4th as the

14:34:17 11   deadline.  I appreciate it.

14:34:20 12                THE COURT:  It doesn't seem like it's that

14:34:22 13   difficult of a decision.  You should be able to decide it

14:34:25 14   within two days.

14:34:29 15                All right.  Any other questions?

14:34:34 16                MR. DUSTON:  Nothing further from defendant,

14:34:36 17   Your Honor.

14:34:37 18                MR. McDONOUGH:  Nothing from plaintiff.

14:34:39 19                THE COURT:  All right.  Thanks very much.

20                (Teleconference concluded at 2:34 p.m.)

21

22                I hereby certify the foregoing is a true and
          accurate transcript from my stenographic notes in the proceeding.

23

24                                    /s/ Dale C. Hawkins
                                      Official Court Reporter
25                                    U.S. District Court

## /

**/s** [1] - 18:24

## 1

**1** [1] - 15:8
**100** [1] - 5:4
**101** [1] - 5:5
**102** [1] - 5:6
**103** [1] - 5:1
**104** [1] - 5:4
**105** [1] - 4:5
**106** [1] - 4:5
**112** [1] - 4:5
**113** [1] - 4:6
**14** [1] - 4:6
**15** [1] - 4:6
**16** [1] - 9:21
**16(b)(4** [1] - 13:18
**17-1405(MN** [1] - 1:5
**18** [1] - 3:10

## 2

**2** [1] - 1:10
**2022** [1] - 1:10
**24th** [1] - 4:4
**2:00** [1] - 1:10
**2:34** [1] - 18:20

## 4

**4th** [1] - 18:10

## 5

**50** [2] - 4:14, 5:1

## 7

**76** [1] - 15:5

## 8

**844** [1] - 1:12

## 9

**94** [1] - 4:5
**98** [1] - 4:5
**99** [1] - 4:5

## A

**able** [4] - 16:6, 16:7, 17:15, 18:13
**absent** [1] - 13:6
**accept** [1] - 7:12
**accurate** [1] - 18:22
**accused** [1] - 11:14
**acknowledged** [1] - 14:9
**actors** [1] - 10:4
**acute** [1] - 9:25
**add** [3] - 4:5, 13:14, 15:1
**added** [3] - 5:17, 8:4, 15:9
**adding** [1] - 4:16
**addition** [3] - 5:1, 6:16, 9:19
**addressed** [1] - 9:18
**advanced** [1] - 9:23
**advisement** [1] - 16:8
**afternoon** [6] - 2:11, 2:13, 2:17, 2:18, 2:20, 2:24
**ago** [1] - 13:16
**agree** [3] - 14:7, 15:25, 17:17
**agreeing** [1] - 17:20
**allegations** [12] - 3:3, 3:15, 5:25, 7:1, 7:4, 7:5, 11:10, 13:15, 14:2, 14:6, 14:13, 15:8
**alleged** [1] - 11:17
**allow** [8] - 6:12, 11:20, 14:11, 14:13, 15:21, 16:1, 16:18, 16:24
**allowed** [3] - 10:7, 11:25, 12:15
**allowing** [1] - 16:16
**amend** [6] - 3:1, 3:22, 9:14, 13:13, 13:15, 15:1
**Amended** [7] - 3:12, 3:15, 4:7, 4:23, 5:5, 10:11, 11:18
**amended** [13] - 3:12, 3:13, 4:11, 4:13, 4:14, 6:17, 6:18, 9:11, 10:3, 11:13, 12:18, 15:5
**amendment** [6] - 4:5, 6:20, 11:24, 12:3, 12:24, 14:11
**amendments** [2] - 9:4, 13:2
**ANDERSON** [1] - 1:19
**Anderson** [1] - 2:14
**ANDREW** [1] - 2:3
**Andrew** [1] - 2:19
**announcement** [1] - 16:11
**answer** [3] - 3:4, 4:24, 7:23, 13:1
**answers** [1] - 15:4
**anyway** [1] - 4:22
**apologies** [1] - 18:9
**apologize** [1] - 5:17
**appeal** [1] - 7:14
**APPEARANCES** [2] - 1:18, 2:1
**applies** [1] - 12:2
**appreciate** [1] - 18:11
**appropriate** [2] - 6:3, 14:8
**argument** [1] - 12:2
**art** [1] - 10:8
**ASHBY** [1] - 2:3
**Ashby** [1] - 2:19
**assert** [5] - 4:12, 7:20, 9:16, 11:21, 12:23
**asserted** [13] - 3:2, 3:14, 3:16, 4:6, 5:6, 5:10, 6:11, 9:11, 9:12, 13:14, 14:3, 14:5, 15:16
**assign** [1] - 16:19
**assigned** [1] - 16:17
**assistant** [1] - 2:23
**assume** [2] - 6:7, 11:17
**assuming** [3] - 3:20, 5:11, 6:10
**astounding** [1] - 10:12
**attempting** [1] - 13:22
**available** [2] - 7:9, 8:18
**aware** [2] - 8:15, 8:18

## B

**based** [2] - 5:17, 6:12
**basis** [2] - 8:23, 15:16
**BEFORE** [1] - 1:15
**beginning** [1] - 8:3
**behalf** [2] - 2:14, 2:19
**benefit** [1] - 7:17
**between** [4] - 4:10, 12:17, 12:18, 14:10
**big** [3] - 3:20, 3:22, 5:12
**boggling** [1] - 5:11
**bolster** [2] - 3:17, 8:4
**bolstering** [3] - 3:3, 11:1, 11:10
**BORUN** [1] - 2:5
**Borun** [1] - 2:21
**brand** [1] - 6:16
**brand-new** [1] - 6:16
**briefing** [2] - 18:6, 18:7
**bring** [1] - 3:21
**BY** [5] - 1:20, 1:22, 2:3, 2:6, 2:6

## C

**C.A** [1] - 1:5
**cannot** [2] - 13:25, 15:1
**case** [18] - 7:13, 7:18, 8:9, 8:13, 9:16, 9:17, 10:14, 12:2, 13:16, 14:7, 15:22, 15:23, 15:25, 17:6, 17:15, 17:17, 18:8
**cases** [1] - 16:17
**certain** [2] - 7:1, 7:12
**certainly** [4] - 9:12, 11:13, 16:7, 17:11
**certify** [1] - 18:22
**change** [2] - 8:1, 14:18
**changed** [3] - 12:7, 12:16, 14:10
**changing** [1] - 7:24
**choose** [1] - 17:2
**choosing** [1] - 16:21
**Circuit** [2] - 7:11, 15:18
**Circuit's** [1] - 7:15
**cited** [1] - 9:16
**Civil** [1] - 13:18
**claim** [5] - 3:16, 5:1, 7:2, 8:3, 13:7
**claims** [35] - 3:2, 3:3, 3:11, 3:13, 3:14, 3:17, 4:5, 4:6, 4:12, 4:16, 5:4, 5:5, 5:10, 5:12, 5:16, 5:22, 6:2, 6:5, 6:10, 7:10, 7:22, 8:7, 9:9, 10:1, 10:2, 10:3, 10:4, 10:7, 13:4, 13:14, 14:12, 14:19, 15:5, 15:16
**clarification** [2] - 5:16, 11:9
**clarified** [1] - 13:4
**clarify** [1] - 17:8
**clean** [2] - 14:12, 15:7
**cleaning** [1] - 5:13
**cleanness** [1] - 3:23
**clear** [3] - 9:12, 10:22, 12:9
**clearly** [1] - 11:13
**client** [1] - 16:6
**clients** [1] - 16:11
**co** [2] - 2:15, 2:20
**co-counsel** [2] - 2:15, 2:20
**code** [2] - 8:18, 9:3
**Complaint** [8] - 3:12, 3:15, 4:7, 4:23, 5:5, 10:11, 11:18
**complaint** [12] - 3:13, 4:14, 5:25, 6:3, 6:12, 6:18, 9:11, 10:23, 11:13, 13:13, 14:12, 15:5
**complaints** [1] - 9:7
**concluded** [1] - 18:20
**confer** [1] - 7:15
**confirm** [3] - 14:18, 16:6, 16:18
**confirming** [1] - 17:24
**confirms** [1] - 14:25
**conformed** [1] - 12:15
**confused** [1] - 4:3
**Conor** [2] - 2:15, 3:7
**CONOR** [1] - 1:22
**consent** [7] - 13:20, 16:2, 16:16, 16:19, 16:20, 16:22, 17:1, 17:2, 17:3, 17:4, 17:8, 17:9, 17:10, 17:12, 18:4, 18:5
**consenting** [1] - 17:19
**consider** [2] - 16:25, 17:12
**consideration** [1] - 16:23
**consistent** [1] - 13:23
**consolidation** [2] - 6:25, 7:5, 13:7
**consumers** [2] - 11:4, 11:10
**contentions** [15] - 8:10, 8:15, 8:23, 9:5, 9:6, 9:8, 10:15, 10:18, 10:19, 10:23, 11:19, 12:13, 14:6, 14:24
**CONTINUED** [1] - 2:1
**controls** [1] - 4:11
**coordination** [1] - 10:5
**correct** [1] - 4:18
**correctly** [1] - 5:2
**CORROON** [1] - 1:19
**counsel** [5] - 2:11, 2:15, 2:20, 2:23, 14:9
**Counsel** [2] - 1:23, 2:7
**Count** [1] - 15:8
**counts** [2] - 14:20, 15:7
**COURT** [30] - 1:1, 2:11, 2:17, 2:24, 3:19, 4:15, 4:20, 5:8, 5:19, 6:7, 6:19, 7:19, 8:8, 8:25, 10:13, 10:21, 11:16, 12:1, 12:16, 12:23, 13:10, 14:22, 15:10, 15:19, 16:13, 17:11, 17:22,

18:3, 18:12, 18:19
**court** [1] - 9:18
**Court** [7] - 1:15, 7:17, 13:23, 16:19, 17:1, 18:24, 18:25

## D

**Dale** [1] - 18:24
**dated** [2] - 4:4, 8:17
**DAVID** [1] - 1:20
**David** [1] - 2:13
**days** [3] - 9:3, 18:4, 18:14
**deadline** [6] - 9:13, 9:15, 12:18, 12:24, 13:15, 18:11
**deal** [7] - 3:20, 3:22, 5:13, 6:1, 11:6, 17:2
**decide** [4] - 17:9, 17:14, 17:15, 18:13
**decided** [1] - 5:20
**decision** [3] - 15:25, 17:17, 18:13
**decisions** [1] - 15:17
**Defendant** [2] - 1:8, 2:7
**defendant** [5] - 2:19, 9:1, 14:7, 15:11, 17:23, 18:16
**DELAWARE** [1] - 1:2
**Delaware** [1] - 1:13
**delete** [1] - 13:14
**deleted** [1] - 15:6
**deletion** [1] - 14:19
**denying** [1] - 14:16
**despite** [2] - 9:14, 13:25
**development** [1] - 12:13
**develops** [1] - 12:12
**DI** [1] - 15:5
**difference** [1] - 12:21
**different** [3] - 10:4, 10:5, 12:19
**difficult** [1] - 18:13
**diligence** [5] - 7:8, 9:15, 13:22, 13:25, 14:8
**direct** [5] - 3:16, 7:3, 7:5, 8:3, 14:20
**directed** [1] - 3:23
**disagree** [1] - 14:2
**disclosure** [1] - 10:25
**discovery** [10] - 8:16, 8:22, 8:24, 10:18, 11:19, 11:23, 11:25, 12:12, 12:21
**discrepancy** [1] - 4:10
**dismiss** [5] - 3:21,

3:23, 5:14, 6:13, 15:16
**disrupt** [1] - 4:22
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 1:15, 18:25
**divided** [1] - 10:10
**division** [1] - 10:6
**documents** [1] - 8:16
**done** [3] - 7:16, 12:7, 17:18
**down** [1] - 5:24
**DUSTON** [15] - 2:6, 3:25, 4:8, 4:25, 5:7, 5:15, 5:23, 6:14, 9:2, 15:12, 16:9, 17:7, 17:21, 17:23, 18:16
**Duston** [5] - 2:21, 3:25, 9:2, 15:12, 16:9, 17:7

## E

**early** [1] - 10:8
**effort** [1] - 9:18
**either** [1] - 17:19
**encourage** [1] - 16:15
**enter** [1] - 6:8
**entered** [1] - 6:5
**entirely** [1] - 8:5
**ESQ** [5] - 1:20, 1:22, 2:3, 2:6, 2:6
**exchanged** [4] - 8:15, 9:6, 10:18, 10:20
**exchanges** [1] - 8:16
**excuse** [1] - 9:22
**exist** [1] - 7:7
**explaining** [1] - 12:10
**explicitly** [1] - 11:12
**expressed** [2] - 10:6, 15:6
**extent** [4] - 4:9, 8:14, 8:19, 11:5

## F

**fact** [3] - 5:4, 6:15, 12:21
**Fallon** [1] - 16:22
**far** [3] - 8:2, 8:12, 12:11
**February** [1] - 4:4
**Federal** [4] - 7:11, 7:15, 13:18, 15:18
**filed** [2] - 10:11, 15:15
**final** [2] - 8:23, 10:19
**findings** [1] - 7:12
**first** [5] - 3:1, 3:4, 3:5, 4:2, 12:3
**First** [6] - 3:12, 3:15,

4:7, 5:5, 10:11, 11:18
**folded** [1] - 7:2
**following** [2] - 7:14, 12:13
**FOR** [1] - 1:2
**foregoing** [1] - 18:22
**formal** [2] - 8:22, 10:19
**formulaic** [1] - 13:8
**forth** [4] - 4:13, 7:9, 7:18, 11:12
**forward** [7] - 8:19, 9:10, 15:24, 17:5, 17:16, 18:8
**four** [1] - 6:4
**Friday** [7] - 16:10, 17:5, 18:2, 18:4, 18:7, 18:10
**front** [1] - 5:9
**futility** [1] - 6:12

## G

**Geddes** [1] - 2:19
**GEDDES** [1] - 2:19
**general** [1] - 2:23
**generally** [1] - 17:19
**GERSTEIN** [1] - 2:5
**Gerstein** [1] - 2:21
**given** [2] - 6:3, 9:25
**granting** [1] - 14:15
**Groupon** [12] - 2:20, 2:23, 3:20, 4:1, 5:13, 8:16, 9:2, 11:7, 13:8, 15:13, 16:9, 17:7
**GROUPON** [1] - 1:7
**Groupon's** [2] - 6:14
**guess** [5] - 3:1, 4:2, 7:19, 7:25, 14:15
**guys** [1] - 5:9

## H

**Hawkins** [1] - 18:24
**hear** [5] - 3:5, 3:19, 6:19, 17:13, 17:20
**heard** [3] - 16:2, 16:12, 18:10
**hearing** [1] - 12:8
**Hecht** [1] - 2:15
**HECHT** [1] - 1:22
**hereby** [1] - 18:22
**holding** [1] - 17:15
**HOLDINGS** [1] - 1:4
**Honor** [28] - 2:13, 2:18, 3:9, 3:25, 4:3, 4:8, 4:19, 5:15, 5:23, 6:14, 6:23, 8:13, 9:2, 9:17, 9:22, 10:16,

11:3, 12:10, 12:21, 13:1, 14:17, 15:6, 15:12, 16:9, 16:11, 17:7, 17:21, 18:17
**HONORABLE** [1] - 1:15

## I

**idea** [1] - 8:1
**IN** [1] - 1:1
**INC** [1] - 1:7
**include** [3] - 8:11, 9:18, 10:24
**included** [2] - 5:25, 6:17
**includes** [1] - 7:1
**including** [1] - 14:1
**indeed** [1] - 14:9
**indicated** [1] - 8:17
**indicates** [1] - 4:4
**indirect** [5] - 3:17, 6:25, 8:6, 14:3, 14:20
**infancy** [1] - 8:14
**informs** [1] - 11:25
**infringement** [51] - 3:4, 3:16, 3:17, 5:24, 6:16, 6:17, 6:24, 7:1, 7:3, 7:6, 7:20, 7:24, 8:2, 8:3, 8:7, 8:9, 8:10, 8:11, 8:23, 9:5, 9:7, 9:8, 9:9, 9:13, 9:16, 9:19, 9:23, 10:10, 10:22, 10:25, 11:3, 11:5, 11:9, 11:17, 11:21, 12:17, 12:24, 13:5, 13:15, 14:2, 14:3, 14:4, 14:6, 14:13, 14:20, 14:23, 15:8
**inquiry** [1] - 7:7
**inspection** [2] - 8:18, 9:3
**instance** [1] - 16:24
**interacting** [1] - 11:4
**invalid** [1] - 6:6
**invalidated** [2] - 6:2, 14:19
**invalidity** [1] - 9:6
**involves** [2] - 11:6, 11:22
**IP** [1] - 1:4
**IPR** [5] - 7:11, 7:14, 8:20, 13:17, 14:19
**issue** [7] - 3:13, 5:23, 5:24, 10:10, 13:8, 13:9, 18:1

## J

**joined** [4] - 2:15, 2:20, 2:22, 4:20
**joint** [31] - 5:24, 6:17, 7:3, 7:20, 8:1, 8:11, 9:7, 9:9, 9:12, 9:16, 9:19, 9:23, 10:10, 10:22, 10:25, 11:3, 11:5, 11:9, 11:17, 11:21, 12:17, 12:24, 13:5, 13:15, 14:2, 14:3, 14:4, 14:13, 14:23, 15:8
**judge** [10] - 16:3, 16:16, 16:18, 16:19, 16:20, 17:1, 17:2, 17:19, 17:20
**Judge** [3] - 1:15, 16:14, 16:22
**judge's** [1] - 13:20
**judgment** [2] - 6:4, 6:8

## K

**keep** [1] - 15:20
**Kevin** [1] - 2:23
**kind** [1] - 11:1
**King** [1] - 1:12
**knowledge** [1] - 7:10
**Kroy** [2] - 2:14, 7:9
**KROY** [1] - 1:4

## L

**lack** [1] - 14:5
**last** [2] - 9:4, 9:11
**late** [2] - 4:21, 14:14
**latter** [1] - 3:9
**least** [1] - 8:17
**leave** [3] - 2:25, 14:16, 15:11
**leaves** [2] - 15:14, 16:15
**left** [1] - 7:22
**letter** [7] - 4:3, 4:10, 4:16, 4:24, 5:18, 7:8, 7:9
**letters** [2] - 2:25, 6:9
**letting** [1] - 3:22
**limited** [3] - 12:11, 12:12, 16:24
**limiting** [1] - 13:9
**line** [2] - 2:22, 5:2
**list** [1] - 5:2
**litigation** [1] - 6:4
**LLC** [1] - 1:4
**LLP** [2] - 1:19, 1:22
**look** [3] - 13:12, 15:15, 16:21

**looked** [2] - 5:20, 9:21
**looking** [2] - 5:2, 17:25

## M

**magistrate** [10] - 16:2, 16:3, 16:16, 16:19, 16:20, 17:1, 17:2, 17:19, 17:20, 18:1
**March** [2] - 1:10, 18:10
**Marshall** [1] - 2:21
**MARSHALL** [2] - 2:5
**MARYELLEN** [1] - 1:15
**materials** [1] - 9:22
**Mayo** [1] - 2:19
**MAYO** [2] - 2:3, 2:18
**McCormick** [1] - 2:23
**McDonough** [21] - 1:22, 2:16, 3:7, 4:18, 5:3, 6:23, 7:25, 8:12, 10:16, 11:2, 11:22, 12:9, 12:20, 12:25, 14:17, 15:3, 16:5, 17:24, 18:9, 18:18
**measure** [1] - 13:21
**meet** [2] - 7:15, 13:22
**mention** [2] - 9:7, 9:8
**met** [2] - 9:15, 13:25
**mind** [2] - 5:11, 5:16
**minute** [1] - 13:10
**minutes** [1] - 4:21
**modified** [1] - 13:19
**moment** [2] - 8:20, 16:4
**MOORE** [2] - 1:20, 2:13
**Moore** [2] - 2:14, 4:3
**most** [1] - 3:23
**mostly** [1] - 8:6
**motion** [12] - 3:21, 3:23, 5:14, 5:21, 6:13, 14:15, 16:1, 17:3, 17:9, 17:13, 17:14, 17:18
**motions** [1] - 16:2
**movant's** [1] - 13:22
**move** [1] - 15:15
**moving** [5] - 9:10, 13:25, 15:24, 17:5, 18:8
**MR** [34] - 2:13, 2:18, 3:7, 3:25, 4:8, 4:18, 4:25, 5:3, 5:7, 5:15, 5:23, 6:14, 6:23, 7:25, 8:12, 9:2, 10:16, 11:2, 11:22, 12:9, 12:20, 12:25, 14:17, 15:3, 15:12,

16:5, 16:9, 17:7, 17:21, 17:23, 17:24, 18:9, 18:16, 18:18
**must** [1] - 13:17

## N

**nature** [2] - 10:1, 13:4
**necessarily** [1] - 13:9
**need** [5] - 6:21, 12:4, 15:14, 16:17, 18:5
**new** [12] - 3:1, 5:12, 5:16, 5:22, 5:24, 6:10, 6:11, 6:16, 7:4, 8:5, 10:13, 14:13
**NOREIKA** [1] - 1:15
**notes** [1] - 18:22
**nothing** [4] - 4:10, 10:23, 18:16, 18:18
**notice** [1] - 13:8

## O

**objection** [1] - 6:14
**occur** [2] - 11:23, 16:1
**occurred** [2] - 9:18, 12:3
**OF** [1] - 1:2
**offer** [1] - 11:6
**offered** [1] - 9:22
**Office** [1] - 15:17
**Official** [1] - 18:24
**officially** [1] - 16:7
**one** [5] - 4:25, 6:24, 8:17, 9:24, 10:5
**ongoing** [1] - 11:20
**operate** [1] - 11:15
**operates** [1] - 11:14
**operating** [1] - 10:5
**operative** [6] - 4:12, 7:2, 7:18, 11:8, 14:21, 15:5
**opportunity** [1] - 16:12
**oppose** [1] - 5:21
**opposition** [1] - 6:11
**options** [1] - 16:25
**order** [1] - 14:10
**ordered** [1] - 7:14
**ordinary** [1] - 13:23
**organization** [1] - 11:6
**original** [7] - 3:11, 10:23, 11:12, 13:6, 14:1, 14:24, 15:1
**Original** [1] - 11:18
**originally** [3] - 3:14, 5:4, 7:20
**outcome** [1] - 7:13
**oversight** [3] - 4:9, 4:15, 4:16

## P

**p.m** [2] - 1:10, 18:20
**paragraph** [4] - 3:10, 3:12, 4:14, 5:1
**part** [5] - 7:2, 11:8, 11:23, 14:15, 14:16
**particular** [2] - 17:2, 17:20
**particularly** [3] - 9:25, 12:25
**parties** [6] - 7:14, 15:20, 15:24, 16:17, 16:18, 17:25
**parties'** [1] - 16:20
**PARTNERS** [1] - 1:22
**Partners** [2] - 2:15
**party's** [1] - 13:25
**passed** [2] - 12:24, 13:16
**Patent** [1] - 15:17
**patent** [2] - 10:1, 10:2
**patentee** [1] - 10:3
**pause** [1] - 13:11
**pending** [5] - 7:13, 8:20, 13:17, 15:25, 17:17
**place** [3] - 8:20, 10:19, 15:20
**plaintiff** [10] - 2:14, 3:8, 6:20, 8:11, 10:13, 13:13, 13:17, 14:1, 14:17, 18:18
**Plaintiff** [2] - 1:5, 1:23
**plaintiff's** [1] - 14:9
**plaintiffs** [1] - 14:12
**players** [1] - 10:7
**pleading** [9] - 4:11, 4:13, 5:19, 5:22, 11:8, 14:1, 14:3, 14:21
**pleadings** [16] - 3:17, 3:24, 5:13, 6:25, 7:17, 8:4, 11:15, 11:24, 12:3, 12:14, 13:6, 13:12, 13:16, 14:11, 14:24, 15:1
**point** [3] - 8:17, 10:19, 16:11
**position** [2] - 17:13, 18:1
**Potter** [1] - 2:14
**POTTER** [1] - 1:19
**preliminary** [3] - 8:14, 10:18, 10:23
**present** [1] - 13:24
**prevail** [1] - 10:8
**previous** [1] - 9:7
**previously** [2] - 9:23, 13:14

**primary** [1] - 13:21
**problem** [1] - 9:25
**Procedure** [1] - 13:18
**procedures** [2] - 15:21, 16:14
**proceeding** [1] - 18:22
**proceedings** [2] - 13:3, 15:7
**process** [1] - 16:13
**proposed** [7] - 3:13, 4:10, 4:11, 4:13, 4:14, 6:18, 13:2
**proposes** [1] - 4:5
**provides** [1] - 13:19
**PTAB's** [1] - 7:12
**purposes** [2] - 17:10, 17:12

## Q

**questions** [3] - 3:5, 17:22, 18:15

## R

**raise** [2] - 11:19, 14:24
**raised** [1] - 3:11
**Ray** [1] - 2:22
**RAYMOND** [1] - 2:6
**really** [11] - 3:2, 6:25, 7:4, 7:8, 7:9, 8:21, 11:3, 11:9, 11:12, 12:22, 13:2
**receive** [1] - 17:25
**received** [1] - 5:18
**recent** [1] - 3:24
**recitation** [1] - 13:9
**record** [2] - 12:12, 12:13
**red** [1] - 5:2
**reexamination** [3] - 10:2, 10:3, 10:8
**referring** [1] - 12:10
**reflects** [1] - 5:3
**reject** [1] - 7:11
**remain** [1] - 14:21
**removed** [3] - 3:14, 3:18, 8:6
**removing** [1] - 3:3
**renew** [1] - 6:13
**Reporter** [1] - 18:24
**require** [1] - 9:20
**required** [1] - 10:4
**requirements** [1] - 13:23
**resolved** [1] - 15:17
**respect** [1] - 11:14
**respond** [2] - 4:8, 10:17, 16:6
**responded** [1] - 9:5

**RICORDATI** [1] - 2:6
**Ricordati** [1] - 2:22
**Rule** [2] - 9:21, 13:18
**Rules** [1] - 13:18
**ruling** [1] - 7:15

## S

**satisfy** [1] - 13:17
**saw** [1] - 15:20
**schedule** [6] - 13:19, 13:24, 17:5, 18:6, 18:7
**scheduling** [2] - 13:22, 14:10
**second** [4] - 3:11, 12:1, 12:2
**Second** [1] - 4:23
**secondly** [1] - 6:1
**see** [4] - 7:25, 9:22, 11:17, 14:23
**seeking** [1] - 2:25
**seeks** [1] - 13:13
**seem** [3] - 11:23, 15:24, 18:12
**sensitized** [1] - 10:9
**sent** [1] - 5:20
**served** [1] - 14:6
**services** [1] - 11:7
**set** [8] - 4:12, 4:13, 7:4, 7:8, 7:9, 7:18, 11:12, 16:10
**show** [1] - 6:21
**showing** [1] - 9:20
**shown** [4] - 6:15, 6:22, 9:14, 14:9
**simply** [2] - 6:2, 10:11
**single** [2] - 6:24, 13:7
**sit** [1] - 15:22
**situation** [1] - 9:17
**six** [1] - 4:21
**sorry** [1] - 18:7
**sort** [1] - 13:8
**sounds** [1] - 15:10
**source** [2] - 8:18, 9:3
**specify** [1] - 10:4
**sponsor** [1] - 11:6
**Sprint** [1] - 9:17
**stage** [1] - 14:14
**Stark** [1] - 16:14
**start** [1] - 15:24
**STATES** [1] - 1:1
**States** [1] - 1:15
**status** [1] - 8:13
**stay** [5] - 8:19, 14:25, 15:20, 15:22, 17:17
**stayed** [4] - 7:13, 12:2, 13:17, 15:25
**stenographic** [1] -

18:22
**still** [2] - 3:21, 4:25
**stop** [3] - 5:8, 12:16
**streamline** [1] - 13:3
**streamlined** [1] - 7:17
**Street** [1] - 1:12
**submit** [2] - 17:5, 18:6
**submitted** [2] - 5:5, 8:23
**suggest** [4] - 3:10, 10:9, 14:1, 16:10
**supplemented** [1] - 12:14
**supposed** [1] - 10:24
**survive** [1] - 7:11
**survived** [1] - 10:2
**system** [3] - 10:7, 11:14
**systems** [2] - 10:5, 11:4

## T

**Teleconference** [2] - 1:11, 18:20
**terms** [1] - 12:17
**THE** [32] - 1:1, 1:2, 1:15, 2:11, 2:17, 2:24, 3:19, 4:15, 4:20, 5:8, 5:19, 6:7, 6:19, 7:19, 8:8, 8:25, 10:13, 10:21, 11:16, 12:1, 12:16, 12:23, 13:10, 14:22, 15:10, 15:19, 16:13, 17:11, 17:22, 18:3, 18:12, 18:19
**themselves** [1] - 11:11
**theory** [23] - 3:18, 6:16, 6:17, 6:24, 7:1, 7:3, 7:6, 7:18, 7:24, 8:1, 8:5, 8:11, 9:8, 9:9, 9:13, 9:16, 9:19, 9:20, 9:23, 11:3, 11:5, 13:5
**thinking** [1] - 15:23
**THOMAS** [1] - 2:6
**Thomas** [1] - 2:21
**thoughts** [1] - 16:4
**three** [4] - 9:3, 10:4, 10:5, 10:7
**timing** [1] - 17:24
**today** [2] - 6:10, 14:9
**Tom** [5] - 3:25, 9:2, 15:12, 16:9, 17:7
**totally** [1] - 13:6
**transcript** [1] - 18:22
**true** [1] - 18:22
**try** [1] - 12:23
**trying** [4] - 7:16, 13:2,

16:14, 16:15
**two** [7] - 9:6, 16:25, 17:4, 18:1, 18:4, 18:6, 18:14
**twofold** [1] - 6:24
**typically** [2] - 12:15, 15:21
**typo** [1] - 3:10

## U

**U.S** [1] - 18:25
**under** [5] - 7:3, 7:8, 9:21, 15:8, 16:8
**understood** [5] - 5:17, 10:17, 11:2, 15:3, 18:9
**undertaken** [1] - 8:22
**underwent** [1] - 10:1
**UNITED** [1] - 1:1
**United** [1] - 1:15
**up** [6] - 5:13, 14:12, 15:7, 16:14, 16:15, 17:15
**utility** [1] - 3:21

## W

**wait** [3] - 12:1
**ways** [1] - 16:15
**Wednesday** [1] - 1:10
**weeks** [3] - 17:4, 18:1, 18:6
**willing** [1] - 17:11
**Wilmington** [1] - 1:13
**write** [1] - 6:2

## Y

**years** [1] - 6:4

# EXHIBIT B



US008566843B2

(12) **United States Patent**
Fuchs et al.

(10) Patent No.: **US 8,566,843 B2**
(45) Date of Patent: **\*Oct. 22, 2013**

(54) **SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK**

(75) Inventors: **Axel Fuchs**, San Jose, CA (US); **Scott Sturges Andrews**, Petaluma, CA (US)

(73) Assignee: **Stragent, LLC**, Longview, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/531,319**

(22) Filed: **Jun. 22, 2012**

(65) **Prior Publication Data**

US 2012/0266184 A1     Oct. 18, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/182,570, filed on Jul. 30, 2008, now Pat. No. 8,209,705, which is a continuation of application No. 10/737,690, filed on Dec. 15, 2003, now Pat. No. 7,802,263.

(60) Provisional application No. 60/434,018, filed on Dec. 17, 2002.

(51) **Int. Cl.**
**G06F 9/46**       (2006.01)
**G06F 15/16**      (2006.01)

(52) **U.S. Cl.**
USPC ............................ **719/313**; 709/230; 718/104

(58) **Field of Classification Search**
USPC ............................ 709/230; 718/104; 719/313
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,588,002 | A | 12/1996 | Kawanishi et al. | 370/462 |
| 5,956,489 | A * | 9/1999 | San Andres et al. | 709/221 |
| 6,034,970 | A * | 3/2000 | Levac et al. | 370/466 |
| 6,141,710 | A | 10/2000 | Miesterfeld | 710/110 |
| 6,289,390 | B1 | 9/2001 | Kavner | 719/310 |
| 6,378,001 | B1 | 4/2002 | Aditham et al. | 719/313 |
| 6,801,942 | B1 | 10/2004 | Dietrich et al. | 709/225 |
| 7,103,045 | B2 | 9/2006 | Lavigne et al. | 370/392 |
| 7,103,646 | B1 | 9/2006 | Suzuki | 709/220 |
| 7,103,656 | B2 | 9/2006 | Lewis et al. | 709/223 |
| 7,552,440 | B1 | 6/2009 | Stewart et al. | 719/312 |
| 2001/0018685 | A1 * | 8/2001 | Saito et al. | 707/3 |
| 2002/0073243 | A1 | 6/2002 | Staiger | 719/313 |
| 2002/0198943 | A1 * | 12/2002 | Zhuang et al. | 709/206 |
| 2003/0088568 | A1 * | 5/2003 | Matsunaga et al. | 707/10 |

OTHER PUBLICATIONS

"An Embedded Software Primer," David E. Simon, 1999.
"Application of In-Vehicle Data Buses for Collision Avoidance Systems," William D. Horne, et al., 1998.
"The Foundation.TM Fieldbus Primer," Fieldbus Inc., Jun. 24, 2001.
"GSA Guide to Specifying Interoperable Building Automation and Control Systems Using ANSI/ASHRAE Standard 135-1995," Steven T. Bushby et al., Nov. 1999.
"Programming in the OSEK/VDX Environment," Joseph Lemieux, 2001.

(Continued)

*Primary Examiner* — Charles E Anya

(57)         **ABSTRACT**

A system, method and computer program product are provided for sharing information in a distributed system. After information is received, it is stored on a bulletin board. In use, the information is shared, in real-time, among a plurality of heterogeneous processes.

**59 Claims, 17 Drawing Sheets**



(56) **References Cited**

OTHER PUBLICATIONS

"OSEK/VDX Binding Specification Version 1.3," OSEK Group, Sep. 17, 2001.
"OSEK/VDX Binding Specification Version 1.4," OSEK Group, Sep. 6, 2002.
"OSEK/VDX Binding Specification Version 1.4.1," OSEK Group, Jan. 21, 2003.
"OSEK/VDX Communication Specification Version 2.2.2," OSEK Group, Dec. 18, 2000.
"OSEK/VDX Communication Specification Version 3.0," OSEK Group, Jul. 26, 2002.
"OSEK/VDX Communication Specification Version 3.0.1," OSEK Group, Jan. 29, 2003.
"OSEK/VDX Communication Specification Version 3.0.2," OSEK Group, Dec. 9, 2003.
"OSEK/VDX Fault-Tolerant Communication Specification Version 1.0," OSEK Group, Jul. 24, 2001.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.0," OSEK Group, May 31, 1998.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.1," OSEK Group, May 31, 2000.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.2," OSEK Group, Jan. 16, 2003.
"OSEK/VDX OSEK Implementation Language Specification Version 2.3," OSEK Group, Sep. 10, 2001.
"OSEK/VDX OSEK Implementation Language Specification Version 2.4," OSEK Group, Dec. 2, 2002.
"OSEK/VDX OSEK Implementation Language Specification Version 2.4.1," OSEK Group, Jan. 23, 2003.
"Goals and Motivation: What is OSEK/VDX," OSEK VDX Portal, 2012.
"OSEK/VDX OSEK Run Time Interface Part A: Language Specification Version 2.1," OSEK Group, Jul. 16, 2001.
"OSEK/VDX OSEK Operating System Specification Version 2.0 revision 1," OSEK Group, Oct. 15, 1997.
"OSEK/VDX OSEK Operating System Specification Version 2.1 revision 1," OSEK Group, Nov. 13, 2000.
"OSEK/VDX OSEK Operating System Specification Version 2.2," OSEK Group, Sep. 10, 2001.
"OSEK/VDX OSEK Operating System Specification Version 2.2.1," OSEK Group, Jan. 16, 2003.
"OSEK/VDX Time-Triggered Operating System Specification Version 1.0," OSEK Group, Jul. 24, 2001.
Documents from Case 6:11-cv-00111.

* cited by examiner

FIGURE 1





FIGURE 2



FIGURE 3

FIGURE 4



302 Embedded Software

Application — 401

Application — 401

Middleware — 402

Real-Time Operating System — 403

Device Drivers — 404

Hardware Abstraction Layer — 405

FIGURE 5



402 **Middleware**

Application Programming Interface   502

Upgrade and Configuration Manager   507

Access Manager   508

Event Manager   505

Data Integrity Watchdog   506

501

Bulletin Board Manager

Local Signal Com. Interface
Signal - Variable Conversion   503

509

Remote Message Com. Interface
Message - Variable Conversion   504

510



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9

Store Variable from local I/O

**901** External or internal Notification/ activation

902 — Sample/Poll Input ports

903 — Convert Signals to Variables

804 — Store Variables in Bulletin Board

905 — Variables for other BB section?

yes

no

906 — Task inactive - Wait for notification

FIGURE 10



Bulletin Board
Store Mechanism



FIGURE 11



FIGURE 12



FIGURE 13



FIGURE 14



FIGURE 15



FIGURE 16



FIGURE 17

1

# SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK

## RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 12/182,570 filed Jul. 30, 2008, which is a continuation of U.S. patent application Ser. No. 10/737,690 filed Dec. 15, 2003, now U.S. Pat. No. 7,802,263, which, in turn, claims priority under 35 U.S.C. §119 based on U.S. Provisional Application No. 60/434,018 filed Dec. 17, 2002, all of which are incorporated herein by reference.

## FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to the field of distributed control and monitoring systems that may include certain temporal behavior.

Such technology may optionally apply to electronic vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system.

## SUMMARY OF THE INVENTION

A system, method and computer program product are provided for sharing information in a distributed system. After information is received, it is stored on a bulletin board. In use, the information is shared, in real-time, among a plurality of heterogeneous processes.

In one embodiment, both past and present instances of the information may be stored on the bulletin board. As an option, the information may be replicated among a plurality of the bulletin boards. Optionally, first information may be processed utilizing a first bulletin board and stored utilizing a second bulletin board. Still yet, the bulletin boards may be hierarchical.

In another embodiment, the processes may access multiple sections of the bulletin board. Further, the bulletin board may send notifications to the processes based on a state of the information on the bulletin board.

Optionally, the information may include variables. For example, the information may include input variables, output variables, etc. Moreover, the processes may include local processes, remote processes, etc. Still yet, the processes may include event triggered processes and/or time triggered processes. In use, each of the processes may process the information in a manner that is isolated from temporal characteristics associated with the network.

In still another embodiment, the information may be extracted from a message received by a bulletin board manager. Moreover, the information may be converted from a signal received by a bulletin board manager. Even still, the information may be shared in a single task, may be shared according to a schedule, and/or may be shared with an operating system. Optionally, dynamic preemptive scheduling may be provided. Also, the information may be shared across the communication network with only a portion of a message header that is needed for a specific communication link while other communication links may use a different message header.

As a further option, resources in the network may be protected. Specifically, the resources in the network may be protected utilizing a schedule that allows information sharing

2

utilizing the bulletin board. In another embodiment, the resources in the network may be protected utilizing semaphores.

In even still another embodiment, the information may be shared according to an internal clock, an external clock, etc. During operation, objects may be generated based on a change of state of the information stored in the bulletin board. Such objects may include, but are not limited to flags, events, signals, interrupts, etc. Still yet, the information may be stored in response to interrupts associated with the processes.

In use, the bulletin board may update the processes with information at a first rate that differs from a second rate with which the processes send the information to the bulletin board. Optionally, the bulletin board may be accessed with guaranteed access times, jitter, and bandwidth.

In addition, the bulletin board may be updated irregularly and triggered by internal or external objects including, but not limited to flags, events, signals, interrupts, etc. Event triggers may be provided independent of a link connection between nodes where the processes are carried out. Moreover, failure redundancy may be provided through multiple independent links across diverse physical connections.

As yet another option, the information may have a user-configured constraint associated therewith. Such constraint may include a memory constraint, a real-time constraint, etc. As a further option, the constraint may be configured utilizing a tool.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an embodiment of a system of one embodiment;

FIG. 2 is a block diagram generally depicting an embodiment of an ECU as part of the system illustrated in FIG. 1;

FIG. 3 is a block diagram generally depicting an embodiment of a Gateway device as part of the system illustrated in FIG. 1;

FIG. 4 is a block diagram of an embodiment of the software architecture assumed for one embodiment.

FIG. 5 is a block diagram of an embodiment of the middleware that contains the methods of one embodiment.

FIG. 6 is a block diagram of an embodiment of the bulletin board that describes the process interaction of one embodiment.

FIG. 7 is a block diagram of an embodiment of the bulletin board that describes the process interaction with multiple external communication buses as part of one embodiment.

FIG. 8 is a flow chart diagram of an embodiment of the variable store from remote I/O method of one embodiment.

FIG. 9 is a flow chart diagram of an embodiment of the variable store from local I/O method of one embodiment.

FIG. 10 is a flow chart diagram of an embodiment of the variable method of one embodiment.

FIG. 11 is a flow chart diagram of an embodiment of the variable retrieve method of one embodiment.

FIG. 12 is a flow chart diagram of an embodiment of the application process using the method of one embodiment

FIG. 13 is a flow chart diagram of an embodiment of the local I/O update from bulletin board method of one embodiment.

FIG. 14 is a flow chart diagram of an embodiment of the variable replication method of one embodiment.

FIG. 15 is a flow chart diagram of an embodiment of the message store from remote gateway method of one embodiment.

FIG. **16** is a flow chart diagram of an embodiment of the message forward to remote ECU or Gateway method of one embodiment.

FIG. **17** is a state transition diagram of an embodiment of the mode switching method of one embodiment.

## DETAILED DESCRIPTION

FIG. **1** is a block diagram generally depicting elements of an embodiment of the present distributed embedded communication and computing system. The system architecture may be situated in automotive electronics or industrial control and monitoring systems. In an automotive environment, the various Electronic Control Units (ECUs, **102**) control complex applications such as engine control, brake control, or diagnostics. They are either connected to sensors and actuators via discrete links or simple standard functions such as sensors and actuators are organized into separate sub networks.

These complex functions such as braking, engine-control, etc. are then grouped into the backbone system functions for the car, such as body control, power train and chassis. The backbone also includes the vehicle's high level functions such as diagnostics, telematics and entertainment systems.

Therefore the system is typically hierarchically organized and includes a variety of gateways (**101,104,105**), which relay messages up and down through the system layers. Each layer may contain multiple electronic control units (ECU, **102**) that are connected through wired serial multiplexing bus-systems such as Controller Area Network (CAN or ISO11898), Flexray, LIN, J1850, J1708, MOST, IEEE1394, and other similar serial multiplexing buses or through wireless multiplexing systems such as IEEE802.11, IEEE802.15, Bluetooth, Zigbee, or similar other wireless links.

Typically, functions provided by an ECU (**102**) are bound to hard real-time temporal behavior. In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second.

The ECU may receive a set of real-time input variables from local sensors (**108**), which are connected via discrete signal lines (**113**), or from networked sensors (**106**), which are connected through a multiplexing bus-system (**112**). The ECU may also share variables with other ECUs (**102**) that are either connected on the same physical multiplexing bus or that it can reach through a gateway (**101,103,104**).

Then the ECU (**102**) processes the input variables and generates a set of output variables that are either shared with other ECUs (**102**) as described above, or which are output to local actuators (**109**), which are connected via discrete signal lines (**113**), or to networked actuators, which are connected through a multiplexing bus (**112**). ECUs (**102**) typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system. Gateways (**101,103,104**) link multiple physical multiplexing systems together. In the context of the present description, such information may include data, a signal, and/or anything else capable of being stored and shared.

The highest level in the hierarchical system is the system level. The system level gateway (**101**) may be connected to ECUs on the system level multiplexing bus (**117**), to subsequent gateways (**103**) that also link to subsequent communication buses (**110**), and to external components (**120**) that may contain diagnostics devices (**121**), development tools (**122**), other add-on devices (**123**) or other instances of distributed embedded communication and computing systems

(**100**). In addition, the system gateway (**101**) may also be connected to an external gateway (**131**) that may link the system to a remote device (**132**) through wireless or wired wide-area-networks such as the Internet, using standard protocols such as UDP/IP, TCP/IP, RTP, HTTP, SOAP, JAVA, etc. or nonstandard proprietary protocols.

Subsequent to the system level may be several layers of groups and subgroups that are link to the higher levels via gateways (**101,103,104,105**).

During the design-time of the system, not all ECUs may exist. Therefore, the development tool (**122**) may provide a plug-in component or virtual ECU/GW (**115**) that directly links into the wired multiplexing bus or wireless network (**110**) and also allows for separate control functions via a tool-link (**116**).

The block diagram in FIG. **2** depicts the detailed elements within a generic ECU (**200**) that is one embodiment of ECU (**102**). The ECU (**200**) typically contains a micro-processor (**201**), volatile memory (**204**) such as RAM, S-RAM or similar, non-volatile memory (**203**) such as EEPROM, FLASH, etc., a real time clock for internal timing of processes (**205**), a watchdog (**206**) to maintain the health of the system, one or more communication bus controllers (**207**) with associated drivers (**208**), digital I/O (**209**) with line drivers (**210**), and analog I/O (**211**) with associated analog signal conditioning (**212**).

In an alternate embodiment, the ECU (**200**) may also contain a wireless communication controller (**311**) and a RF-Front-end (**312**) as outlined in FIG. **3**. The software (**202**) can either be stored in local non-volatile memory (**203**) or partially downloaded via the communication link (**207,208**) and stored in the volatile memory. The software is then executed in the microprocessor (**201**).

The block diagram FIG. **3** depicts the detailed elements within a generic gateway (**300**) that is one embodiment of Gateway (**101,103,104,105**) in FIG. **1**.

FIG. **4** outlines one embodiment of the software architecture in an embedded system. The hardware abstraction layer (**405**) allows the system developer to adapt a standard operating system to a specific hardware as used in an ECU (**200**) or gateway (**300**). The hardware abstraction layer (**405**) adapts the real-time operating system (**403**) and the device drivers (**404**) to a specific hardware implementation.

One embodiment includes the middleware (**402**) that has direct access to the real-time operating system (**403**), the device drivers (**404**) and the hardware abstraction layer (**405**). The middleware isolates the application from input/output functions and allows multiple applications to share common variables locally. In addition, the middleware lets applications share variables with remote applications/processes. In the context of the present description, a process may refer to any hardware and/or software operation, etc.

In one embodiment, the middleware can directly interface with the input/output mechanisms of the hardware without utilizing an operating system (**403**) or hardware abstraction layer (**405**).

Another embodiment of the middleware utilizes a preemptive multitasking operating system with explicit control of resources. In an alternate embodiment, the middleware can be built with a static multitasking scheme with implicit resource management or be part of a single task system.

Referring now to FIG. **5**, the middleware (**402**) contains the bulletin board manager (**501**), a local signal communication interface (**503**), a remote message communication interface (**504**), and an application programming interface (**502**). The application interface (**502**) provides methods and data inter-

faces to a plurality of applications. In one embodiment, the application interface is an object library that can be linked to an application at design time.

The bulletin board manager (**501**) contains an upgrade and configuration manager (**507**), an event manager (**505**), a data access manager (**508**), and a data integrity watchdog (**506**). The upgrade and configuration manager (**507**) is necessary to configure the data structure of the bulletin board and to make executable code available to individual processing nodes. In the context of the present description, the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process.

The access manager provides access control mechanisms for the code update and configuration mode. It also may control access rights for individual applications at execution time in the run mode.

The event manager (**505**) captures input-output events as variables and generates new events, flags, or signals based on operations on state variables in the bulletin board. Such operations may include test of maximum values, the occurrence of logically combined events, the result of an integrity check, or events and signals that are created based on any other logical or arithmetic computation on the state variables that are stored in the bulletin board. The actual processing of data and manipulation of data may be done in the application that uses the middleware (**402**). The data integrity watchdog analyses the stored state variables for its integrity and generates events or flags if any problem occurs.

The local signal communication interface (**503**) interfaces with the local discrete input/output hardware to update the bulletin board with new variables and to update the input/output interfaces with the state variables from the bulletin board. It also converts state variables to input/output signals and input/output signals to state variables that can be stored in the bulletin board. The conversion process may contain scaling of signals as well as offset compensation. Typically this processing helps to convert I/O signals that are measured in Volt to a physical entity and vice versa. The communication with the local discrete input output system can be triggered by events or signals can be sampled time-triggered based on a cyclic global or local time base.

The remote message communication interface (**504**) interfaces with serial multiplexing interfaces (buses) that are connected to the specific processing node (ECU or Gateway). It extracts variables from a plurality of messaging protocols and stores them in the database. It also replicates local bulletin-board state variables to the associated processing nodes by composing the appropriate messages for each communication link. The message transfer can be initiated triggered by a bus event, by a local event, or by a time-triggered mechanism that uses a cyclic local or global time base.

FIG. **6** shows the concept of an extended bulletin board or an embedded real-time database (**601**). In this embodiment the ECU (**102**) or the Gateway (**101**) hosts one or multiple bulletin boards with relational links between the variables in the bulletin boards. The relations are defined by data processing functions that the gateway can operate on bulletin boards to obtain new information that can be stored in yet another bulletin board.

The bulletin board (**601**) may contain but is not limited to events (**607**), real-time variables (**608**), diagnostics data (**609**), configuration parameters (**610**), and firmware (**611**) to upgrade individual components of the executable code or the entire software of a processing node. Each type of informa-

tion may include one or more sections so that individual processes are not blocked if they access separate sections of data.

The memory of the bulletin board is subdivided into areas that nodes on each external network can read from and write into and other areas that an external network may only read from. The data contained in the bulletin board may be stored in volatile or non-volatile memory. Each data entry may consist of one value or an array of values that also may represent a time series.

In one embodiment, each application process (**603**), local signal communication process (**605**), remote message communication process, and the bulletin manager (**602**) can individually access the bulletin board using operating system functions for resource management that may include semaphores, events, signals, call-back routines, flags, etc. in an alternate embodiment of the system the bulletin-board manager controls all interaction with the bulletin-board and all applications have to pass data to the bulletin-board manager. This approach simplifies the interaction with the bulletin board, but adds delay time and jitter to the state variables.

At design time, various hierarchies of memory management can be applied. In practice it is more efficient to allow each sub network and subsystem to place system variable data into local bulletin boards. This is because many system variables are primarily used only within their subsystem or sub network. By placing local information in a shared memory (local bulletin board), it can be used by multiple processes on this processor node. A group bulletin board allows devices on a sub-network to share information with a minimum of network traffic. A system bulletin board allows access to system-wide variables and information.

FIG. **7** illustrates the logical architecture of the interconnection between three heterogeneous network controllers (**702, 703, 704**), the associate Operating System interfaces (**705**), the remote message communication process (**706**), the bulletin board (**608**), and the application process (**606**). The connection to each communication controller is fundamentally implemented at the physical interface (the wire, fiber or electromagnetic wireless interface). Each of the higher level layers (data link, network, etc) in the communication interface (**705**) deals with specific features of the individual communication process. In practice these layers are typically represented in a message by "header" bits that contain information about that layer of the network being used to send the message.

Using this model, each communicated message may be processed at each layer to remove (and use) the associated header information for that level. Once all layers are processed the remaining packet data unit (PDU) represents the datum or core information carried by the overall message. In one embodiment, each communication controller has an associated communication interface and an associated remote message conversion mechanism. For instance communication bus controller 2 (**703**) has an associated communication interface 2 (**709**), and an associated remote message conversion 2 (**710**).

This arrangement allows the remote message process (**706**) to directly access information at the data link layer and interface it with the bulletin board. A network layer is not necessary. The remote message communication process (**706**) has a multi-network access interface (essentially a processing capability that can interpret and apply the header information for a variety of networks) and the bulletin board read/write memory access. Now, the individual processing nodes do not need to know about the existence of multiple networks. Each variable can be accessed from all connected physical net-

works in their proprietary format. Thus the normalization of the information has only to be handled at the gateway through replication of stored data to multiple attached networks.

Continuing with FIG. 7, the communication procedure is described. In the given example, an external event (**701**) on communication controller **2** (**703**) triggers the operating system to notify the remote message communication process (**706**) that data is available. The notification may be a flag, a call-back routine, an event, or any other operating signal. The associated remote message conversion method **2** (**710**) extracts the data (e.g. real time variables) from the message PDU and stores the data in the bulletin board (**608**). It may also store the associated event as variable in the bulletin board and signal the bulletin-board event manager that new data is available.

The bulletin event manager then notifies the application process (**606**) with the appropriate mechanism. In addition, the event manager may trigger the sampling of local signals using the local signal communication process (**605**) described in FIG. 6. Finally the bulletin event manager may trigger the bulletin board manager (**707**) to perform integrity checks or generate additional events based on the change of the state variables.

One embodiment provides a new mechanism for creating an information interconnection between two or more heterogeneous communication networks. In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different.

The approach uses a common, or shared storage system that is connected to all of the system networks through network interfaces. A critically important feature of the bulletin board approach is that the complexity of the bulletin board grows linearly with the number of networks (as opposed to as N(N−1) for the gateway approach), and in one-to-many situations the number of message transformations is half that of the standard networking approach.

In an alternate embodiment of the remote message communication process (**706**) any remote process can access data via a single network interface. This approach requires a network layer in each processing node and therefore adds overhead to communications. To communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link. The remote message communication manager (**706**) then can be simplified to only one message assembly and disassembly mechanism.

FIGS. **8-17** illustrate the method of operation of one embodiment of the present system, and also refer to aspects and elements one embodiment shown in FIGS. **1** through **7**.

FIG. **8** details the remote messaging process (**706**) described in FIG. **7**. Referring now to FIG. **8**, the core process of storing data from remote processes that are communicated through multiplexed communication links, into the bulletin board is described. An external notification or task activation starts the process. Then a message (**802**) is received from the operating system layer.

In an alternate embodiment, the message is directly copied form the input register of the communication controller. Then the process extracts variables from the message. Additional signal adaptation may be necessary. The sub-process **804** stores the variables in the bulletin board. If the process only updates one section of the bulletin board it waits for the next message notification (**806**). If variables in multiple sections need to be updated, the process repeats (**804**).

FIG. **9** shows the data update from local input/output peripherals. The process starts with an internal or external notification or task activation. Typically this process is repeated cyclic triggered by an internal or external real-time clock. When the process is activated, it samples or polls the local input ports that may include analog and digital signals (**902**). Then it converts these signals to real-time variables by using the conversion parameters stored in the bulletin board. The signal conditioning parameters van either be defined at design time or adaptively updated by the application process. Then the process stored the new state variables in the bulletin board using the sub-process (**804**) described above.

FIG. **10** describes the bulletin board store procedure (**804**) in more detail. Before new data can be stored in the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1001**). This is called explicit resource management.

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1011**) until the resource is available. After a certain time has elapsed (**1009**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process.

After reserving the resource (**1003**), the bulletin board store mechanism (**804**) timestamps the state variable for future temporal reference (**1004**). Then, the bulletin board store procedure (**804**) copies the variables or parameters from its private memory (**1006**) to the shared bulletin-board memory (**601**). Then it releases the bulletin board resource.

In an alternate embodiment, the bulletin board store procedure (**804**) has exclusive access to the bulletin board (**601**) and does not need operations **1002**, **1003**, **1007**, **1009**, **1010**, and **1011** because the resource access is realized through implicit resource management. This can be achieved with either static task scheduling or by allowing only the bulletin board store procedure (**804**) to access the bulletin board (**601**).

FIG. **11** describes the bulletin board retrieve procedure (**1101**) in more detail. Before data can be retrieved from the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1102**).

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1108**) until the resource is available. After a certain time has elapsed (**1109**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process (**1110**).

After reserving the resource (**1104**), the bulletin board retrieve mechanism (**1101**) copies the variables or parameters from the shared bulletin-board memory (**601**) to its private memory (**1006**). Then, it releases the bulletin board resource. In an alternate embodiment the bulletin board retrieve procedure (**1101**) has exclusive access to the bulletin board (**601**) and does not need operations **1103**, **1104**, **1106**, **1108**, **1109**, and **1110**. Because the resource access is realized through implicit resource management, this can be achieved with either static task scheduling or by allowing only the bulletin board retrieve procedure (**1101**) to access the bulletin board (**601**).

Referring to FIG. **12**, the application process (**1200**) utilizes the bulletin board retrieve procedure (**1101**) to access all parameters, events, and real-time variables from the bulletin board. Thus the application process is decoupled from

the temporal behavior of the input/output variables and can be triggered by a plurality of events (**1201**).

The application process may retrieve one or multiple sets of variables stored in a plurality of memory sections. Then the application process processes the variables (**1203**) with its method. Because the method is not tied to the location of the input/output variables, the application process can be moved or replicated to a plurality of processing nodes (ECUs or Gateways). After processing the input variables and generating a set of output variables, the application process uses the bulletin board store method (**801**) to update one or a plurality of memory sections in the bulletin board. If the application process is a cyclic procedure, it waits until the next activation occurs (**1205**).

Continuing with FIG. **13**, the update local I/O from bulletin board process (**1300**) utilizes the bulletin board retrieve mechanism (**1101**) to access real-time variables from the bulletin board and convert them to output signals (**1302**) that can be written to the output port (**1303**). The I/O update process may retrieve one or multiple sets of variables stored in a plurality of memory sections. If the I/O update process is a cyclic procedure, it waits until the next activation occurs (**1305**).

FIG. **14** describes the data replication process (**1400**). This process can be triggered by a plurality of notification mechanisms, such as events, alarm signals, internal and external timers, and flags set in the bulletin board. It then selects a subset of variables to be replicated and a communication port (**1402**). Next it retrieves the variables from the bulletin board with mechanism (**1401**) and assembles the messages for the specific communication link (**1403**). The message may include an address or identification number for all bulletin boards and associated processing nodes (ECUs and Gateways).

Finally, it writes the messages to the communication port (**1404**). In an alternate embodiment, it handles the messages to the associated interface procedure of the operating system. Then it repeats the procedure, until all variables are updated on all communication ports. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1405**).

Referring now to FIG. **15**, the store message from remote processing node (gateway or ECU) process (**1500**) describes how replicated data is stored in the bulletin board. This process can be triggered by a plurality of notification mechanisms, such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications. The process (**1500**) then reads a message from the communication port (**1502**), selects a subset of variables to be replicated (**1503**), and stores the variables in the bulletin board with procedure (**801**). In an alternate embodiment, this procedure may also be used to store a packet data unit (PDU) in the bulletin board for later replication on the same or a different communication link.

This store and forward networking mechanism can be implemented without the need for complex networking protocols and is therefore well suited for limited processing power and memory environments. It also works in soft-real time environments when no strict temporal behavior is required. The data store operation (**801**) may be repeated for a plurality of bulletin board sections. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1505**).

Continuing now with FIG. **16**, the store and forward updating mechanism (**1600**) replicates messages from remote processing nodes to other processing nodes from stored packet

data units in the bulletin board. This process can be triggered by a plurality of notification mechanisms (**1601**), such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications.

The process (**1600**) then selects a message to be forwarded (**1602**) and the appropriate communication link and retrieves the PDU with the bulletin board retrieve mechanism (**1101**). It then adds the appropriate messages header for the communication link (**1603**) and may add routing information (**1604**). Finally the update process (**1600**) writes the messages to the communication port (**1605**). If the updating process is a cyclic procedure, it waits until the next activation occurs (**1607**).

FIG. **17** describes the various modes that the distributed communications and computing system (**100**) can be operated in. In one embodiment, the system operates in various distinct modes in order to preserve the integrity of the system and still allow for changing the architecture and behavior of the network or the roles of the individual nodes. When the distributed computing and communication system wakes up from the sleep mode (**1701**), it can enter a configuration and upgrade mode (**1702**), an emergency or debug mode (**1704**), or the normal real-time run mode (**1703**). The root node or system gateway in a distributed communication and computing system defines the mode based on the existence of external events, such as an external control command, internal events, a system failure, or failed integrity check.

Referring now to FIG. **1**, the external commands may be generated from a development tool (**122**) or a remote device (**132**) that is connected via a remote gateway (**131**). In an alternate embodiment, each ECU (**102**) or virtual ECU (**115**) can trigger the system to enter a different operating mode.

Continuing with FIG. **17**, in the configuration mode (**1702**), the system software and the information-sharing configuration can be updated via a secure communication link with encrypted commands. Each processing node (ECU or gateway) may have security mechanisms such as a certificate that allows it to identify and authorize another entity (remote gateway, remote ECU, or development tool) to make changes to its bulletin board parameters.

The remote entity may also download a new firmware to the bulletin board. The ECU or gateway can store this new firmware in its non-volatile memory while it backs up the original image on the bulletin board for the case that the new software is not functional. In the update mode, the distributed system can also reconfigure the communication and computing infrastructure based on a new set of parameters that need to be stored in the individual bulletin boards.

In the normal run mode (**1703**), the system operates in the real-time information sharing mode and network configuration and certain parameters can't be changed. That protection allows defining deterministic temporal behavior on all communication links. But any processing node may enter a debug/emergency mode (**1704**) if a failure or other qualifying event occurs.

In the emergency mode, a processor executes an alternate procedure that maintains the temporal behavior on the communication links but may reduce or increase the amount of information shared with other processors. It also lets other processing nodes check on the integrity of sensors and actuators. In the maintenance and upgrade mode, an external system can upgrade executable code images and the bulletin-board configuration via secure communication links.

A system and method are thus provided for sharing information within a distributed embedded communications and computing system and with components outside the embedded system. The information sharing mechanism relies on a

**11**

bulletin board that may include a small database operating under hard real-time conditions with minimal delays, communication latency, and jitter. The embedded database or bulletin board isolates a real-time application in a Electronic Control Unit (ECU) from various other real time applications and from input output signals in the same module (local information sharing), from event-triggered communications with applications in other modules, and from time-triggered communications with applications in other modules.

One design criteria of the database is that the temporal behavior of communications does not impact the real-time computing task and provides enough information access performance at peak time demand. Typically, distributed embedded systems consist of a static structure that can be analyzed at design time. In addition to the real-time operation, the proposed method for information sharing also provides access to the parameters of the embedded system and allows for software upgrades of certain modules.

The present embodiment addresses the shortcomings of traditional computer networks with following enhancements:
1) The concept of multi-mode storage that links two or more communication networks via a bulletin board. The bulletin board is a multi-mode storage that can be thought of an extension to shared memory that can be accessed by local and remote processes at attached networks. There may be multiple hierarchical layers of bulletin boards depending on the topology of the communication system. The bulletin board increases the network efficiency by reducing the number of transactions needed to access remote variables.
2) The concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the network. Even though this approach restricts the reach of each node to only adjacent nodes and the next gateway, this still allows cross-network variable sharing though vertical real-time replication of data.
3) The concept of hierarchical bulletin board management that allows restriction of information access to certain levels in a network, but still allows the replication of information to other nodes in the network. This paradigm follows the path of reducing the information amount from the leaves of the network to central control and diagnosis hubs.
4) The concept that a gateway can host an assembly of bulletin boards or embedded database that allows operations on bulletin boards to generate events for associated processes. This extension allows definition of a set of data processing operations that would be done once in a network and would be instantly available for connected nodes. Examples for operations are sensor data state observers, diagnostics, integrity checks, fail-safe mechanisms, etc.
5) The concept that an embedded communication and computing network can run in multiple modes in order to provide for a guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode. If the network is booted in the normal operating mode, all processors execute the existing code and only allow data sharing through the bulletin boards. The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running. For each operating mode, the gateway can store a processing image on the bulletin board. The advantage of this procedure is that only the communication hubs need to deal with secure data transfer and encryption while the peripheral nodes in the network can be relative simple in design.
6) The concept of designing the topology of a distributed computing and communication system independent of the

**12**

definition of the individual functions that the network performs. Each processing task is only associated with a bulletin board, but isolated from I/O processing.

Of course, these are all optional embodiments/enhancements.

While various embodiments have been described above, it should be understood that they have been presented by the way of example only, and not limitation. Thus, the breadth and scope of a preferred embodiment should be not limited by any of the above described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

**1**. A non-transitory computer-readable medium storing a computer program product for sharing information, the computer program product, comprising:

code for allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network;

code for causing a determination as to whether a storage resource is available;

code for determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached;

code for, in the event the threshold has been reached, causing an error notification to be sent;

code for, in the event the storage resource is available, causing storage of the information utilizing the storage resource; and

code for causing the information to be shared by:

in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network;

wherein the computer program product is associated with an electronic control unit with a plurality of interface portions including:

a first interface portion for interfacing with the first network, the first interface portion including a first interface-related first layer part for receiving first interface-related first layer messages and a first interface-related second layer part, the computer program product being operable such that the first interface-related first layer messages are processed after which first interface-related second layer messages are provided, where the first network is at least one of a Controller Area Network type, a Flexray network type, or a Local Interconnect Network type; and

a second interface portion for interfacing with the second network, the second interface portion including a second interface-related first layer part for receiving second interface-related first layer messages and a second interface-related second layer part, the computer program product being operable such that the second interface-related first layer messages are processed after which second interface-related second layer messages are provided, where the second network is at least one of the Controller Area Network type, the Flexray network type, or the Local Interconnect Network type.

**2**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the determination as to whether the storage resource is available is made utilizing an initial request in connection with the storage resource.

**3**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource includes a bulletin board resource.

**4**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource includes a shared memory.

**5**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource stores messages that are addressed to no particular process.

**6**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource stores messages available by any number of processes.

**7**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource is a section of a storage.

**8**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource involves a database.

**9**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the request is a re-request.

**10**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the request is a storage resource request.

**11**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the request is repeated until the storage resource is available unless a certain time beyond the threshold has elapsed.

**12**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the request is another storage resource request.

**13**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the request is for access to the storage resource.

**14**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the determining, causing, and threshold are each associated with a same layer of processing.

**15**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the determining, causing, and threshold are each associated with a middleware layer that sits under an application layer.

**16**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the sharing includes providing the information to a plurality of software or hardware operations that share the storage resource.

**17**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the electronic control unit is equipped with at least one gateway function.

**18**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the real-time involves a response time that is measured in milliseconds.

**19**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the real-time involves a response time that is measured in microseconds.

**20**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the real-time involves a response time that is less than 1 second.

**21**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first network or the second network is of the Controller Area Network type.

**22**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first network or the second network is of the Flexray network type.

**23**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first network or the second network is of the Local Interconnect Network type.

**24**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first interface-related first layer part or the second interface-related first layer part includes at least one of a controller, a communication interface, or an operating system interface; and

the first interface-related second layer part or the second interface-related second layer part includes at least one of a remote message conversion layer, a communication interface, or an operating system interface.

**25**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first interface portion and the second interface portion are each separate portions of a same apparatus.

**26**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first network and the second network are heterogeneous networks.

**27**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the second network protocol is different than the first network protocol.

**28**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the second network protocol is different than the first network protocol such that rates thereof are different.

**29**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the second network protocol is different than the first network protocol, and the at least one message format corresponding to the second network protocol is different than a particular message format corresponding to the first network protocol, such that the information is converted from the particular message format to the at least one message format.

**30**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the information is processed utilizing the storage resource, where the information is originally received in a first message format corresponding to the first network protocol, to create, in real-time, messages in at least two other message formats including a second message format corresponding to the second network protocol and a third message

format corresponding to a third network protocol, where the first network protocol is different than either of the second and third network protocols.

**31**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource is protected utilizing semaphores.

**32**. The non-transitory computer-readable medium as set forth in claim **31**, wherein the computer program product is operable such that the first network and the second network are heterogeneous networks, and each of a plurality of different processes process the information in a manner that is isolated from temporal characteristics associated with the heterogeneous networks.

**33**. The non-transitory computer-readable medium as set forth in claim **32**, wherein the computer program product is operable such that the information is stored in response to interrupts associated with the different processes.

**34**. The non-transitory computer-readable medium as set forth in claim **32**, wherein the computer program product is operable such that the different processes are updated with the information at a first rate that differs from a second rate with which the different processes send the information to the storage resource.

**35**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the storage resource is operable so as not to require a network layer translation of messages.

**36**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the threshold includes a timeout.

**37**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the threshold includes a time-related threshold.

**38**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first interface-related first layer messages, the first interface-related second layer messages, the second interface-related first layer messages, and the second interface-related second layer messages include protocol data units (PDUs).

**39**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the first interface-related first layer messages and the first interface-related second layer messages are different in terms of at least one aspect of headers thereof.

**40**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the processing includes conversion; the first interface-related first layer messages are related to the first interface-related first layer by virtue of being received thereby; and the first interface-related second layer part carries out the processing of the first interface-related first layer messages.

**41**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the message includes a protocol data unit (PDU).

**42**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the message includes a header.

**43**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first interface-related first layer part is associated with a layer that is below another layer associated the first interface-related second layer part.

**44**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first interface-related second layer messages and the second interface-related first layer messages have a same format.

**45**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that the first interface-related second layer messages and the second interface-related first layer messages are a same messages.

**46**. The non-transitory computer-readable medium as set forth in claim **1**, wherein the computer program product is operable such that a waiting period is implemented between re-requests for the storage resource.

**47**. A method for sharing information, the method comprising:

allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network;

causing a determination as to whether a storage resource is available;

determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached;

in the event the threshold has been reached, causing an error notification to be sent;

in the event the storage resource is available, causing storage of the information utilizing the storage resource; and

causing the information to be shared by:

in real-time, sharing the information;

wherein the method is associated with an electronic control unit with a plurality of interface portions including:

a first interface portion for interfacing with the first network, the first interface portion including a first interface-related first layer part for receiving first interface-related first layer messages and a first interface-related second layer part, the first interface-related first layer messages being processed after which first interface-related second layer messages are provided, where the first network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network; and

a second interface portion, the second interface portion including a second interface-related part for receiving second interface-related messages, the second interface-related messages being processed after which processed second interface-related messages are provided.

**48**. A non-transitory computer-readable medium storing a computer program product for sharing information, the computer program product comprising:

code for receiving information associated with a message received utilizing a first network protocol associated with a first network;

code for issuing a storage resource request in connection with a storage resource for determining whether the storage resource is available;

code for determining whether a threshold has been reached in association with the determination whether the storage resource is available;

code for, when the storage resource is not available and the threshold associated with the determination whether the storage resource is available has not been reached, issuing another storage resource request in connection with the storage resource;

**17**

code for, when the storage resource is not available and the threshold associated with determination whether the storage resource is available has been reached, sending a notification; and

code for, when the storage resource is available, storing the information utilizing the storage resource;

wherein the computer program product is operable such that the information is capable of being shared in real-time utilizing a control unit that includes a plurality of interfaces including:

a first interface for interfacing with the first network, the first interface including a first interface-related first component for receiving first data units and a first interface-related second component, the computer program product being operable such that the first data units are processed after which processed first data units are provided, where the first network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network; and

a second interface, the second interface including a second interface-related component for receiving second data units, the computer program product being operable such that the second data units are processed after which processed second data units are provided.

**49**. A non-transitory computer-readable medium storing a computer program product for sharing information, the computer program product comprising:

code for allowing receipt of information associated with a message;

code for causing a determination as to whether a storage resource is available;

code for determining whether a threshold has been reached and causing a request in connection with the storage resource;

code for, in the event the storage resource is available and the threshold has not been reached, causing storage of the information utilizing the storage resource;

code for, in the event the threshold has been reached, causing an error notification to be sent; and

code for causing the information to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a network protocol associated with a network;

wherein the computer program product is associated with a unit with a plurality of interface portions including:

a first interface portion, the first interface portion including a first interface-related part for receiving first messages, the computer program product being operable such that the first messages are processed after which processed first messages are provided; and

a second interface portion for interfacing with the network, the second interface portion including a second interface-related first part for receiving second messages and a second interface-related second part, the computer program product being operable such that the second messages are processed after which processed second messages are provided, where the network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network.

**50**. An apparatus, comprising:

an electronic control unit configured for:

receiving information associated with a message;

issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available;

determining whether a threshold has been reached in association with the storage resource request;

**18**

when the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource;

when the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification; and

when the storage resource is available, storing the information utilizing the storage resource;

wherein the electronic control unit is operable such that the information is capable of being shared in real-time, and the electronic control unit includes a plurality of interfaces including:

a first interface, the first interface including a first interface-related component for receiving first signals, the electronic control unit being operable such that the first signals are processed for providing a result of the processing of the first signals; and

a second interface for interfacing with a network, the second interface including a second interface-related first component for receiving second signals and a second interface-related second component, the electronic control unit being operable such that the second signals are processed for providing a result of the processing of the second signals, where the network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network.

**51**. An apparatus, comprising:

a control unit configured for:

identifying information associated with a message received utilizing a first network protocol associated with a first network;

issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available;

determining whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification; and

in the event the storage resource is available, storing the information utilizing the storage resource;

wherein the apparatus is operable such that the information is capable of being shared in real-time utilizing a second network protocol associated with a second network, and the control unit includes:

a first interface for interfacing with the first network, the first interface including a first interface-related first component for receiving first data units and a first interface-related second component, the control unit being operable such that the first data units are processed after which processed first data units are provided, where the first network is at least one of a Controller Area Network type, a Flexray network type, or a Local Interconnect Network type; and

a second interface for interfacing with the second network, the second interface including a second interface-related first component for receiving second data units and a second interface-related second component, the control unit being operable

such that the second data units are processed after which processed second data units are provided, where the second network is at least one of the Controller Area Network type, the Flexray network type, or the Local Interconnect Network type.

**52**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the processed first data units and the second data units have a same format.

**53**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the processed first data units and the second data units are the same data units.

**54**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the processing involves headers.

**55**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the first network and the second network are heterogeneous networks.

**56**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the second network protocol is different than the first network protocol.

**57**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the second network protocol is different than the first network protocol such that rates thereof are different.

**58**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the second network protocol is different than the first network protocol, and the at least one message format corresponding to the second network protocol is different than a particular message format corresponding to the first network protocol, such that the information is converted from the particular message format to the at least one message format.

**59**. The apparatus as set forth in claim **51**, wherein the apparatus is operable such that the information is originally received in a first message format corresponding to the first network protocol and processed to create, in real-time, messages in at least two other message formats including a second message format corresponding to the second network protocol and a third message format corresponding to a third network protocol, where the first network protocol is different than either of the second and third network protocols.

* * * * *

# EXHIBIT C



US010002036B2

(12) **United States Patent**
Fuchs et al.

(10) Patent No.: **US 10,002,036 B2**
(45) Date of Patent: *Jun. 19, 2018

(54) **SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK**

(71) Applicant: **Stragent, LLC**, Longview, TX (US)

(72) Inventors: **Axel Fuchs**, San Jose, CA (US); **Scott Sturges Andrews**, Petaluma, CA (US)

(73) Assignee: **Stragent, LLC**, Longview, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 66 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/405,110**

(22) Filed: **Jan. 12, 2017**

(65) **Prior Publication Data**

US 2017/0123869 A1     May 4, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/011,705, filed on Aug. 27, 2013, now Pat. No. 9,575,817, which is a (Continued)

(51) **Int. Cl.**
  *G06F 9/54*     (2006.01)
  *H04L 12/26*     (2006.01)
  (Continued)

(52) **U.S. Cl.**
  CPC .......... *G06F 9/546* (2013.01); *B60R 16/0231* (2013.01); *G06F 9/542* (2013.01);
  (Continued)

(58) **Field of Classification Search**
  CPC .......... G06F 9/542; G06F 9/545; G06F 9/546; H04L 43/10; H04L 67/10; B60R 16/0231
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,230,051 A    7/1993  Quan
5,265,250 A    11/1993  Andrade et al.
(Continued)

OTHER PUBLICATIONS

Reinhard Maier, "Event-Triggered Communication on Top of Time-Triggered Architecture," Proceedings of the 21st Digital Avionics Systems Conference, vol. 2, 13.C.5-1-13.C.5-9 (Oct. 27-31, 2002).
(Continued)

*Primary Examiner* — Charles E Anya

(57) **ABSTRACT**

A system, method and computer program product are provided for receiving information associated with a message, utilizing a first network protocol associated with a first network and causing a determination as to whether a storage resource is available. In use, in the event the storage resource is available, causing storage of the information utilizing the storage resource and sharing the information in less than one second, utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol wherein the system, method and computer program product are associated with an automotive electronic control unit with at least one gateway function that remains in hardwired communication with the first network and the second network, the automotive electronic control unit having a plurality of interfaces.

**127 Claims, 17 Drawing Sheets**



## Related U.S. Application Data

continuation of application No. 13/531,319, filed on Jun. 22, 2012, now Pat. No. 8,566,843, which is a continuation of application No. 12/182,570, filed on Jul. 30, 2008, now Pat. No. 8,209,705, which is a continuation of application No. 10/737,690, filed on Dec. 15, 2003, now Pat. No. 7,802,263.

(60) Provisional application No. 60/434,018, filed on Dec. 17, 2002.

(51) **Int. Cl.**
  *H04L 29/08* (2006.01)
  *B60R 16/023* (2006.01)

(52) **U.S. Cl.**
  CPC ............. *G06F 9/545* (2013.01); *H04L 43/10* (2013.01); *H04L 67/10* (2013.01); *G06F 2209/547* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,388,189 | A | 2/1995 | Kung |
| 5,513,324 | A | 4/1996 | Dolin, Jr. et al. |
| 5,588,002 | A | 12/1996 | Kawanishi et al. .......... 370/462 |
| 5,666,485 | A | 9/1997 | Suresh et al. |
| 5,737,529 | A | 4/1998 | Dolin, Jr. et al. |
| 5,854,454 | A | 12/1998 | Upender et al. |
| 5,923,846 | A | 7/1999 | Gage et al. |
| 5,941,947 | A | 8/1999 | Brown et al. |
| 5,956,489 | A | 9/1999 | San Andres et al. ......... 709/221 |
| 6,034,970 | A | 3/2000 | Levac et al. ................. 370/466 |
| 6,128,315 | A | 10/2000 | Takeuchi |
| 6,141,710 | A | 10/2000 | Miesterfeld ................... 710/110 |
| 6,185,466 | B1 | 2/2001 | Nicewonger |
| 6,289,390 | B1 | 9/2001 | Kavner ....................... 719/310 |
| 6,363,427 | B1 | 3/2002 | Teibel et al. |
| 6,378,001 | B1 | 4/2002 | Aditham et al. ............. 719/313 |
| 6,430,607 | B1 | 8/2002 | Kavner |
| 6,438,632 | B1 | 8/2002 | Kikugawa |
| 6,484,082 | B1 | 11/2002 | Millsap et al. |
| 6,725,348 | B1 | 4/2004 | Marier et al. |
| 6,801,942 | B1 | 10/2004 | Dietrich et al. ............. 709/225 |
| 6,941,510 | B1 | 9/2005 | Ozzie et al. |
| 7,103,045 | B2 | 9/2006 | Lavigne et al. ............. 370/392 |
| 7,103,646 | B1 | 9/2006 | Suzuki ....................... 709/220 |
| 7,103,656 | B2 | 9/2006 | Lewis et al. ................. 709/223 |
| 7,552,440 | B1 | 6/2009 | Kavner et al. ............... 719/312 |
| 7,950,017 | B1 | 5/2011 | Cain et al. |
| 2001/0018685 | A1 | 8/2001 | Saito et al. |
| 2002/0002586 | A1 | 1/2002 | Rafal et al. |
| 2002/0032856 | A1 | 3/2002 | Noguchi et al. |
| 2002/0047868 | A1 | 4/2002 | Miyazawa |
| 2002/0073243 | A1 | 6/2002 | Staiger ....................... 719/313 |
| 2002/0124007 | A1 | 9/2002 | Zhao |
| 2002/0159460 | A1 | 10/2002 | Carrafiello et al. |
| 2002/0188691 | A1 | 12/2002 | Ignatius et al. |
| 2002/0191543 | A1 | 12/2002 | Buskirk et al. |
| 2002/0198943 | A1 | 12/2002 | Zhuang et al. |
| 2003/0061388 | A1 | 3/2003 | Cleghorn et al. |
| 2003/0074474 | A1 | 4/2003 | Roach et al. |
| 2003/0088568 | A1 | 5/2003 | Matsunaga et al. |
| 2003/0154116 | A1 | 8/2003 | Lofton |
| 2003/0236894 | A1 | 12/2003 | Herley |
| 2004/0003087 | A1 | 1/2004 | Chambliss |
| 2006/0155867 | A1 | 7/2006 | Kilian et al. |
| 2006/0155907 | A1 | 7/2006 | Yoshimasa et al. |
| 2007/0101206 | A1 | 5/2007 | Brabant |
| 2010/0333096 | A1 | 12/2010 | Dice et al. |
| 2011/0047218 | A1 | 2/2011 | Nojima et al. |
| 2011/0047310 | A1 | 2/2011 | Bonola |
| 2012/0029898 | A1 | 2/2012 | Carroll et al. |
| 2013/0111299 | A1 | 5/2013 | Hashimoto et al. |

### OTHER PUBLICATIONS

William Wong, "Software and Hardware Standards Help, But In-Vehicle Network Growth Will Be Conservative: CAN networks and OSEK/VDX compatible operating systems will drive tomorrow's vehicles," Electronic Design, vol. 49, issue 1, 62 (Jan. 8, 2001).
OSEK/VDX Network Management Concept and Application Programming Interface, Version 2.51 (May 31, 2000).
"An Embedded Software Primer," David E. Simon, 1999.
"Application of In-Vehicle Data Buses for Collision Avoidance Systems," William D. Horne, et al., 1998.
"The Foundation.TM Fieldbus Primer," Fieldbus Inc., Jun. 24, 2001.
"GSA Guide to Specifying Interoperable Building Automation and Control Systems Using ANSI/ASHRAE Standard 135-1995," Steven T. Bushby et al., Nov. 1999.
"Programming in the OSEK/VDX Environment," Joseph Lemieux, 2001.
"OSEK/VDX Binding Specification Version 1.3," OSEK Group, Sep. 17, 2001.
"OSEK/VDX Binding Specification Version 1.4," OSEK Group, Sep. 6, 2002.
"OSEK/VDX Binding Specification Version 1.4.1," OSEK Group, Jan. 21, 2003.
"OSEK/VDX Communication Specification Version 2.2.2," OSEK Group, Dec. 18, 2000.
"OSEK/VDX Communication Specification Version 3.0," OSEK Group, Jul. 26, 2002.
"OSEK/VDX Communication Specification Version 3.0.1," OSEK Group, Jan. 29, 2003.
"OSEK/VDX Communication Specification Version 3.0.2," OSEK Group, Dec. 9, 2003.
"OSEK/VDX Fault-Tolerant Communication Specification Version 1.0," OSEK Group, Jul. 24, 2001.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.0," OSEK Group, May 31, 1998.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.1," OSEK Group, May 31, 2000.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.2," OSEK Group, Jan. 16, 2003.
"OSEK/VDX OSEK Implementation Language Specification Version 2.3," OSEK Group, Sep. 10, 2001.
"OSEK/VDX OSEK Implementation Language Specification Version 2.4," OSEK Group, Dec. 2, 2002.
"OSEK/VDX OSEK Implementation Language Specification Version 2.4.1," OSEK Group, Jan. 23, 2003.
"Goals and Motivation: What is OSEK/VDX," OSEK VDX Portal, 2012.
"OSEK/VDX OSEK Run Time Interface Part A: Language Specification Version 2.1," OSEK Group, Jul. 16, 2001.
"OSEK/VDX OSEK Operating System Specification Version 2.0 revision 1," OSEK Group, Oct. 15, 1997.
"OSEK/VDX OSEK Operating System Specification Version 2.1 revision 1," OSEK Group, Nov. 13, 2000.
"OSEK/VDX OSEK Operating System Specification Version 2.2," OSEK Group, Sep. 10, 2001.
"OSEK/VDX OSEK Operating System Specification Version 2.2. 1," OSEK Group, Jan. 16, 2003.
"OSEK/VDX Time-Triggered Operating System Specification Version 1.0," OSEK Group, Jul. 24, 2001.
Berwanger et al "FlexRay—The Communication System for Advanced Automotive Control Systems" 2001-01-0676, SAE 2001 World Congress, Mar. 5-8, 2001.
Bosch, "CAN Specification Version 2.0" Sep. 1991.
Clarke et al "Formal Verification of Autonomous Systems NASA Intelligent Systems Program" Carnegie Mellon University, Sep. 25, 2001.
Courtois et al "Concurrent Control with "Readers" and "Writers"" Communications of the ACM, vol. 14, No. 10, Oct. 1971.

(56)  **References Cited**

OTHER PUBLICATIONS

Fredriksson, Lars-Berno "Controller Area Networks and the Protocol can for Machine Control Systems" Mechatronics vol. 4, No. 2, pp. 159-172, 1994.

Hernandez et al "Algorithms and architectures for real-time control 2000," Proceedings volume from the 6th IFAC Workshop, Palma de Mallorca, Spain, May 15-17, 2000.

Kirrmann et al. "The IEC/IEEE Train Communication Network," IEEE Micro, Mar.-Apr. 2001

Koopman, Philip "Control Area Network (CAN)" 18-540 Distributed Embedded Systems, Presentation Slides, Oct. 4, 2000.

Leen et al, "Digital networks in the automotive vehicle," Computing and Control Engineering 10(6):257-266, Jan. 2000.

IEEE "The Authoritative Dictionary of IEEE Standards Terms" 7th Ed., IEEE Press, 2000.

IEEE "IEEE Standard for Information Technology—Portable Operating System Interface (POSIX®)—Part 1: System Application Program Interface (API)—Amendment d: Additional Realtime Extensions," IEEE Std 1003.1d-1999 (Amendment to IEEE Std 1003.1-1990), Jun. 16, 2000.

Mellor-Crummey et al. "Algorithms for Scalable Synchronization on Shared-Memory Multiprocessors," ACM Transactions on Computer Systems, vol. 9, No. 1, Feb. 1991, pp. 21-65.

Jagannathan et al. "Blackboard Architectures and Applications," vol. 3, Academic Press Inc., 1989, 524 pages.

SAE International, "Surface Vehicle Standard—SAE J1850" Rev May 2001.

Intelligent Transportation Systems Standards, United States Department of Transportation "SAE J2366—Family of Its Data Bus (IDB) Protocol Standards," (online fact sheet written Jul. 12, 2006), available at https://www.standards.its.dot.gov/Factsheets/PrintFactsheet/56.

SAE International, "Surface Vehicle Recommended Practice—SAE J2366-1" Nov. 2001.

SAE International, "Surface Vehicle Recommended Practice—SAE J2366-2" Nov. 2001.

Schill, John "An Overview of the CAN Protocol," Embedded Systems Programming, Sep. 1997, pp. 46-62.

Stewart et al., "Integration of Real-Time Software Modules for Reconfigurable Sensor-Based Control Systems," Proceedings of the 1992 IEEE/RSJ International Conference on Intelligent Robots and Systems, Jul. 7-10, 1992.

Tanenbaum, Andrew S. "Computer Networks," 3rd Ed., Prentice Hall, Inc, 1996, pp. 1-76 (Introduction).

Tanenbaum, Andrew S. "Modern Operating Systems," 2nd Ed., Prentice Hall, Inc., 2001, excerpts from Chapters 2, 7, 8, and 10.

Upender et al., "Embedded Communication Protocol Options," Proceedings of the Fifth Annual Embedded Systems Conference, vol. 2, Miller Freeman, Inc., 1993.

Wargui et al. "Application of Controller Area Network to Mobile Robots," IEEE, Electrotechnical Conference, May 16, 1996, p. 205-207.

Wense et al. "Building Automotive LIN Applications," pp. 279-292, found as part of Krueger et al., "Advanced Microsystems for Automotive Applications 2001," Springer, 2001.

Giusto et al., "Automotive Virtual Integration Platforms: Why's, What's, and How's" Sep. 2002, Proceedings of the 2002 IEEE International Conference on Computer Design: VLSI in Computers and Processors (ICCD'02).

Juan Luis Posadas, et al., "Communications Structure for Sensor Fusion in Distributed Real Time Systems," May 2000, Algorithms and Architectures for Real-Time Control 2000: A Proceedings volume from the 6th IFAC Workshop.

Leen et al. "Expanding Automotive Electronic Systems" Jan. 2002, Computer 35(1).

Posadas et al. "Communications Structure for Sensory Data in Mobile Robots" 2002 , Engineering Applications of Artificial Intelligence, 15:341-350.

SAE, "ITS Data Bus—IDB-C Physical Layer" Nov. 2001, Surface Vehicle Recommended Practice, J2366-1.

Stewart et al. "The Chimera II Real-Time Operating System for Advanced Sensor-Based Control Applications" 1992, IEEE Transactions on Systems, Man, and Cybernetics, vol. 22, No. 6.

U.S. Appl. No. 15/919,201, filed Mar. 12, 2018.

Brad Johanson, Armando Fox, Pat Hanrahan, Terry Winograd, "The Event Heap: An Enabling Infrastructure for Interactive Workspaces," White Paper, Stanford University, Stanford, CA 1999.



100 Distributed Embedded Communication and Computing System
120 External Components
130 Remote System
ECU
System Gateway
Group Gateway
SubGroup Gateway
ECU & Gateway
Virtual ECU/GW
Network Sensor
Network Actuator
Local Sensor
Local Actuator
Diagnosis Device
Develop-ment Tool
Add-On Device
Gateway
Remote Device
101
102
103
104
105
106
107
108
109
110
111
112
113
114
115
116
121
122
123
131
132

FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4

FIGURE 5





FIGURE 6



Application Process
606
607
707
BB Manager Process Integrity Check
Bulletin Board Real-Time Variables
608
712
Bulletin Board Events
711
BB Manager Process Event Manager Resource Manager
708
714
706
Remote Message Conversion 1
Remote Message Conversion 2
710
Remote Message Conversion 3
Remote Mess Proc
705
Com I/F 1
Com I/F 2
709
Com I/F 3
OS
713
Com. Bus Controller 1
Com. Bus Controller 2
Com. Bus Controller 3
702
701
External Event
703
704
FIGURE 7

FIGURE 8

Store Variable
from remote I/O

**801**
External
Notification /
Activation

Receive
Message

802

Extract
Variables

803

Store
Variables in
Bulletin Board

804

Variables for
other BB section?

805

yes

no

Set Task inactive -
Wait for notification

806



FIGURE 9

Store Variable from local I/O

**901** External or internal Notification/ activation

902 Sample/Poll Input ports

903 Convert Signals to Variables

804 Store Variables in Bulletin Board

905 Variables for other BB section?

yes / no

906 Task inactive – Wait for notification



FIGURE 10



FIGURE 11



FIGURE 12



FIGURE 13



FIGURE 14



FIGURE 15



FIGURE 16



FIGURE 17

1

# SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK

## RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 14/011,705 filed Aug. 27, 2013, which is a continuation of U.S. patent application Ser. No. 13/531,319 filed Jun. 22, 2012, now U.S. Pat. No. 8,566,843, which is a continuation of U.S. patent application Ser. No. 12/182, 570 filed Jul. 30, 2008, now U.S. Pat. No. 8,209,705, which is a continuation of U.S. patent application Ser. No. 10/737, 690 filed Dec. 15, 2003, now U.S. Pat. No. 7,802,263, which, in turn, claims priority under 35 U.S.C. § 119 based on U.S. Provisional Application No. 60/434,018 filed Dec. 17, 2002, all of which are incorporated herein by reference.

## FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to the field of distributed control and monitoring systems that may include certain temporal behavior.

Such technology may optionally apply to electronic vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system.

## SUMMARY OF THE INVENTION

A system, method and computer program product are provided for sharing information in a distributed system. After information is received, it is stored on a bulletin board. In use, the information is shared, in real-time, among a plurality of heterogeneous processes.

In one embodiment, both past and present instances of the information may be stored on the bulletin board. As an option, the information may be replicated among a plurality of the bulletin boards. Optionally, first information may be processed utilizing a first bulletin board and stored utilizing a second bulletin board. Still yet, the bulletin boards may be hierarchical.

In another embodiment, the processes may access multiple sections of the bulletin board. Further, the bulletin board may send notifications to the processes based on a state of the information on the bulletin board.

Optionally, the information may include variables. For example, the information may include input variables, output variables, etc. Moreover, the processes may include local processes, remote processes, etc. Still yet, the processes may include event triggered processes and/or time triggered processes. In use, each of the processes may process the information in a manner that is isolated from temporal characteristics associated with the network.

In still another embodiment, the information may be extracted from a message received by a bulletin board manager. Moreover, the information may be converted from a signal received by a bulletin board manager. Even still, the information may be shared in a single task, may be shared according to a schedule, and/or may be shared with an operating system. Optionally, dynamic preemptive scheduling may be provided. Also, the information may be shared across the communication network with only a portion of a

2

message header that is needed for a specific communication link while other communication links may use a different message header.

As a further option, resources in the network may be protected. Specifically, the resources in the network may be protected utilizing a schedule that allows information sharing utilizing the bulletin board. In another embodiment, the resources in the network may be protected utilizing semaphores.

In even still another embodiment, the information may be shared according to an internal clock, an external clock, etc. During operation, objects may be generated based on a change of state of the information stored in the bulletin board. Such objects may include, but are not limited to flags, events, signals, interrupts, etc. Still yet, the information may be stored in response to interrupts associated with the processes.

In use, the bulletin board may update the processes with information at a first rate that differs from a second rate with which the processes send the information to the bulletin board. Optionally, the bulletin board may be accessed with guaranteed access times, jitter, and bandwidth.

In addition, the bulletin board may be updated irregularly and triggered by internal or external objects including, but not limited to flags, events, signals, interrupts, etc. Event triggers may be provided independent of a link connection between nodes where the processes are carried out. Moreover, failure redundancy may be provided through multiple independent links across diverse physical connections.

As yet another option, the information may have a user-configured constraint associated therewith. Such constraint may include a memory constraint, a real-time constraint, etc. As a further option, the constraint may be configured utilizing a tool.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an embodiment of a system of one embodiment;

FIG. 2 is a block diagram generally depicting an embodiment of an ECU as part of the system illustrated in FIG. 1;

FIG. 3 is a block diagram generally depicting an embodiment of a Gateway device as part of the system illustrated in FIG. 1;

FIG. 4 is a block diagram of an embodiment of the software architecture assumed for one embodiment.

FIG. 5 is a block diagram of an embodiment of the middleware that contains the methods of one embodiment.

FIG. 6 is a block diagram of an embodiment of the bulletin board that describes the process interaction of one embodiment.

FIG. 7 is a block diagram of an embodiment of the bulletin board that describes the process interaction with multiple external communication buses as part of one embodiment.

FIG. 8 is a flow chart diagram of an embodiment of the variable store from remote I/O method of one embodiment.

FIG. 9 is a flow chart diagram of an embodiment of the variable store from local I/O method of one embodiment.

FIG. 10 is a flow chart diagram of an embodiment of the variable method of one embodiment.

FIG. 11 is a flow chart diagram of an embodiment of the variable retrieve method of one embodiment.

FIG. 12 is a flow chart diagram of an embodiment of the application process using the method of one embodiment

FIG. **13** is a flow chart diagram of an embodiment of the local I/O update from bulletin board method of one embodiment.

FIG. **14** is a flow chart diagram of an embodiment of the variable replication method of one embodiment.

FIG. **15** is a flow chart diagram of an embodiment of the message store from remote gateway method of one embodiment.

FIG. **16** is a flow chart diagram of an embodiment of the message forward to remote ECU or Gateway method of one embodiment.

FIG. **17** is a state transition diagram of an embodiment of the mode switching method of one embodiment.

DETAILED DESCRIPTION

FIG. **1** is a block diagram generally depicting elements of an embodiment of the present distributed embedded communication and computing system. The system architecture may be situated in automotive electronics or industrial control and monitoring systems. In an automotive environment, the various Electronic Control Units (ECUs, **102**) control complex applications such as engine control, brake control, or diagnostics. They are either connected to sensors and actuators via discrete links or simple standard functions such as sensors and actuators are organized into separate sub networks.

These complex functions such as braking, engine-control, etc. are then grouped into the backbone system functions for the car, such as body control, power train and chassis. The backbone also includes the vehicle's high level functions such as diagnostics, telematics and entertainment systems.

Therefore the system is typically hierarchically organized and includes a variety of gateways (**101,104,105**), which relay messages up and down through the system layers. Each layer may contain multiple electronic control units (ECU, **102**) that are connected through wired serial multiplexing bus-systems such as Controller Area Network (CAN or ISO11898), Flexray, LIN, J1850, J1708, MOST, IEEE1394, and other similar serial multiplexing buses or through wireless multiplexing systems such as IEEE802.11, IEEE802.15, Bluetooth, Zigbee, or similar other wireless links.

Typically, functions provided by an ECU (**102**) are bound to hard real-time temporal behavior. In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second.

The ECU may receive a set of real-time input variables from local sensors (**108**), which are connected via discrete signal lines (**113**), or from networked sensors (**106**), which are connected through a multiplexing bus-system (**112**). The ECU may also share variables with other ECUs (**102**) that are either connected on the same physical multiplexing bus (**112**) or that it can reach through a gateway (**101,103,104**).

Then the ECU (**102**) processes the input variables and generates a set of output variables that are either shared with other ECUs (**102**) as described above, or which are output to local actuators (**109**), which are connected via discrete signal lines (**113**), or to networked actuators, which are connected through a multiplexing bus (**112**). ECUs (**102**) typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system. Gateways (**101,103,104**) link multiple physical multiplexing systems together. In the context of the present description, such information may include data, a signal, and/or anything else capable of being stored and shared.

The highest level in the hierarchical system is the system level. The system level gateway (**101**) may be connected to ECUs on the system level multiplexing bus (**117**), to subsequent gateways (**103**) that also link to subsequent communication buses (**110**), and to external components (**120**) that may contain diagnostics devices (**121**), development tools (**122**), other add-on devices (**123**) or other instances of distributed embedded communication and computing systems (**100**). In addition, the system gateway (**101**) may also be connected to an external gateway (**131**) that may link the system to a remote device (**132**) through wireless or wired wide-area-networks such as the Internet, using standard protocols such as UDP/IP, TCP/IP, RTP, HTTP, SOAP, JAVA, etc. or nonstandard proprietary protocols.

Subsequent to the system level may be several layers of groups and subgroups that are link to the higher levels via gateways (**101,103,104,105**).

During the design-time of the system, not all ECUs may exist. Therefore, the development tool (**122**) may provide a plug-in component or virtual ECU/GW (**115**) that directly links into the wired multiplexing bus or wireless network (**110**) and also allows for separate control functions via a tool-link (**116**).

The block diagram in FIG. **2** depicts the detailed elements within a generic ECU (**200**) that is one embodiment of ECU (**102**). The ECU (**200**) typically contains a micro-processor (**201**), volatile memory (**204**) such as RAM, S-RAM or similar, non-volatile memory (**203**) such as EEPROM, FLASH, etc., a real time clock for internal timing of processes (**205**), a watchdog (**206**) to maintain the health of the system, one or more communication bus controllers (**207**) with associated drivers (**208**), digital I/O (**209**) with line drivers (**210**), and analog I/O (**211**) with associated analog signal conditioning (**212**).

In an alternate embodiment, the ECU (**200**) may also contain a wireless communication controller (**311**) and a RF-Front-end (**312**) as outlined in FIG. **3**. The software (**202**) can either be stored in local non-volatile memory (**203**) or partially downloaded via the communication link (**207,208**) and stored in the volatile memory. The software is then executed in the microprocessor (**201**).

The block diagram FIG. **3** depicts the detailed elements within a generic gateway (**300**) that is one embodiment of Gateway (**101,103,104,105**) in FIG. **1**.

FIG. **4** outlines one embodiment of the software architecture in an embedded system. The hardware abstraction layer (**405**) allows the system developer to adapt a standard operating system to a specific hardware as used in an ECU (**200**) or gateway (**300**). The hardware abstraction layer (**405**) adapts the real-time operating system (**403**) and the device drivers (**404**) to a specific hardware implementation.

One embodiment includes the middleware (**402**) that has direct access to the real-time operating system (**403**), the device drivers (**404**) and the hardware abstraction layer (**405**). The middleware isolates the application from input/output functions and allows multiple applications to share common variables locally. In addition, the middleware lets applications share variables with remote applications/processes. In the context of the present description, a process may refer to any hardware and/or software operation, etc.

In one embodiment, the middleware can directly interface with the input/output mechanisms of the hardware without utilizing an operating system (**403**) or hardware abstraction layer (**405**).

Another embodiment of the middleware utilizes a pre-emptive multitasking operating system with explicit control of resources. In an alternate embodiment, the middleware can be built with a static multitasking scheme with implicit resource management or be part of a single task system.

Referring now to FIG. 5, the middleware (402) contains the bulletin board manager (501), a local signal communication interface (503), a remote message communication interface (504), and an application programming interface (502). The application interface (502) provides methods and data interfaces to a plurality of applications. In one embodiment, the application interface is an object library that can be linked to an application at design time.

The bulletin board manager (501) contains an upgrade and configuration manager (507), an event manager (505), a data access manager (508), and a data integrity watchdog (506). The upgrade and configuration manager (507) is necessary to configure the data structure of the bulletin board and to make executable code available to individual processing nodes. In the context of the present description, the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process.

The access manager provides access control mechanisms for the code update and configuration mode. It also may control access rights for individual applications at execution time in the run mode.

The event manager (505) captures input-output events as variables and generates new events, flags, or signals based on operations on state variables in the bulletin board. Such operations may include test of maximum values, the occurrence of logically combined events, the result of an integrity check, or events and signals that are created based on any other logical or arithmetic computation on the state variables that are stored in the bulletin board. The actual processing of data and manipulation of data may be done in the application that uses the middleware (402). The data integrity watchdog analyses the stored state variables for its integrity and generates events or flags if any problem occurs.

The local signal communication interface (503) interfaces with the local discrete input/output hardware to update the bulletin board with new variables and to update the input/output interfaces with the state variables from the bulletin board. It also converts state variables to input/output signals and input/output signals to state variables that can be stored in the bulletin board. The conversion process may contain scaling of signals as well as offset compensation. Typically this processing helps to convert I/O signals that are measured in Volt to a physical entity and vice versa. The communication with the local discrete input output system can be triggered by events or signals can be sampled time-triggered based on a cyclic global or local time base.

The remote message communication interface (504) interfaces to serial multiplexing interfaces (buses) that are connected to the specific processing node (ECU or Gateway). It extracts variables from a plurality of messaging protocols and stores them in the database. It also replicates local bulletin-board state variables to the associated processing nodes by composing the appropriate messages for each communication link. The message transfer can be initiated triggered by a bus event, by a local event, or by a time-triggered mechanism that uses a cyclic local or global time base.

FIG. 6 shows the concept of an extended bulletin board or an embedded real-time database (601). In this embodiment the ECU (102) or the Gateway (101) hosts one or multiple

bulletin boards with relational links between the variables in the bulletin boards. The relations are defined by data processing functions that the gateway can operate on bulletin boards to obtain new information that can be stored in yet another bulletin board.

The bulletin board (601) may contain but is not limited to events (607), real-time variables (608), diagnostics data (609), configuration parameters (610), and firmware (611) to upgrade individual components of the executable code or the entire software of a processing node. Each type of information may include one or more sections so that individual processes are not blocked if they access separate sections of data.

The memory of the bulletin board is subdivided into areas that nodes on each external network can read from and write into and other areas that an external network may only read from. The data contained in the bulletin board may be stored in volatile or non-volatile memory. Each data entry may consist of one value or an array of values that also may represent a time series.

In one embodiment, each application process (603), local signal communication process (605), remote message communication process, and the bulletin manager (602) can individually access the bulletin board using operating system functions for resource management that may include semaphores, events, signals, call-back routines, flags, etc. in an alternate embodiment of the system the bulletin-board manager controls all interaction with the bulletin-board and all applications have to pass data to the bulletin-board manager. This approach simplifies the interaction with the bulletin board, but adds delay time and jitter to the state variables.

At design time, various hierarchies of memory management can be applied. In practice it is more efficient to allow each sub network and subsystem to place system variable data into local bulletin boards. This is because many system variables are primarily used only within their subsystem or sub network. By placing local information in a shared memory (local bulletin board), it can be used by multiple processes on this processor node. A group bulletin board allows devices on a sub-network to share information with a minimum of network traffic. A system bulletin board allows access to system-wide updates and information.

FIG. 7 illustrates the logical architecture of the interconnection between three heterogeneous network controllers (702, 703, 704), the associate Operating System interfaces (705), the remote message communication process (706), the bulletin board (608), and the application process (606). The connection to each communication controller is fundamentally implemented at the physical interface (the wire, fiber or electromagnetic wireless interface). Each of the higher level layers (data link, network, etc) in the communication interface (705) deals with specific features of the individual communication process. In practice these layers are typically represented in a message by "header" bits that contain information about that layer of the network being used to send the message.

Using this model, each communicated message may be processed at each layer to remove (and use) the associated header information for that level. Once all layers are processed the remaining packet data unit (PDU) represents the datum or core information carried by the overall message. In one embodiment, each communication controller has an associated communication interface and an associated remote message conversion mechanism. For instance com-

7

munication bus controller 2 (703) has an associated communication interface 2 (709), and an associated remote message conversion 2 (710).

This arrangement allows the remote message process (706) to directly access information at the data link layer and interface it with the bulletin board. A network layer is not necessary. The remote message communication process (706) has a multi-network access interface (essentially a processing capability that can interpret and apply the header information for a variety of networks) and the bulletin board read/write memory access. Now, the individual processing nodes do not need to know about the existence of multiple networks. Each variable can be accessed from all connected physical networks in their proprietary format. Thus the normalization of the information has only to be handled at the gateway through replication of stored data to multiple attached networks.

Continuing with FIG. 7, the communication procedure is described. In the given example, an external event (701) on communication controller 2 (703) triggers the operating system to notify the remote message communication process (706) that data is available. The notification may be a flag, a call-back routine, an event, or any other operating signal. The associated remote message conversion method 2 (710) extracts the data (e.g. real time variables) from the message PDU and stores the data in the bulletin board (608). It may also store the associated event as variable in the bulletin board and signal the bulletin-board event manager that new data is available.

The bulletin event manager then notifies the application process (606) with the appropriate mechanism. In addition, the event manager may trigger the sampling of local signals using the local signal communication process (605) described in FIG. 6. Finally the bulletin event manager may trigger the bulletin board manager (707) to perform integrity checks or generate additional events based on the change of the state variables.

One embodiment provides a new mechanism for creating an information interconnection between two or more heterogeneous communication networks. In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different.

The approach uses a common, or shared storage system that is connected to all of the system networks through network interfaces. A critically important feature of the bulletin board approach is that the complexity of the bulletin board grows linearly with the number of networks (as opposed to as N(N−1) for the gateway approach), and in one-to-many situations the number of message transformations is half that of the standard networking approach.

In an alternate embodiment of the remote message communication process (706) any remote process can access data via a single network interface. This approach requires a network layer in each processing node and therefore adds overhead to communications. To communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link. The remote message communication manager (706) then can be simplified to only one message assembly and disassembly mechanism.

FIGS. 8-17 illustrate the method of operation of one embodiment of the present system, and also refer to aspects and elements one embodiment shown in FIGS. 1 through 7.

8

FIG. 8 details the remote messaging process (706) described in FIG. 7. Referring now to FIG. 8, the core process of storing data from remote processes that are communicated through multiplexed communication links, into the bulletin board is described. An external notification or task activation starts the process. Then a message (802) is received from the operating system layer.

In an alternate embodiment, the message is directly copied form the input register of the communication controller. Then the process extracts variables from the message. Additional signal adaptation may be necessary. The sub-process 804 stores the variables in the bulletin board. If the process only updates one section of the bulletin board it waits for the next message notification (806). If variables in multiple sections need to be updated, the process repeats (804).

FIG. 9 shows the data update from local input/output peripherals. The process starts with an internal or external notification or task activation. Typically this process is repeated cyclic triggered by an internal or external real-time clock. When the process is activated, it samples or polls the local input ports that may include analog and digital signals (902). Then it converts these signals to real-time variables by using the conversion parameters stored in the bulletin board. The signal conditioning parameters van either be defined at design time or adaptively updated by the application process. Then the process stored the new state variables in the bulletin board using the sub-process (804) described above.

FIG. 10 describes the bulletin board store procedure (804) in more detail. Before new data can be stored in the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (1001). This is called explicit resource management.

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (1011) until the resource is available. After a certain time has elapsed (1009) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process.

After reserving the resource (1003), the bulletin board store mechanism (804) timestamps the state variable for future temporal reference (1004). Then, the bulletin board store procedure (804) copies the variables or parameters from its private memory (1006) to the shared bulletin-board memory (601). Then it releases the bulletin board resource.

In an alternate embodiment, the bulletin board store procedure (804) has exclusive access to the bulletin board (601) and does not need operations 1002, 1003, 1007, 1009, 1010, and 1011 because the resource access is realized through implicit resource management. This can be achieved with either static task scheduling or by allowing only the bulletin board store procedure (804) to access the bulletin board (601).

FIG. 11 describes the bulletin board retrieve procedure (1101) in more detail. Before data can be retrieved from the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (1102).

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (1109) until the resource is available. After a certain time has elapsed (1109) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process (1110).

After reserving the resource (**1104**), the bulletin board retrieve mechanism (**1101**) copies the variables or parameters from the shared bulletin-board memory (**601**) to its private memory (**1006**). Then, it releases the bulletin board resource. In an alternate embodiment the bulletin board retrieve procedure (**1101**) has exclusive access to the bulletin board (**601**) and does not need operations **1103**, **1104**, **1106**, **1108**, **1109**, and **1110**. Because the resource access is realized through implicit resource management, this can be achieved with either static task scheduling or by allowing only the bulletin board retrieve procedure (**1101**) to access the bulletin board (**601**).

Referring to FIG. **12**, the application process (**1200**) utilizes the bulletin board retrieve mechanism (**1101**) to access all parameters, events, and real-time variables from the bulletin board. Thus the application process is decoupled from the temporal behavior of the input/output variables and can be triggered by a plurality of events (**1201**).

The application process may retrieve one or multiple sets of variables stored in a plurality of memory sections. Then the application process processes the variables (**1203**) with its method. Because the method is not tied to the location of the input/output variables, the application process can be moved or replicated to a plurality of processing nodes (ECUs or Gateways). After processing the input variables and generating a set of output variables, the application process uses the bulletin board store method (**801**) to update one or a plurality of memory sections in the bulletin board. If the application process is a cyclic procedure, it waits until the next activation occurs (**1205**).

Continuing with FIG. **13**, the update local I/O from bulletin board process (**1300**) utilizes the bulletin board retrieve mechanism (**1101**) to access real-time variables from the bulletin board and convert them to output signals (**1302**) that can be written to the output port (**1303**). The I/O update process may retrieve one or multiple sets of variables stored in a plurality of memory sections. If the I/O update process is a cyclic procedure, it waits until the next activation occurs (**1305**).

FIG. **14** describes the data replication process (**1400**). This process can be triggered by a plurality of notification mechanisms, such as events, alarm signals, internal and external timers, and flags set in the bulletin board. It then selects a subset of variables to be replicated and a communication port (**1402**). Next it retrieves the variables from the bulletin board with mechanism (**1401**) and assembles the messages for the specific communication link (**1403**). The message may include an address or identification number for all bulletin boards and associated processing nodes (ECUs and Gateways).

Finally, it writes the messages to the communication port (**1404**). In an alternate embodiment, it handles the messages to the associated interface procedure of the operating system. Then it repeats the procedure, until all variables are updated on all communication ports. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1405**).

Referring now to FIG. **15**, the store message from remote processing node (gateway or ECU) process (**1500**) describes how replicated data is stored in the bulletin board. This process can be triggered by a plurality of notification mechanisms, such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications. The process (**1500**) then reads a message from the communication port (**1502**), selects a subset of variables to be replicated (**1503**), and stores the variables in the bulletin

board with procedure (**801**). In an alternate embodiment, this procedure may also be used to store a packet data unit (PDU) in the bulletin board for later replication on the same or a different communication link.

This store and forward networking mechanism can be implemented without the need for complex networking protocols and is therefore well suited for limited processing power and memory environments. It also works in soft-real time environments when no strict temporal behavior is required. The data store operation (**801**) may be repeated for a plurality of bulletin board sections. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1505**).

Continuing now with FIG. **16**, the store and forward updating mechanism (**1600**) replicates messages from remote processing nodes to other processing nodes from stored packet data units in the bulletin board. This process can be triggered by a plurality of notification mechanisms (**1601**), such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications.

The process (**1600**) then selects a message to be forwarded (**1602**) and the appropriate communication link and retrieves the PDU with the bulletin board retrieve mechanism (**1101**). It then adds the appropriate messages header for the communication link (**1603**) and may add routing information (**1604**). Finally the update process (**1600**) writes the messages to the communication port (**1605**). If the updating process is a cyclic procedure, it waits until the next activation occurs (**1607**).

FIG. **17** describes the various modes that the distributed communications and computing system (**100**) can be operated in. In one embodiment, the system operates in various distinct modes in order to preserve the integrity of the system and still allow for changing the architecture and behavior of the network or the roles of the individual nodes. When the distributed computing and communication system wakes up from the sleep mode (**1701**), it can enter a configuration and upgrade mode (**1702**), an emergency or debug mode (**1704**), or the normal real-time run mode (**1703**). The root node or system gateway in a distributed communication and computing system defines the mode based on the existence of external events, such as an external control command, internal events, a system failure, or failed integrity check.

Referring now to FIG. **1**, the external commands may be generated from a development tool (**122**) or a remote device (**132**) that is connected via a remote gateway (**131**). In an alternate embodiment, each ECU (**102**) or virtual ECU (**115**) can trigger the system to enter a different operating mode.

Continuing with FIG. **17**, in the configuration mode (**1702**), the system software and the information-sharing configuration can be updated via a secure communication link with encrypted commands Each processing node (ECU or gateway) may have security mechanisms such as a certificate that allows it to identify and authorize another entity (remote gateway, remote ECU, or development tool) to make changes to its bulletin board parameters.

The remote entity may also download a new firmware to the bulletin board. The ECU or gateway can store this new firmware in its non-volatile memory while it backs up the original image on the bulletin board for the case that the new software is not functional. In the update mode, the distributed system can also reconfigure the communication and computing infrastructure based on a new set of parameters that need to be stored in the individual bulletin boards.

In the normal run mode (**1703**), the system operates in the real-time information sharing mode and network configuration and certain parameters can't be changed. That protection allows defining deterministic temporal behavior on all communication links. But any processing node may enter a debug/emergency mode (**1704**) if a failure or other qualifying event occurs.

In the emergency mode, a processor executes an alternate procedure that maintains the temporal behavior on the communication links but may reduce or increase the amount of information shared with other processors. It also lets other processing nodes check on the integrity of sensors and actuators. In the maintenance and upgrade mode, an external system can upgrade executable code images and the bulletin-board configuration via secure communication links.

A system and method are thus provided for sharing information within a distributed embedded communications and computing system and with components outside the embedded system. The information sharing mechanism relies on a bulletin board that may include a small database operating under hard real-time conditions with minimal delays, communication latency, and jitter. The embedded database or bulletin board isolates a real-time application in a Electronic Control Unit (ECU) from various other real time applications and from input output signals in the same module (local information sharing), from event-triggered communications with applications in other modules, and from time-triggered communications with applications in other modules.

One design criteria of the database is that the temporal behavior of communications does not impact the real-time computing task and provides enough information access performance at peak time demand Typically, distributed embedded systems consist of a static structure that can be analyzed at design time. In addition to the real-time operation, the proposed method for information sharing also provides access to the parameters of the embedded system and allows for software upgrades of certain modules.

The present embodiment addresses the shortcomings of traditional computer networks with following enhance-ments:

1) The concept of multi-mode storage that links two or more communication networks via a bulletin board. The bulletin board is a multi-mode storage that can be thought of an extension to shared memory that can be accessed by local and remote processes at attached networks. There may be multiple hierarchical layers of bulletin boards depending on the topology of the communication system. The bulletin board increases the network efficiency by reducing the number of transactions needed to access remote variables.

2) The concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the network. Even though this approach restricts the reach of each node to only adjacent nodes and the next gateway, this still allows cross-network variable sharing though vertical real-time replication of data.

3) The concept of hierarchical bulletin board management that allows restriction of information access to certain levels in a network, but still allows the replication of information to other nodes in the network. This paradigm follows the path of reducing the information amount from the leaves of the network to central control and diagnosis hubs.

4) The concept that a gateway can host an assembly of bulletin boards or embedded database that allows operations on bulletin boards to generate events for associated processes. This extension allows definition of a set of data processing operations that would be done once in a network

and would be instantly available for connected nodes. Examples for operations are sensor data state observers, diagnostics, integrity checks, fail-safe mechanisms, etc.

5) The concept that an embedded communication and computing network can run in multiple modes in order to provide for a guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode. If the network is booted in the normal operating mode, all processors execute the existing code and only allow data sharing through the bulletin boards. The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running. For each operating mode, the gateway can store a processing image on the bulletin board. The advantage of this procedure is that only the communication hubs need to deal with secure data transfer and encryption while the peripheral nodes in the network can be relative simple in design.

6) The concept of designing the topology of a distributed computing and communication system independent of the definition of the individual functions that the network performs. Each processing task is only associated with a bulletin board but isolated from I/O processing.

Of course, these are all optional embodiments/enhancements.

While various embodiments have been described above, it should be understood that they have been presented by way of example only, and not limitation. Thus, the breadth and scope of a preferred embodiment should be not limited by any of the above described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

1. An apparatus, comprising:

an automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired communication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Flexray network protocol associated with a Flexray network;

issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

in the event the storage resource is available, store the information utilizing the storage resource; and

share the information in less than one millisecond utilizing a Controller Area Network protocol associated with a Controller Area Network, the automotive electronic control unit remaining in hardwired communication with the Flexray network and the Controller Area Network, and including:

13

a first interface for interfacing with the Flexray network, the first interface including a first interface-related data link layer component that uses Flexray network-related data link layer header bits and a first interface-related network layer component that uses Flexray network-related network layer header bits; and

a second interface for interfacing with the Controller Area Network, the second interface including a second interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a second interface-related network layer component that uses Controller Area Network-related network layer header bits.

2. The apparatus as recited in claim 1, wherein the information is also shared in less than the one millisecond utilizing, in addition to the Controller Area Network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits.

3. The apparatus as recited in claim 1, wherein the identifying, the issuing the another storage resource request, and the sending the notification collectively occur in less than one microsecond.

4. The apparatus as recited in claim 1, wherein the identifying, the issuing of the storage resource request, the storing the information, and an initiation of the sharing collectively occur in less than one microsecond.

5. The apparatus as recited in claim 4, wherein the second interface-related network layer component uses the Controller Area Network-related network layer header bits by adding the Controller Area Network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Controller Area Network-related data link layer header bits by adding the Controller Area Network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Controller Area Network.

6. The apparatus as recited in claim 5, wherein the first interface-related data link layer component uses the Flexray network-related data link layer header bits by removing the Flexray network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Flexray network-related network layer header bits by removing the Flexray network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

7. The apparatus as recited in claim 1, wherein a duration between the information being sent to the automotive electronic control unit and the sharing being completed by the information arriving at a destination, is less than the one millisecond.

8. The apparatus as recited in claim 1, wherein a duration between the information being received at the automotive electronic control unit, and the sharing being completed by arriving at a destination, is less than the one millisecond.

9. The apparatus as recited in claim 1, wherein the storage resource request and the another storage resource request each includes a request for an access.

14

10. The apparatus as recited in claim 1, wherein the storage resource is configured to store the information that is received utilizing the Flexray network that is a physical network, for the purpose of sharing the information utilizing the Controller Area Network that is another physical network.

11. The apparatus as recited in claim 1, wherein the hardware processor and the instructions are for releasing the storage resource after the storing.

12. The apparatus as recited in claim 1, wherein the apparatus is configured such that the information is replicated among a plurality of the storage resources.

13. The apparatus as recited in claim 1, wherein the apparatus is configured such that both past and present instances of the information are stored on the storage resource.

14. The apparatus as recited in claim 1, wherein a plurality of the storage resources are included which are organized in a hierarchical manner.

15. The apparatus as recited in claim 1, wherein the apparatus is configured such that different processes are capable of accessing multiple sections of the storage resource.

16. The apparatus as recited in claim 15, wherein the different processes include local processes.

17. The apparatus as recited in claim 15, wherein the different processes include remote processes.

18. The apparatus as recited in claim 15, wherein the different processes include both event triggered processes and time triggered processes.

19. The apparatus as recited in claim 1, wherein the apparatus is configured such that a storage resource manager sends notifications to different processes based on a state of the information stored utilizing the storage resource.

20. The apparatus as recited in claim 1, wherein the apparatus is configured such that the information is shared without multiplexing.

21. The apparatus as recited in claim 1, wherein the apparatus is configured such that at least one of a plurality of different processes process the information in a manner that is isolated from temporal characteristics associated with at least one of the Controller Area Network or the Flexray Network.

22. The apparatus as recited in claim 1, wherein the apparatus is configured such that the information is shared in a single task.

23. The apparatus as recited in claim 1, wherein the apparatus is configured such that the information is shared according to a schedule.

24. The apparatus as recited in claim 1, wherein the apparatus is configured such that the information is shared with an operating system.

25. The apparatus as recited in claim 1, wherein the apparatus is configured such that dynamic preemptive scheduling is provided.

26. The apparatus as recited in claim 1, wherein the apparatus is configured such that the storage resource is protected utilizing a schedule that allows information sharing utilizing the storage resource.

27. The apparatus as recited in claim 1, wherein the apparatus is configured such that the storage resource is protected utilizing semaphores.

28. The apparatus as recited in claim 1, wherein the apparatus is configured such that the information is shared according to an internal clock.

**29**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared according to an external clock.

**30**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that objects are generated based on a change of state of the information stored utilizing the storage resource.

**31**. The apparatus as recited in claim **30**, wherein the objects include at least one of flags, events, signals, or interrupts.

**32**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is stored in response to interrupts associated with different processes.

**33**. The apparatus as recited in claim **1**, wherein the storage resource is replicated through a distributed system.

**34**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared by the automotive electronic control unit with only a portion of a network communication protocol header.

**35**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource updates at least one process with the information at a first rate that differs from a second rate with which at least one other process sends the information to the storage resource.

**36**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that event triggers are provided independent of a link connection between nodes where different processes are performed.

**37**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that failure redundancy is provided across multiple independent links across diverse physical connections.

**38**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is accessed with guaranteed access times.

**39**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is accessed with guaranteed jitter.

**40**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is accessed with guaranteed bandwidth.

**41**. The apparatus as recited in claim **1**, wherein the information has a user-configured constraint associated therewith.

**42**. The apparatus as recited in claim **41**, wherein the constraint includes a memory constraint.

**43**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is processed utilizing a first storage resource and stored utilizing a second storage resource.

**44**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that instances of the information are time-stamped when stored utilizing the storage resource for temporal reference.

**45**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource updates different processes based on an event.

**46**. The apparatus as recited in claim **1**, wherein the apparatus is part of an embedded system.

**47**. The apparatus as recited in claim **1**, wherein the instructions include code.

**48**. The apparatus as recited in claim **1**, wherein the apparatus includes middleware.

**49**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for multicasting the information to the Flexray Network in addition to at least one other different network.

**50**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for concurrently sending the information to the Flexray Network in addition to at least one other network.

**51**. The apparatus as recited in claim **1**, wherein the storage resource includes a multi-mode storage.

**52**. The apparatus as recited in claim **1**, wherein the storage resource includes a section of the memory storage.

**53**. The apparatus as recited in claim **1**, wherein the storage resource is a component of firmware.

**54**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway.

**55**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for sending the information to the Flexray Network in addition to at least one other network.

**56**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for sending the information to multiple Flexray Networks.

**57**. The apparatus as recited in claim **1**, wherein the storage resource includes non-volatile memory and volatile memory.

**58**. The apparatus as recited in claim **1**, wherein the storage resource stores a data entry.

**59**. The apparatus as recited in claim **58**, wherein the data entry includes an array of values.

**60**. The apparatus as recited in claim **58**, wherein the data entry includes an array of values that represents a time series.

**61**. The apparatus as recited in claim **1**, wherein at least one of the determinations is carried out as part of explicit resource management.

**62**. The apparatus as recited in claim **1**, wherein at least one of the determinations is carried out as part of implicit resource management.

**63**. The apparatus as recited in claim **1**, wherein the storage resource includes at least two different types of memory.

**64**. The apparatus as recited in claim **1**, wherein at least one aspect of the storage resource grows linearly with a number of heterogeneous networks to which the apparatus is coupled.

**65**. The apparatus as recited in claim **1**, wherein the information is associated with at least one of engine control or brake control.

**66**. The apparatus as recited in claim **1**, wherein the information is associated with diagnostics.

**67**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of the automotive electronic control units which are each capable of interfacing at least one of an actuator or a sensor.

**68**. The apparatus as recited in claim **67**, wherein the apparatus further includes at least one gateway capable of interfacing the plurality of electronic control units.

**69**. The apparatus as recited in claim **68**, wherein the gateway includes a group gateway.

**70**. The apparatus as recited in claim **68**, wherein the gateway includes a subgroup gateway.

**71**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is a virtual automotive electronic control unit.

**72**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system that is capable of interfacing a diagnostic tool and a design tool.

**73**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers

including an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer.

**74**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers including at least two of an application layer, a middleware layer, a real-time operating apparatus layer, a device driver layer, and a hardware abstraction layer.

**75**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers including at least three of an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer.

**76**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers including at least four of an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer.

**77**. The apparatus as recited in claim **1**, wherein the storage resource is configured such that temporal behavior of communications does not impact a real-time computing task.

**78**. The apparatus as recited in claim **1**, wherein the storage resource is configured for providing software upgrades for each of a plurality of modules.

**79**. The apparatus as recited in claim **78**, wherein the apparatus is configured such that the software upgrades are downloaded via a communication link.

**80**. The apparatus as recited in claim **1**, wherein the storage resource is configured such that network efficiency is increased by reducing a number of transactions needed to access remote variables.

**81**. The apparatus as recited in claim **1**, wherein the storage resource is a direct-access storage resource.

**82**. The apparatus as recited in claim **1**, wherein the apparatus is configured so as to avoid a network layer translation of the message.

**83**. The apparatus as recited in claim **1**, wherein the storage resource is configured so as to allow cross-network variable sharing though vertical real-time replication of data.

**84**. The apparatus as recited in claim **1**, wherein the storage resource is configured to restrict information access to certain levels in a particular network.

**85**. The apparatus as recited in claim **1**, wherein the storage resource is configured to restrict information access to certain network levels, while allowing replication of the information to nodes.

**86**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that multiple modes of operation are enabled in order to provide for a guaranteed deterministic behavior.

**87**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that multiple modes of operation are enabled, wherein at least one of the modes includes a secured configuration or upgrade mode that allows changes to configuration and/or functions.

**88**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that multiple modes of operation are enabled, wherein at least one of the modes includes a diagnostic mode.

**89**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that a topology of a distributed computing and communication system is capable of being designed independent of a definition of individual functions that a particular network performs.

**90**. The apparatus as recited in claim **1**, and further comprising: a hardware abstraction layer that allows a

system developer to adapt a real-time operating system and a plurality of device drivers to a specific hardware implementation of the automotive electronic control unit.

**91**. The apparatus as recited in claim **90**, and further comprising: middleware that has access to the real-time operating system, the device drivers, and the hardware abstraction layer.

**92**. The apparatus as recited in claim **91**, wherein the middleware isolates multiple application from input or output functions.

**93**. The apparatus as recited in claim **92**, wherein the middleware allows the multiple applications to share common variables locally.

**94**. The apparatus as recited in claim **91**, wherein the middleware interfaces with input or output mechanisms without utilizing the real-time operating system nor the hardware abstraction layer.

**95**. The apparatus as recited in claim **91**, wherein the middleware is adapted for implementing different types of control of the storage resource.

**96**. The apparatus as recited in claim **95**, wherein the different types of control of the storage resource include implicit control and explicit control.

**97**. The apparatus as recited in claim **95**, wherein the different types of control of the storage resource include a control associated with the identifying, the issuing of the storage resource request, the storing of the information, and the sharing.

**98**. The apparatus as recited in claim **1**, and further comprising: a data integrity watchdog that analyses stored state variables for integrity and generates events or flags if a problem occurs.

**99**. The apparatus as recited in claim **1**, wherein the information includes state variables that are converted before storage utilizing the storage resource.

**100**. The apparatus as recited in claim **99**, wherein the state variables are converted for offset compensation in connection with the state variables.

**101**. The apparatus as recited in claim **1**, wherein the storage resource takes a form of storage other than a buffer.

**102**. An apparatus, comprising:

an automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired communication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Controller Area Network protocol associated with a Controller Area Network;

issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

in the event the storage resource is available, store the information utilizing the storage resource; and

share the information in less than one millisecond utilizing a Flexray network protocol associated with a Flexray network;

wherein the automotive electronic control unit is in hardwired communication with the Controller Area Network and the Flexray network and includes:

a first interface in hardwired communication with the Controller Area Network, the first interface including a first interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a first interface-related network layer component that uses Controller Area Network-related network layer header bits; and

a second interface in hardwired communication with the Flexray network, the second interface including a second interface-related data link layer component that uses Flexray network-related data link layer header bits and a second interface-related network layer component that uses Flexray network-related network layer header bits.

**103.** The apparatus as recited in claim **102**, wherein the information is also shared in less than the one millisecond utilizing, in addition to the Flexray network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits.

**104.** The apparatus as recited in claim **102**, wherein the identifying, the issuing the another storage resource request, and the sending the notification collectively occur in less than one microsecond.

**105.** The apparatus as recited in claim **102**, wherein the identifying, the issuing of the storage resource request, the storing the information, and an initiation of the sharing collectively occur in less than one microsecond.

**106.** The apparatus as recited in claim **102**, wherein the second interface-related network layer component uses the Flexray network-related network layer header bits by adding the Flexray network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Flexray network-related data link layer header bits by adding the Flexray network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Flexray network.

**107.** The apparatus as recited in claim **106**, wherein the first interface-related data link layer component uses the Controller Area Network-related data link layer header bits by removing the Controller Area Network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Controller Area Network-related network layer header bits by removing the Controller Area Network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

**108.** The apparatus as recited in claim **107**, wherein a duration between the information being sent to the automotive electronic control unit and the sharing being completed by the information arriving at a destination, is less than the one millisecond.

**109.** The apparatus as recited in claim **108**, and further comprising: a hardware abstraction layer that allows a system developer to adapt a real-time operating system and a plurality of device drivers to a specific hardware implementation of the automotive electronic control unit.

**110.** The apparatus as recited in claim **109**, and further comprising: middleware that has access to the real-time operating system, the device drivers, and the hardware abstraction layer.

**111.** The apparatus as recited in claim **110**, wherein the middleware isolates multiple application from input or output functions.

**112.** The apparatus as recited in claim **111**, wherein the middleware allows the multiple applications to share common variables locally.

**113.** The apparatus as recited in claim **110**, wherein the middleware interfaces with input or output mechanisms without utilizing the real-time operating system nor the hardware abstraction layer.

**114.** The apparatus as recited in claim **110**, wherein the middleware is adapted for implementing different types of control of the storage resource.

**115.** The apparatus as recited in claim **114**, wherein the different types of control of the storage resource include implicit control and explicit control.

**116.** The apparatus as recited in claim **114**, wherein the different types of control of the storage resource include a control associated with the identifying, the issuing of the storage resource request, the storing the information, and the sharing.

**117.** The apparatus as recited in claim **108**, and further comprising: a data integrity watchdog that analyses stored state variables for integrity and generates events or flags if a problem occurs.

**118.** The apparatus as recited in claim **108**, wherein the information includes state variables that are converted before storage utilizing the storage resource.

**119.** The apparatus as recited in claim **118**, wherein the state variables are converted for scaling the state variables.

**120.** The apparatus as recited in claim **118**, wherein the state variables are converted for offset compensation in connection with the state variables.

**121.** The apparatus as recited in claim **107**, wherein a duration between the information being received at the automotive electronic control unit, and the sharing being completed by arriving at a destination, is less than the one millisecond.

**122.** The apparatus as recited in claim **121**, wherein the first interface-related data link layer component and the second interface-related data link layer component are drivers.

**123.** The apparatus as recited in claim **122**, wherein the first interface-related data link layer component and the second interface-related data link layer component are part of a hardware abstraction layer.

**124.** The apparatus as recited in claim **123**, wherein the hardware processor and the instructions are for releasing the storage resource after the storing.

**125.** The apparatus as recited in claim **121**, wherein the apparatus is configured such that the information is shared without multiplexing.

**126.** The apparatus as recited in claim **102**, where the storage resource is configured to store the information that is received utilizing the Controller Area Network protocol associated with the Controller Area Network that is a first physical network, for the purpose of sharing the information

utilizing the Flexray network protocol associated with the Flexray network that is another physical network.

**127**. The apparatus as recited in claim **102**, wherein the storage resource takes a form of storage other than a buffer.

\* \* \* \* \*

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PURDUE PHARMA L.P. et al.,                )
                                          )
     Plaintiffs,                        )
                                          )
v.                                        )    Civil Action No. 15-1155-RGA-SRF
                                          )
MYLAN PHARMACEUTICALS INC. and )
MYLAN INC.,                               )
                                          )
     Defendants.                        )

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Presently before the court in this patent infringement action is a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by defendants Mylan Inc. ("Mylan") and Mylan Pharmaceuticals Inc. ("MPI") (collectively, "defendants"). (D.I. 23) For the following reasons, I recommend that the court deny the motion.

## II.    BACKGROUND

### A.    The Patent-In-Suit

This action arises out of defendants' submission of Abbreviated New Drug Application ("ANDA") No. 203915 to the United States Food and Drug Administration ("FDA") on November 2, 2015. (D.I. 1 at ¶¶ 1, 31) Plaintiffs Purdue Pharma L.P., Purdue Pharmaceuticals L.P., The P.F. Laboratories, Inc., and Rhodes Technologies (collectively, "plaintiffs") assert that defendants' ANDA filing constitutes infringement of United States Patent No. 9,073,933 ("the '933 patent"), which relates to plaintiffs' OxyContin® brand oxycodone hydrochloride. (*Id.* at ¶¶ 1-2) OxyContin® is an extended-release pain medication. (*Id.* at ¶ 2)

The '933 patent, entitled "Oxycodone Hydrochloride Having Less Than 25 PPM 14-Hydroxycodeinone," was issued on July 7, 2015, naming Robert Chapman, Lonn S. Rider, Qi Hong, Donald Kyle, and Robert Kupper as the inventors. (*Id.* at ¶ 30) The '933 patent is directed to an oxycodone hydrochloride active pharmaceutical ingredient ("API") with low levels of 14-hydroxycodeinone ("14-hydroxy"), and the processes for making the oxycodone hydrochloride composition. ('933 patent, col. 1:25-27) 14-hydroxy belongs to a class of potentially toxic compounds known as alpha, beta unsaturated ketones ("ABUKs") found in oxycodone compositions. (*Id.*, col. 6:51-54); *Chapman v. Casner*, 315 F. App'x 294, 295 (Fed. Cir. 2009).

In a July 1, 2014 office action, the United States Patent and Trademark Office ("PTO") issued a non-final rejection of then-pending claims 71-90 of the '933 patent as unpatentable for obviousness-type double patenting[1] over certain prior art references. Specifically, the examiner rejected the claims as being unpatentable over claims 1 to 14 of U.S. Patent No. 7,683,072 ("the '072 patent"), claims 1 to 9 of U.S. Patent No. 7,674,799 ("the '799 patent"), and claims 38 to 55 of U.S. Patent No. 7,674,800 ("the '800 patent;" together with the '072 patent and the '799 patent, the "low-ABUK patents"), among others.[2]  (D.I. 25, Ex. 8 at 7/1/14 Office Action, ¶¶ 10, 12, 13) The low-ABUK patents share a common specification and priority date with the '933 patent and, like the '933 patent, are directed to reducing the amount of 14-hydroxy in an oxycodone hydrochloride preparation.

---

[1] Claims 71-90 of the '933 patent were also rejected as obvious pursuant to 35 U.S.C. § 103 because the examiner found the claims to be unpatentable over U.S. Patent No. 6,177,567 ("Chiu"), which teaches the preparation of oxycodone by hydrogenation of 14-hydroxy, and other references. (D.I. 25, Ex. 8 at 7/1/14 Office Action, ¶ 6)

[2] The Southern District of New York issued a decision invalidating the low-ABUK patents on January 14, 2014, prior to the office actions and ultimate allowance of the '933 patent. *In re OxyContin Antitrust Litig.*, 994 F. Supp. 2d 367 (S.D.N.Y. 2014).

In response to the obviousness-type double patenting rejection, plaintiffs filed terminal disclaimers on October 1, 2014[3] to dispose of the double-patenting rejection, stating that "[a]pplicants traverse these rejections, but submit herewith terminal disclaimers . . . in an effort to expedite prosecution." (*Id.*, 10/1/14 Response at 13) Plaintiffs expressly stated that "[t]hese terminal disclaimers are being submitted solely for the purpose of removing the double patenting rejections. The filing of these terminal disclaimers is neither an admission of the propriety of the rejections nor an admission that the inventions claimed in present claims 71-90 are not 'independent and distinct' from the inventions of" the low-ABUK patents. (*Id.*)

The PTO issued a final rejection of the '933 patent application on October 31, 2014, rejecting claims 71-90 as obvious under § 103 after concluding that it would have been obvious to one skilled in the art to prepare an oxycodone hydrochloride composition with a reduced amount of 14-hydroxy by dehydrating 8α in view of the FDA's instructions to prepare oxycodone salt with reduced amounts of 14-hydroxy. ('933 patent, 10/31/14 Final Rejection at ¶ 3) The examiner further noted that parent patent application 11/391,897 (the "Chapman application") was invalidated based on an obviousness rejection during an interference proceeding. On January 29, 2015, the examiner held a telephonic interview with plaintiffs to discuss the adverse decision on the claims at issue in the interference proceedings regarding the Chapman application. Plaintiffs filed a response after final rejection on March 4, 2015, further amending the claims to distinguish them from the Chapman application by independently requiring 8α as an element of the claimed composition or process. The PTO issued a notice of

---

[3] Plaintiffs re-filed the terminal disclaimers on May 8, 2015, noting that the previously-filed terminal disclaimers "inadvertently omitted the name of one of the assignees of the instant application (i.e., Rhodes Technologies)." A terminal disclaimer review decision was issued on May 27, 2015 approving the terminal disclaimers.

3

allowance of the amended claims 71-90, renumbered as claims 1-20, on March 23, 2015, after

concluding that the arguments filed on March 4, 2015 were persuasive in overcoming the

obviousness rejections and the addition of the 8α limitation rendered the claims patentably

distinct from the claims at issue in the Chapman interference proceedings.

## B.    The *Teva* Litigation

Plaintiffs previously sued Teva Pharmaceuticals, USA ("Teva") in the Southern District

of New York,[4] alleging infringement of the low-ABUK patents. *In re OxyContin Antitrust Litig.*,

994 F. Supp. 2d 367 (S.D.N.Y. 2014). The claims of the '799 and '072 patents are directed to

oxycodone hydrochloride, with the '799 patent claiming an "oral dosage form" of low-ABUK

oxycodone hydrochloride. *Id.* at 387-88. The asserted claims of the '800 patent recite a process

for preparing an oxycodone salt substantially free of 14-hydroxy. *Id.* at 387. The Southern

District of New York held that Teva infringed all of the asserted product-by-process claims, but

concluded that those claims were invalid for obviousness pursuant to 35 U.S.C. § 103. *Id.* at 403

("For purposes of validity, the Court considers only the product limitations of a claim, not

process limitations or source limitations that add no patentable significance to the end product.").

The court acknowledged that plaintiffs discovered 8α as the source of the 14-hydroxy problem,

---

[4] Plaintiffs also previously sued Mylan for infringement of the low-ABUK patents. The Federal
Circuit set forth the procedural history of the litigation over the low-ABUK patents as follows:

> In March 2011, Purdue sued Teva for infringement of the low-ABUK patents in
> response to Teva's filing of an ANDA seeking FDA approval to market generic
> versions of Reformulated OxyContin®. Between November 2011 and January
> 2013, Purdue filed similar lawsuits against Epic, Mylan, and Amneal. In addition,
> in June 2012, Grunenthal and Purdue jointly sued Teva for infringement of the
> '383 patent. The two Teva cases were consolidated and joined with the Epic,
> Mylan, and Amneal cases, along with six actions involving other defendants, in
> multi-district litigation for pretrial purposes.

*Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1350 (Fed. Cir. 2016) (*"Teva"*).

4

and noted that 8α was unknown in the prior art, but the court ultimately did not consider the derived-from-8α language in the low-ABUK patent claims in reaching its conclusion because process limitations in product-by-process claims are disregarded in the obviousness inquiry, and 8α was "largely irrelevant to the process used by Purdue to obtain the product claimed by the patents." *Id.* at 405.

On February 1, 2016, the Federal Circuit affirmed the Southern District of New York's decision regarding the invalidity of the low-ABUK patents, relying on principles specific to product-by-process claims and concluding that the district court did not err in disregarding the 8α limitations in the obviousness inquiry. *Teva,* 811 F.3d at 1352-54. The district court's invalidity determination was therefore upheld with respect to claims 3 and 19 of the '799 patent, claims 30-34 and 76-79 of the '800 patent, and claims 1, 4, and 5 of the '072 patent. *Id.*; *In re OxyContin,* 994 F. Supp. 2d at 438. On April 1, 2016, plaintiffs petitioned for rehearing en banc of the Federal Circuit's decision in the *Teva* appeal. (D.I. 28, Ex. 1) Plaintiffs' petition for rehearing en banc was denied by the Federal Circuit on May 4, 2016, and plaintiffs' subsequent petition for a writ of certiorari before the United States Supreme Court was denied on November 14, 2016. (D.I. 33; D.I. 51)

## C. The Chapman Application

The low-ABUK patents and the '933 patent are continuations of the Chapman application, which was filed on March 29, 2006. *In re OxyContin,* 994 F. Supp. 2d at 388. The Chapman application recited a "process for preparing oxycodone hydrochloride having less than 25 ppm [14-hydroxy]." *Id.* During an interference proceeding on April 19, 2007 involving claims 96-188 of the Chapman application, the Board of Patent Appeals and Interferences (the

5

"BPAI")[5] declared an interference between the Chapman application and U.S. Patent No. 7,153,966 ("Casner"). On March 18, 2008, the BPAI found that independent claim 96 of the Chapman application and the dependent claims thereof were invalid as obvious in view of U.S. Patent No. 7,153,966 ("*Casner*"), and the Federal Circuit affirmed. *See Chapman v. Casner*, C.A. No. 08-1427, 315 F. App'x 294, 295 (Fed. Cir. Mar. 11, 2009); (D.I. 25, Ex. 10, 3/13/08 Order). The adjudicated Chapman application claims related to a method for making oxycodone API using a hydrogenation step to remove 14-hydroxy, but they did not require that some of the remaining 14-hydroxy be derived from the 8α isomer. *Teva*, 811 F.3d at 1349. In holding that the claims at issue were unpatentable under § 103, the BPAI relied on the lack of any reference in the claims to 8α as the source of the 14-hydroxy, noting that "[b]ecause the claims did not specify the source of the 14-hydroxy, any prior art reference that disclosed conditions under which either 8α or 8β converted to 14-hydroxy would render the claim obvious." *Id.* (citing *Chapman*, 315 F. App'x at 297). Because the prior art references disclosed conditions under which 8β converts to 14-hydroxy, the BPAI determined that the Chapman application claims were obvious in view of the prior art. *Id.*

## III. LEGAL STANDARD

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

---

[5] Pursuant to the America Invents Act of 2011, the BPAI subsequently changed its name to the Patent Trial and Appeal Board ("PTAB") when the legislation went into effect on September 16, 2012.

6

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

When determining whether dismissal is appropriate, the court must take three steps.[6] *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must identify the elements of the claim. *Iqbal*, 556 U.S. at 675. Second, the court must identify and reject conclusory allegations. *Id.* at 678. Third, the court should assume the veracity of the well-pleaded factual allegations identified under the first prong of the analysis, and determine whether they are sufficiently alleged to state a claim for relief. *Id.*; *see also Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The third prong presents a context-specific inquiry that "draw[s] on [the court's] experience and common sense." *Id.* at 663-64; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). As the Supreme Court instructed in *Iqbal*, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

---

[6]Although *Iqbal* describes the analysis as a "two-pronged approach," the Supreme Court observed that it is often necessary to "begin by taking note of the elements a plaintiff must plead to state a claim." 556 U.S. at 675, 679. For this reason, the Third Circuit has adopted a three-pronged approach. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

## IV. DISCUSSION

In support of their motion to dismiss, defendants contend that collateral estoppel bars plaintiffs from relitigating the previously-adjudicated issue of the invalidity of claims requiring oxycodone products with low levels of 14-hydroxy. (D.I. 24 at 8-18) In response, plaintiffs allege that the '933 patent has never been adjudicated and includes limitations that have never been addressed in previous litigations. (D.I. 28 at 8) Moreover, plaintiffs argue that applying collateral estoppel to different patent claims from those previously adjudicated requires an intense factual analysis that would be premature at this stage of the litigation. (*Id.* at 11)

As a preliminary matter, the court notes that collateral estoppel may be decided on a motion to dismiss under Rule 12(b)(6). *M & M Stone Co. v. Pennsylvania*, 388 F. App'x 156, 162 (3d Cir. 2010). In considering the motion, the court "may consider 'matters incorporated by reference integral to the claim, items subject to judicial notice, matters of public record, orders [and] items appearing in the record of the case.'" *Thibault v. Del. Tech. & Cmty. Coll.*, C.A. No. 11-1080-MPT, 2012 WL 2073847, at *2 (D. Del. June 8, 2012) (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)). Matters of public record may include prior judicial opinions and patent prosecution histories, among other things. *See M & M Stone*, 388 F. App'x at 162; *Genetic Techs Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 526 (D. Del. 2014).

In *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1971), the Supreme Court held that defensive collateral estoppel may be used in the patent context if the accused infringer shows: "(1) that a patent was found invalid in a prior case that had proceeded through final judgment and in which all procedural opportunities were available to the patentee; (2) that the issues litigated were identical; and (3) that the party against whom estoppel is applied had a full and fair opportunity to litigate." *Abbott Labs. v. Andrx Pharma.*,

8

*Inc.*, 473 F.3d 1196, 1203 (Fed. Cir. 2007). Regional circuit law controls the determination of whether prior findings invoke collateral estoppel pursuant to these guidelines. *Id.* at 1202-03. In this regard, the Third Circuit has held that collateral estoppel applies when "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (citations omitted). Although collateral estoppel may apply even when the previously-litigated patent claims are not identical to the claims at issue in the patent-in-suit, "the differences between the unadjudicated patent claims and adjudicated patent claims" cannot "materially alter the question of invalidity." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013).

For the reasons set forth below, I recommend that the court deny the pending motion to dismiss. At this stage of the proceedings, defendants have failed to establish that the invalid claims of the previously-litigated low-ABUK patents are sufficiently identical to the disputed claims of the '933 patent. The claims of the '933 patent contain limitations not set forth in the low-ABUK patents, but whether these limitations are material to the patentability of the '933 patent is a question of fact to be reserved for a later stage of the proceedings.

## A.   Product Claims 1 & 16 of the '933 Patent

### 1.   8α limitation

The inclusion of the 8α limitation as a required element in claims 1 and 16 of the '933 patent distinguishes those claims from the claims of the low-ABUK patents and the Chapman application. Specifically, independent claims 1 and 16 of the '933 patent claim "[a]n oxycodone hydrochloride composition," which "comprises . . . 8α, 14-dihydroxy-7, 8-dihydrocodeinone."

9

The "well understood" definition of "comprising" is "including but not limited to." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1319 (Fed. Cir. 2009); *see also Glaxo Group LTD v. Teva Pharms. USA, Inc.*, 2009 WL 1220544, at \*2 (D. Del. Apr. 30, 2009) (Comprising "is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.") (internal quotations omitted).

In contrast, the product-by-process claim language of the low-ABUK patents does not necessarily require the 8α required by the '933 patent product claims. The '072 patent claims "[a]n oxycodone hydrochloride active pharmaceutical ingredient having less than 25 ppm 14-hydroxycodeinone, wherein at least a portion of the 14-hydroxycodeinone is derived from 8α, 14-dihydroxy-7, 8-dihydrocodeinone." ('072 patent, col. 34:57-60) Claim 1 of the '799 patent claims "[a]n oral dosage form comprising particles . . . wherein at least a portion of the 14-hydroxycodeinone is derived from 8α, 14-dihydroxy-7, 8-dihydrocodeinone." ('799 patent, col. 34:54-59) Claim 38 of the '800 patent claims "[a]n oxycodone hydrochloride composition having less than 25 ppm 14-hydroxycodeinone . . . wherein at least a portion of the 14-hydroxycodeinone in the composition having more than 100 ppm 14-hydroxycodeinone was derived from the 8α, 14-dihydroxy-7, 8-dihydrocodeinone component during the conversion of the oxycodone free base to the oxycodone salt." ('800 patent, col. 36:1-21) The "derived from 8α" language of the low-ABUK product-by-process patent claims does not transform 8α into a required claim limitation, unlike the "comprises" language in the '933 patent product claims. Whether the 8α limitation in the '933 patent renders claims 1 and 16 patentably distinct from the invalid low-ABUK claims is a question of fact not properly resolved at this stage of the proceedings.

10

The Federal Circuit and district court decisions in the *Teva* litigation illustrate why the invalidity determination regarding the low-ABUK patents is insufficient to have collateral estoppel effect on the validity of the '933 patent at this stage of the proceedings. In *Teva*, the Federal Circuit concluded that determining the source of 14-hydroxy in the end product did not need to be resolved to arrive at the claimed invention, which was an oxycodone API with low-ABUK levels. *Teva*, 811 F.3d at 1352. The Federal Circuit also held that identification of the source of the remaining 14-hydroxy as being 8α had no effect on the structure or nature of the low-ABUK oxycodone product. *Id.*; *see also In re OxyContin*, 994 F. Supp. 2d at 405. The Federal Circuit's reasoning was based on the fact that the "derived from 8α" limitation in the low-ABUK patents was a process limitation in a product-by-process claim that was thus immaterial to the obviousness analysis. *Id.* at 1353-54 ("Because the source of the 14-hydroxy has no effect on its structure or its removal through hydrogenation, the limitation that it be 'derived from 8α' cannot be a structural limitation.").

"A product-by-process claim is 'one in which the product is defined at least in part in terms of the method or process by which it is made.'" *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1315 (Fed. Cir. 2006) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 158 n. (1989)). "In determining validity of a product-by-process claim, the focus is on the product and not the process of making it" because "an old product is not patentable even if it is made by a new process." *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) (quoting *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1369 (Fed. Cir. 2009)) (internal quotation marks omitted); *see also SmithKline*, 439 F.3d at 1317. As a result, "[i]f the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a

different process." *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985). However, if the process limitations impart "structural and functional differences" to the product, converting the product into something that is actually "new," the structural and functional differences are relevant to the analysis even when they are "not explicitly part of the claim[s]." *Amgen*, 580 F.3d at 1367, 1370.

Unlike the product-by-process claims of the low-ABUK patents, claims 1 and 16 of the '933 patent are product claims with a mandatory 8α limitation. Although the "derived from 8α" limitation in the low-ABUK patents had no bearing on the invalidity determination because the 8α process was immaterial to the obviousness analysis, the 8α limitation present in the '933 patent claims must be evaluated to determine the validity of the claims. The 8α limitation in the '933 patent could therefore be material to patentability, and it would be premature to grant the motion to dismiss before a factual analysis of this issue occurs. The prosecution history of the '933 patent also confirms the significance of the 8α limitations in the claims of the '933 patent, as plaintiffs overcame the Chapman application by demonstrating that "[t]he claims at issue in the interference proceedings . . . did not recite" 8α. ('933 patent, 3/4/14 Applicant Arguments / Remarks Made in an Amendment at 5; 3/23/15 Notice of Allowance at ¶ 4)

Defendants refer to the PTO's double patenting rejection of the '933 patent and plaintiffs' terminal disclaimers of the low-ABUK patents in response thereto in support of their contention that the validity issues for the '933 patent are substantially identical to the validity issues that rendered the low-ABUK patents invalid. (D.I. 24 at 9-10) A double patenting rejection is issued when a continuation application,[7] defined as "a second application for the same invention

---

[7] Continuation applications allow inventors to file new patent applications based on the disclosures of previous applications, without having the previous applications treated as

12

claimed in a prior nonprovisional application," MPEP § 201.07 (9th ed. 2014), is not patentably distinct from the parent, *In re Berg*, 140 F.3d 1428, 1432 (Fed. Cir. 1998). "Uniformly, unlike examination for obviousness based on prior art, the issue of obviousness-type double patenting is directed to whether the invention claimed in a later patent is an obvious variant of the invention claimed in an earlier patent." *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 625 F.3d 719, 722 (Fed. Cir. 2010). As such, "the disclosure of a patent cited in support of a double patenting rejection cannot be used as though it were prior art, even where the disclosure is found in the claims." *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1277 (Fed. Cir. 1992); *see also In re Kaplan*, 789 F.2d 1574, 1579 (Fed. Cir. 1986) ("In considering the question [of obviousness-type double patenting], the patent disclosure may not be used as prior art.").

The purpose of the judicially-created doctrine of obviousness-type double patenting is "to prevent improper timewise extension of the patent right by prohibiting the issuance of claims in a second patent which are not 'patentably distinct' from the claims of a first patent." *In re Braat*, 937 F.2d 589, 592 (Fed. Cir. 1991). The filing of a terminal disclaimer overcomes an obviousness-type double patenting rejection by "foregoing that portion of the term of the second patent that extends beyond the term of the first." *In re Berg*, 140 F.3d at 1432 (citing *In re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993)). As a result, the "filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 874 (Fed. Cir. 1991) (concluding that a terminal disclaimer "is not an admission of obviousness of the later-filed claimed invention in light of the earlier-

---

invalidating prior art. *Word to Info, Inc. v. Google Inc.*, 140 F. Supp. 3d 986, 991 (N.D. Cal. 2015).

13

filed disclosure, for that is not the basis of the disclaimer."); *see also Edwards Lifesciences Corp. v. St. Jude Med., Inc.*, 2003 WL 25784357, at \*11 n.19 (C.D. Cal. Aug. 29, 2003) ("[A]n obviousness-type double-patenting rejection is issued when the PTO considers pending claims obvious in view of another patent by the same inventor; such rejection does not mean that the respective claims are considered the same.").

In the present matter, defendants filed terminal disclaimers, but expressly stated that "[t]hese terminal disclaimers are being submitted solely for the purpose of removing the double patenting rejections. The filing of these terminal disclaimers is neither an admission of the propriety of the rejections nor an admission that the inventions claimed in present claims 71-90 are not 'independent and distinct' from the inventions of" the low-ABUK patents. (D.I. 25, Ex. 8 at 10/1/14 Response at 13) The filing of the terminal disclaimers does not constitute acquiescence to the merits of the rejection. *See Quad Envtl.*, 946 F.2d at 874; *Edwards Lifesciences*, 2003 WL 25784357, at \*11 n.19. Thus, the only practical effect of the terminal disclaimers was to limit the term of the '933 patent to the full statutory term of the low-ABUK patents. The foregoing analysis of the claim language of the '933 patent compared to the low-ABUK patents further demonstrates that the '933 patent contains additional limitations not required by the low-ABUK patents, and it is premature for the court determine with certainty that these limitations do not render the claims patentably distinct from the low-ABUK patents.

Defendants also rely on the doctrine of inherency in support of their argument that the '933 patent should be invalidated based on its similarities to the invalid low-ABUK patents. (D.I. 24 at 13-14; D.I. 31 at 3-7) Pursuant to the doctrine of inherency, "the discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for

14

the prior art's functioning, does not render the old composition patentably new to the

discoverer." *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999).

As a result, "[t]he express, implicit, and inherent disclosures of a prior art reference may be

relied upon in the rejection of claims under 35 U.S.C. §§ 102 or 103." MPEP § 2112. "[A] prior

art reference may anticipate without disclosing a feature of the claimed invention if that missing

characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering*

*Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

> Inherency, however, may not be established by probabilities or possibilities. The
> mere fact that a certain thing may result from a given set of circumstances is not
> sufficient. If, however, the disclosure is sufficient to show that the natural result
> flowing from the operation as taught would result in the performance of the
> questioned function, it seems to be well settled that the disclosure should be
> regarded as sufficient.

*In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981) (quoting *Hansgirg v. Kemmer*, 102 F.2d 212,

214 (C.C.P.A. 1939)). A party must meet a high standard to rely on inherency in establishing the

existence of a claim limitation in the prior art in an obviousness analysis. *Par Pharm. Inc. v. Twi*

*Pharms., Inc.*, 773 F.3d 1186, 1195-96 (Fed. Cir. 2014). "Whether a claim limitation is inherent

in a prior art reference . . . is also a question of fact." *Finnigan Corp. v. Int'l Trade Comm'n*,

180 F.3d 1354, 1362 (Fed. Cir. 1999); *see also S.O.I.Tec Silicon On Insulator Techs., S.A. v.*

*MEMC Elec. Materials, Inc.*, 745 F. Supp. 2d 489, 513 (D. Del. 2010) ("Inherency is a factual

issue."); *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir.

1991).

The inherency doctrine does not apply under the facts presently before the court. As

previously discussed in conjunction with the obviousness-type double patenting analysis, the

low-ABUK patents are not prior art references in relation to the '933 patent because the '933

15

patent is a continuation of the low-ABUK patents. *Gen. Foods Corp.*, 972 F.2d at 1277.
Defendants cite the Southern District of New York's decision in *Abbvie Inc. v. Kennedy Trust for Rheumatology Research*, 2014 WL 3360722, at \*6-7 (S.D.N.Y. July 9, 2014), to support the application of the inherency doctrine to non-prior art references to establish collateral estoppel. In *Abbvie*, the court granted summary judgment, invalidating the patent claims on grounds of collateral estoppel based on an obviousness-type double patenting rejection. *Id.* The court discussed inherency without acknowledging that the previously-litigated patents were not prior art. *Id.* This case contradicts the Federal Circuit's decision in *Quad Environmental Technologies*, which held that the filing of a terminal disclaimer did not raise estoppel issues on the merits of the double patenting rejection. 946 F.2d at 874. It is also inconsistent with the decision in *Bourns, Inc. v. United States*, which observed that "[a] domino approach in which each successively narrower claim is compared with the one before it, not with the prior art, is inappropriate since it improperly gives prior-art effect to the subject matter of an invalid claim." 537 F.2d at 493. In this instance, I recommend that the court follow Federal Circuit precedent over the Southern District of New York's unpublished decision in *Abbvie*.

Even if the court were to credit defendants' authority, courts have routinely held that the inherent teaching of a prior art reference is a question of fact. *See Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1320-21 (Fed. Cir. 2004); *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995). As previously stated, fact-based inquiries are premature for resolution at this stage of the proceedings. This is particularly true where, as here, the case authorities relied upon by the defendants represent decisions on summary judgment or thereafter. *See Abbvie*, 2014 WL 3360722, at \*6-7 (decided on summary judgment). None of defendants' authority was decided on a motion to dismiss, and a question of fact remains in the present case regarding whether the

16

differences between the unadjudicated patent claims and the adjudicated claims materially alter the question of validity. *See Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311 (Fed. Cir. 2015) (post-verdict judgment as a matter of law); *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333 (Fed. Cir. 2013) (summary judgment); *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362 (Fed. Cir. 2012) (post-trial appeal of final judgment); *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344 (Fed. Cir. 2012) (post-trial appeal of final judgment); *In re Kao*, 639 F.3d 1057 (Fed. Cir. 2011) (review of BPAI decision assessing whether obviousness determinations were based on substantial evidence); *Bourns Inc. v. U.S.*, 537 F.2d 486 (Ct. Cl. 1976) (summary judgment); *Westwood Chem., Inc. v. U.S.*, 525 F.2d 1367 (Ct. Cl. 1975) (summary judgment). As such, resolution at this stage of the proceedings would be premature.

## 2. 95% limitation

The low-ABUK patent claims do not recite any percentage of oxycodone hydrochloride, whereas claims 1 and 16 of the '933 patent specify that the composition must comprise at least 95% oxycodone hydrochloride. ('933 patent, col. 6:3-8; '072 patent, col. 5:65-6:3) Defendants refer to the low-ABUK patent specification, which indicates that the composition "preferably" contains at least 95% oxycodone hydrochloride or higher, as evidence that plaintiffs did not intend to exclude this limitation from the low-ABUK patent claims. (D.I. 24 at 12-13) However, the claims of the low-ABUK patents do not recite the 95% limitation. To the extent that the 95% limitation is identified in the patent specifications of the low-ABUK patents, the court notes that patent claims are evaluated for invalidity. Although the claims must be analyzed in view of the specification, preferred embodiments identified in the specification cannot be

17

improperly imported into the language of the claims themselves. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323-24 (Fed. Cir. 2005).

As previously explained in connection with the 8α limitation, whether a product containing 95% oxycodone is novel over the low-ABUK patents is a question of fact not properly resolved on a Rule 12(b)(6) motion to dismiss. The *Teva* decision does not discuss the percentages of oxycodone in the prior art. Therefore, it would be inappropriate at this stage of the proceedings for the court to conclusively rule that the 95% limitation does not materially affect the patentability of the '933 patent.

### 3.    5 ppm limitation

Claim 16 of the '933 patent contains another limitation requiring that the composition "comprises . . . less than 5 ppm of codeinone." This limitation was not present in the low-ABUK patent claims, and codeinone was not discussed in the course of the *Teva* litigation or the Chapman interference proceedings. Whether the limitation represents only a slight difference that does not render claim 16 patentably distinct from the adjudicated low-ABUK claims is an issue of fact not properly resolved on a motion to dismiss. The fact that the low-ABUK patent specification states that the present invention may reduce other ABUKs, such as codeinone, does not establish that codeinone is necessarily present in the specific 5 ppm quantity in the adjudicated claims. *See Phillips*, 415 F.3d at 1323-24. Moreover, the 5 ppm limitation of claim 16 is narrower than the low-ABUK claims, which have limits of 25 ppm, and the adjudicated low-ABUK claims therefore cover oxycodone hydrochloride that is less pure than the recitation of oxycodone hydrochloride with less than 5 ppm of 14-hydroxy in claim 16 of the '933 patent. *See Bourns*, 537 F.2d at 493 ("A domino approach in which each successively narrower claim is compared with the one before it, not with the prior art, is inappropriate since it improperly gives

18

prior-art effect to the subject matter of an invalid claim."). Because the *Teva* litigation did not address the narrower 5 ppm limitation, and the question of whether the difference in claim language materially alters the patentability of claim 16 is fact-intensive, the court cannot rule at this stage of the proceedings that collateral estoppel should apply to invalidate claim 16 of the '933 patent.

## B. Process Claim 10 of the '933 Patent

The claimed processes in claim 10 of the '933 patent require the step of removing 8α from an oxycodone base composition. ('933 patent, col. 34:27-35:27) In contrast, the Federal Circuit in *Teva* declined to consider process limitations in concluding that the disputed product-by-process claims were invalid. *See Teva*, 811 F.3d at 1354 ("We also conclude that, because 'derived from 8α[]' is a process limitation, the district court did not err in disregarding the limitation in its obviousness analysis."). Questions regarding whether hydrogenation was well-known in the art and whether the process of removing 8α from an oxycodone base composition is material to the patentability of the '933 patent claims are factual in nature and are not properly resolved on a motion to dismiss. Moreover, the process claims at issue in the Chapman interference proceedings did not recite an 8α limitation.

A petition for rehearing en banc before the Federal Circuit in the *Teva* litigation was denied on May 4, 2016. (D.I. 33, Ex. 1) On November 14, 2016, the United States Supreme Court denied the petitions for writ of certiorari. *Purdue Pharma L.P., et al. v. Epic Pharma, LLC, et al.*, 137 S. Ct. 475 (2016); *Grunenthal GmbH v. Teva Pharms. USA, Inc., et al.*, 137 S. Ct. 476 (2016).

19

## V.  CONCLUSION

For the foregoing reasons, I recommend that the court deny defendants' motion to dismiss pursuant to Rule 12(b)(6).  (D.I. 23)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objections and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: March 1, 2017

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

20